# SPARF AND HANSEN *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF CALIFORNIA.

No. 613. Submitted March 5, 1894. — Decided January 21, 1895.

If one of two persons accused of having together committed the crime of
murder makes a voluntary confession in the presence of the other, under
such circumstances that he would naturally have contradicted it if he did
not assent, the confession is admissible in evidence against both.

If two persons are indicted and tried jointly for murder, declarations of one
made after the killing and in the absence of the other, tending to prove
the guilt of both, are admissible in evidence against the one making the
declarations, but not against the other.

An objection to the admissibility of such evidence, made at the trial in the
name of both defendants, on the general ground that it was irrelevant,
immaterial, and incompetent, furnishes, if the testimony be admitted, suf-
ficient ground in case of conviction for bringing the case to this court,
and warrants the reversal of the conviction of the defendant against
whom it was not admissible.

Confession of a person imprisoned and in irons, under an accusation of hav-
ing committed a capital offence, are admissible in evidence against him,
if they appear to have been voluntary, and not obtained by putting him
in fear, or by promises.

Section 1035 of the Revised Statutes does not authorize a jury in a criminal
case to find the defendant guilty of a less offence than the one charged,
unless the evidence justifies it; but it enables the jury, in case the de-
fendant is not shown to be guilty of the particular crime charged, to find
him guilty of a lesser offence necessarily included in the one charged, or
of the attempt to commit the one charged, when the evidence permits
that to be done.

In the courts of the United States it is the duty of the jury, in criminal
cases, to receive the law from the court, and to apply it as given by the
court, subject to the condition that by a general verdict a jury of neces-
sity determines both law and fact as compounded in the issue submitted
to them in the particular case.

In criminal cases it is competent for the court to instruct the jury as to the
legal presumptions arising from a given state of facts ; but it may not,
by a peremptory instruction, require the jury to find the accused guilty of
the offence charged, nor of any offence less than that charged.

On the trial in a court of the United States of a person accused of commit-
ting the crime of murder, if there be no evidence upon which the jury
can properly find the defendant guilty of an offence included in or less
than the one charged, it is not error to instruct them that they cannot
return a verdict of guilty of manslaughter, or of any offence less than

the one charged; and, in such case, if the defendant was not guilty of the offence charged, it is the duty of the jury to return a verdict of not guilty.

THE case is stated in the opinion.

*Mr. J. F. Smith* and *Mr. F. J. Kierce* for plaintiffs in error.

*Mr. Assistant Attorney General Conrad* for defendants in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

The plaintiffs in error and Thomas St. Clair were indicted jointly for the murder of Maurice Fitzgerald upon the high seas, on board of an American vessel, the bark Hesper, as set forth in the indictment mentioned in *St. Clair v. United States*, 154 U. S. 134. On motion of the accused it was ordered that they be tried separately. St. Clair was tried, found guilty of murder, and sentenced to suffer the punishment of death. Subsequently the order for separate trials was set aside, and the present defendants were tried together, and both were convicted of murder. A motion for a new trial having been overruled, a like sentence was imposed upon them.

The general facts of this case do not differ from those proved in St. Clair's case, and some of the questions arising upon the present assignments of error were determined in that case. Only such questions will be here examined as were not properly presented or did not arise in the other case, and as are of sufficient importance to require notice at our hands.

In the night of January 13, 1893, Fitzgerald, the second mate of the Hesper, was found to be missing, and it was believed that he had been killed and his body thrown overboard. Suspicion being directed to St. Clair, Sparf, and Hansen, part of the crew of the Hesper, as participants in the killing, they were put in irons by order of Captain Sodergren, master of the vessel; and were so kept during the

voyage from the locality of the supposed murder to Tahiti, an island in the South Pacific belonging to the French government. They were taken ashore by the United States consul at that island, and subsequently were sent, with others, to San Francisco on the vessel Tropic Bird.

At the trial, Captain Sodergren, a witness for the government, was asked whether or not after the 13th day of January and before reaching Tahiti — which was more than one thousand miles from the locality of the alleged murder — he had any conversation with the defendant Hansen about the killing of Fitzgerald. This question having been answered by the witness in the affirmative, he was fully examined as to the circumstances under which the conversation was held. He said among other things that no one was present but Hansen and himself. Being asked to repeat the conversation referred to, the accused, by the counsel who had been appointed by the court to represent them, objected to the question as "irrelevant, immaterial, and incompetent, and upon the ground that any statement made by Hansen was not and could not be voluntary." The objection was overruled, and the defendants duly excepted. The witness then stated what Hansen had said to him. That evidence tended strongly to show that Fitzgerald was murdered pursuant to a plan formed between St. Clair, Sparf, and Hansen; that all three actively participated in the murder; and that the crime was committed under the most revolting circumstances.

Thomas Green and Edward Larsen, two of the crew of the Hesper, were also witnesses for the government. They were permitted to state what Hansen said to them during the voyage from Tahiti to San Francisco. This evidence was also objected to as irrelevant, immaterial, and incompetent, and upon the further ground that the statement the accused was represented to have made was not voluntary. But the objection was overruled and an exception taken.

Upon the conclusion of the evidence the defendants requested certain instructions which the court refused to give, and they excepted to its action in that particular, as well as to certain parts of the charge to the jury.

1. The declarations of Hansen, as detailed by Sodergren, Green, and Larsen, were clearly admissible in evidence against him. There was no ground on which their exclusion could have been sustained. In reference to this proof, the court charged the jury that if they believed from the evidence that Green and Larsen or either of them were accomplices in the commission of the acts charged in the indictment, they should act upon their testimony with great caution, subjecting it to a careful examination in the light of all the other evidence, and ought not to convict upon their testimony alone, unless satisfied beyond reasonable doubt of its truth; that if Larsen and Green or either of them or any other person were induced to testify by promises of immunity from punishment, or by hope held out from any one that it would go easier with them in case they disclosed their confederates, or in case they implicated some one else in the crime, this must be taken into consideration in determining the weight to be given to their testimony, and should be closely scrutinized; that the confessions of a prisoner out of court and in custody made to persons having no authority to examine him, should be acted upon and received with great care and caution; that words are often misreported through ignorance, inattention, or malice, are extremely liable to misconstruction, are rarely sufficient to warrant conviction as well on account of the great danger of mistake upon the part of the witness, as of the fact that the mind of the prisoner himself may be oppressed by his situation or influenced by motives of hope or fear to make an untrue confession; that in considering the weight to be given to the alleged confessions of the defendants, the jury were to consider their condition at the time they were made, the fact that they had been charged with crime, and were in custody; and that the jury were to determine whether those confessions were voluntary or whether any inducements were held out to them by any one. The defendants did not offer themselves as witnesses, and the court took care to say that a person charged with crime is under no obligation to testify in his own behalf, and that his neglect to testify did not create any presumption whatever against him.

So far as the record discloses, these confessions were entirely free and voluntary, uninfluenced by any hope of reward or fear of punishment. In *Hopt* v. *Utah*, 110 U. S. 574, 584, it was said : " While some of the adjudged cases indicate distrust of confessions which are not judicial, it is certain, as observed by Baron Parke, in *Regina* v. *Baldry*, 2 Dennison & Pearce Cr. Cas. 430, 445, that the rule against their admissibility has been sometimes carried too far, and in its application justice and common sense have too frequently been sacrificed at the shrine of mercy. A confession, if freely and voluntarily made, is evidence of the most satisfactory character. Such a confession, said Eyre, C. B., *King* v. *Warickshall*, 1 Leach Cr. Law, 263, ' is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, and, therefore, it is admitted as proof of the crime to which it refers.' Elementary writers of authority concur in saying that while from the nature of such evidence it must be subjected to careful scrutiny and received with great caution, a deliberate voluntary confession of guilt is among the most effectual proofs in the law and constitutes the strongest evidence against the party making it that can be given of the facts stated in such confession."

Counsel for the accused insist that there cannot be a voluntary statement, a free open confession, while a defendant is confined and in irons under an accusation of having committed a capital offence. We have not been referred to any authority in support of that position. It is true that the fact of a prisoner being in custody at the time he makes a confession is a circumstance not to be overlooked, because it bears upon the inquiry whether the confession was voluntarily made or was extorted by threats or violence or made under the influence of fear. But confinement or imprisonment is not in itself sufficient to justify the exclusion of a confession, if it appears to have been voluntary, and was not obtained by putting the prisoner in fear or by promises. Wharton's Cr. Ev. 9th ed. §§ 661, 663, and authorities cited. The import of Sodergren's evidence was that when Hansen manifested a desire to speak to him on the subject of the killing, the latter said he did not

wish to hear it, but " to keep it until the right time came and then tell the truth." But this was not offering to the prisoner an inducement to make a confession. Littledale, J., well observed in *Rex* v. *Court*, 7 Car. & P. 486, that telling a man to be sure to tell the truth is not advising him to confess anything of which he is really not guilty. See also *Queen* v. *Reeve*, L. R. 1 C. C. 362. Nothing said to Hansen prior to the confession was at all calculated to put him in fear or to excite any hope of his escaping punishment by telling what he knew or witnessed or did in reference to the killing.

The declarations of Hansen after the killing, as detailed by Green and Larsen, were also admissible in evidence against Sparf, because they appear to have been made in his presence and under such circumstances as would warrant the inference that he would naturally have contradicted them if he did not assent to their truth.

But the confession and declarations of Hansen to Sodergren after the killing of Fitzgerald were incompetent as evidence against Sparf. St. Clair, Hansen, and Sparf were charged jointly with the murder of Fitzgerald. What Hansen said after the deed had been fully consummated, and not on the occasion of the killing and in the presence only of the witness, was clearly incompetent against his codefendant, Sparf, however strongly it tended to connect the latter with the commission of the crime. If the evidence made a case of conspiracy to kill and murder, the rule is settled that " after the conspiracy has come to an end, and whether by success or by failure, the admissions of one conspirator by way of narrative of past facts are not admissible in evidence against the others." *Logan* v. *United States*, 144 U. S. 263, 309 ; *Brown* v. *United States*, 150 U. S. 93, 98 ; Wright's Criminal Conspiracies, Carson's ed. 212, 213, 217 ; 1 Greenleaf, § 233. The same rule is applicable where the evidence does not show that the killing was pursuant to a conspiracy, but yet was by the joint act of the defendants.

The objection to the question, in answer to which the declarations of Hansen to Sodergren were given, was sufficiently specific. The general rule undoubtedly is that an objection

should be so framed as to indicate the precise point upon which the court is asked to rule. It has, therefore, been often held that an objection to evidence as irrelevant, immaterial, and incompetent, nothing more being stated, is too general to be considered on error, if in any possible circumstances it could be deemed or could be made relevant, material, or competent. But this principle will not sustain the ruling by which the declarations of Hansen, made long after the commission of the alleged murder, and not in the presence of Sparf, were admitted as evidence against the latter. In no state of case were those declarations competent against Sparf. Its inadmissibility as to *him* was apparent. It appeared upon the very face of the question itself.

In *People* v. *Beach*, 87 N. Y. 508, 513, which was an indictment for petit larceny, the prosecution offered in evidence the statements of a third party, not in the presence of the accused, which related to the vital point upon which the conviction turned. There was a general objection to the evidence. The court said: " We think, however, the general objection made in this case was sufficient. It appeared, when the objection was made, that the conversation proposed to be shown was between the prosecutor and Hardacre, when the defendant was not present. There was no possible view of the case, as it then or afterward stood, in which such a conversation was admissible. When the witness was asked to state the conversation, and counsel objected, both the court and the prosecuting officer must have understood that it was an objection to the competency of the proposed evidence. If the objection had been made in terms, on the ground that the evidence was incompetent, the sufficiency of the objection could not have been questioned, and the objection, as made, necessarily implied this. Neither the court nor prosecuting attorney could have been misled as to the point of the objection. It was patent on considering the objection in connection with the proof offered. If any doubt could be entertained as to the technical sufficiency of the objection, we should be disinclined in a criminal case, to deprive a defendant of the benefit of an exception by the strict application of a rule more especially

applicable to civil cases, when we can see that its application would produce injustice." And in *Turner* v. *City of Newburgh*, 109 N. Y. 301, 308, it was said: "This court has held that when the objection to evidence is general and it is overruled and the evidence is received, the ruling will not be held erroneous unless there be some grounds which could not have been obviated had they been specified, or unless the evidence in its essential nature be incompetent." *Tozer* v. *N. Y. Central & Hudson River Railroad*, 105 N. Y. 659; *Alcorn* v. *Chicago & Alton Railway*, 108 Missouri, 81; *Curr* v. *Hundley*, (Colorado) 31 Pac. Rep. 939, 940; *McCaden* v. *Lowenstein*, 92 Tennessee, 614; *Ward* v. *Wilms*, 16 Colorado, 86.

We are of opinion that as the declarations of Hansen to Sodergren were not, in any view of the case, competent evidence against Sparf, the court, upon objection being made by counsel representing both defendants, should have excluded them as evidence against him, and admitted them against Hansen. The fact that the objection was made in the name of both defendants did not justify the court in overruling it as to both, when the evidence was obviously incompetent and could not have been made competent against Sparf, and was obviously competent against Hansen. It was not necessary that counsel should have made the objection on behalf of one defendant and then formally repeated it, in the same words, for the other defendant. If Sparf had been tried alone, a general objection in his behalf on the ground of incompetency would have been sufficiently definite. Surely, such an objection coming from Sparf when tried with another ought not to be deemed ineffectual because of the circumstance that his counsel, who by order of the court represented also his codefendant, incautiously spoke in the name of both defendants. Each was entitled to make his own defence, and the jury could have found one of them guilty and acquitted the other. *Mutual Life Ins. Co.* v. *Hillmon*, 145 U. S. 285, 293. See also *Commonwealth* v. *Robinson*, 1 Gray, 555, 560.

For the error of the court in not sustaining the objection referred to, so far as it related to Sparf, the judgment must be reversed as to him. If he were the only defendant, we might

withhold any expression of opinion upon other questions raised by the assignments of error. But as some of those questions are important and may arise upon another trial of Sparf, and especially as they must be now determined with reference to Hansen, we proceed to their examination.

2. One of the specifications of error relates to the refusal of the court to give certain instructions asked by the defendants, and to parts of the charge to the jury.

The defendants asked the court to instruct the jury as follows:

"In all criminal causes the defendant may be found guilty of any offence the commission of which is necessarily included in that with which he is charged in the indictment, or the defendant may be found guilty of an attempt to commit the offence so charged, provided that such attempt be itself a separate offence." "Under an indictment charging murder, the defendant may be convicted of murder, of manslaughter, or an attempt to commit either murder or manslaughter." "Under the indictment in this case, the defendants may be convicted of murder, or manslaughter, or of an attempt to commit murder or manslaughter, and if after a full and careful consideration of all the evidence before you you believe beyond a reasonable doubt that the defendants are guilty, either of manslaughter or of an assault with intent to commit murder or manslaughter, you should so find your verdict." These instructions were refused and the defendants excepted.

In its charge to the jury the court, among other things, said: "What, then, is murder? There are only two kinds of felonious homicide known to the laws of the United States. One is murder and the other is manslaughter. There are no degrees of murder." "There is no definition of murder by any United States statute. We resort to the common law for that. By the common law, murder is the unlawful killing of a human being in the peace of the State, with malice aforethought, either express or implied. Malice, then, is an element in the offence and discriminates it from the other crime of felonious homicide which I have mentioned, to wit, manslaughter; that is, malice express or implied, discriminates

murder from the offence of manslaughter." "Express malice exists when one, by deliberate premeditation and design, formed in advance, to kill or to do bodily harm, the premeditation and design being implied from external circumstances capable of proof, such as lying in wait, antecedent threats, and concerted schemes against a victim. Implied malice is an inference of the law from any deliberate and cruel act committed by one person against another. The two kinds of malice, therefore, to repeat, indicate but one state of mind, established in different ways, the one by circumstances showing premeditation of the homicide, the other by an inference of the law from the act committed; that is, malice is inferred when one kills another without provocation, or when the provocation is not great. Manslaughter is the unlawful killing of a human being without malice either expressed or implied. I do not consider it necessary, gentlemen, to explain it further, *for if a felonious homicide has been committed, of which you are to be the judges from the proof, there is nothing in this case to reduce it below the grade of murder.* In other words, it may be in the *power* of the jury under the indictment by which these defendants are accused and tried of finding them guilty of a less crime than murder, to wit, manslaughter, or an attempt to commit murder; *yet, as I have said in this case, if a felonious homicide has been committed at all, of which 1 repeat you are the judges, there is nothing to reduce it below the grade of murder.*"

The court further said to the jury:

"You are the exclusive judges of the credibility of the witnesses, and in judging of their credibility you have a right to take into consideration their prejudices, motives, or feelings of revenge, if any such have been proven or shown by the evidence in the case; if you believe from the evidence that any witness or witnesses have knowingly and wilfully testified falsely as to any material fact or point, you are at liberty to disregard entirely the testimony of such witness or witnesses." "Gentlemen, I have given you these instructions as carefully as I could, avoiding all references to the testimony, but I do not wish to be misunderstood, and out of abundant

caution I say further to you, in giving you these instructions, I may by accident have assumed facts to be proven; if so you must disregard the assumption. It is not my purpose, nor is it my function, to assume any fact to be proven, nor to suggest to you that any fact has been proven. *You are the exclusive judges of the fact. No matter what assumption may appear during the course of the trial in any ruling of mine, or what may appear in any one of these instructions, you are to take this case and consider it, and remember you are the tribunal to which the law has referred the case and whose judgment the law wants on the case.*"

After the jury had been in consultation for a time, they returned into court for further instructions. The colloquy between the court and the jurors is set forth at large in the margin.[1]

---

[1] "FOREMAN. There is one of us who wishes to be instructed by your honor as to certain points upon the question of United States marine laws in regard to murder on the high seas.

"COURT. The instruction which I gave you, gentlemen, in regard to the law upon which the indictment was based was section 5339 of the Revised Statutes, which I will read to you again. JUROR. Your honor, I would like to know in regard to the interpretation of the laws of the United States in regard to manslaughter, as to whether the defendants can be found guilty of manslaughter, or that the defendants must be found guilty.

"COURT. I will read the section to you and see if that touches the proposition. The indictment is based upon section 5339, which provides, among other things, 'that every' person who commits murder upon the high seas or in any arm of the sea, or in any river, haven, creek, basin, or bay, within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, or who, upon any such waters, maliciously strikes, stabs, wounds, poisons, 'or shoots any other person, of which striking, stabbing, wounding, poisoning, or shooting such other person dies on land or at sea, within or without the United States, shall suffer death.' Hence, that is the penalty for the offence described in the indictment. I have given you the definition of murder. If you remember it, you will connect it with these words: 'Every person who commits murder upon the high seas, or in any arm of the sea, or in any river, haven, etc. JUROR. Are the two words 'aiding' or 'abetting' defined? COURT. The words 'aiding' or 'abetting' are not defined, but I have instructed you as to the legal effect of aiding and abetting, and this you should accept as law. If I have made an error there is a higher tribunal to correct it.

"JUROR. I am the spokesman for two of us. We desire to clearly understand the matter. It is a barrier in our mind to our determining the matter. The question arising amongst us is as to aiding and abetting.

The requests for instruction made by the defendants were based upon section 1035 of the Revised Statutes of the United

---

Furthermore, as I understand, it must be one thing or the other. It must be guilty or not guilty. COURT. Yes; under the instructions I have given you. I will read them to you again, so as to be careful and that you may understand. Murder is the unlawful killing of a human being in the peace of the State, with malice aforethought, either express or implied. I defined to you what malice was, and I assume you can recall my definition to your minds. Manslaughter is the unlawful killing of a human being without malice, either express or implied. I do not con· sider it necessary to explain it further. If a felonious homicide has been committed by either of the defendants, of which you are to be the judges from the proof, there is nothing in this case to reduce it below the grade of murder.

"JUROR. Then, as I understand your honor clearly, there is nothing about manslaughter in this court? COURT. No; I do not wish to be so ·understood. A verdict must be based on evidence, and in a proper case a verdict for manslaughter may be rendered.

"JUROR. A crime committed on the high seas must have been murder, or can it be manslaughter? COURT. *In a proper case, it may be murder or it may be manslaughter, but in this case it cannot be properly manslaughter. As I have said, if a felonious homicide has been committed, the facts of the case do not reduce it below murder.* Do not understand me to say that manslaughter or murder *has been committed.* That is for you gentlemen to determine *from the testimony and the instructions* I have given you. . . . MR. SMITH. We take an exception. JUROR. We have got to bring a verdict for either manslaughter or murder? COURT. Do not misunderstand me. I have not said so. JUROR. I know you have not. COURT. *I cannot direct you what conclusion to come to from the facts. I direct you only as to the law. A judgment on the facts is your province.*

"MR GARTER. May I ask the court to instruct this jury that in cases where persons are being tried upon a charge of murder, and the facts proven at their trial show that the defendants are guilty of manslaughter, under an indictment, they may find him guilty of manslaughter, as a general rule; but, however, if the facts show that the defendants have been guilty of murder, and that, in this case, there is no evidence tending to establish the crime or offence of manslaughter——

"MR. SMITH. It is the province of the jury. COURT. I have already so instructed the jury. I have endeavored to make myself understood. JUROR. If we bring in a verdict of guilty, that is capital punishment? COURT. Yes. JUROR. Then there is no other verdict we can bring in except guilty or not guilty? COURT. In a proper case, a verdict for manslaughter may be rendered, as the district attorney has stated; and even in this case you have the physical power to do so; ·but as one of the tribunals of the country, *a jury is expected to be governed by law, and the law it should receive from the court.* JUROR. There has been a misunderstanding amongst us. Now it is clearly interpreted to us, and no doubt we can now agree on certain facts."

States, providing that " in all criminal causes the defendant may be found guilty of any offence the commission of which is necessarily included in that with which he is charged in the indictment, or may be found guilty of an attempt to commit the offence so charged: *Provided,* That such attempt be itself a separate offence."

The refusal to grant the defendants' requests for instructions, taken in connection with so much of the charge as referred to the crime of manslaughter, and the observations of the court when the jury through their foreman applied for further instructions, present the question whether the court transcended its authority when saying, as in effect it did, that in view of the evidence the only verdict the jury could under the law properly render would be either one of guilty of the offence charged or one of not guilty of the offence charged ; that if a felonious homicide had been committed by either of the defendants, *of which the jury were the judges from the proof,* there was nothing in this case to reduce it below the grade of murder; and that, " as one of the tribunals of the country, a jury is expected to be governed by law, *and the law it should receive from the court.*"

The court below assumed, and correctly, that section 1035 of the Revised Statutes did not authorize a jury in a criminal case to find the defendant guilty of a less offence than the one charged, unless the evidence justified them in so doing.   Congress did not intend to invest juries in criminal cases with power arbitrarily to disregard the evidence and the principles of law applicable to the case on trial.   The only object of that section was to enable the jury, in case the defendant was not shown to be guilty of the particular crime charged, *and if the evidence permitted them to do so,* to find him guilty of a lesser offence necessarily included in the one charged, or of the offence of attempting to commit the one charged.   Upon a careful scrutiny of the evidence, we cannot find any ground whatever upon which the jury could properly have reached the conclusion that the defendant Hansen was only guilty of an offence included in the one charged, or of a mere attempt to commit the offence charged.   A verdict of guilty of an

offence less than the one charged would have been in flagrant disregard of all the proof, and in violation by the jury of their obligation to render a true verdict. There was an entire absence of evidence upon which to rest a verdict of guilty of .manslaughter or of simple assault. A verdict of that kind would have been the exercise by the jury of the power to commute the punishment for an offence actually committed, and thus impose a punishment different from that prescribed by law.

The general question as to the duty of the jury to receive the *law* from the court, is not concluded by any direct decision of this court. But it has been often considered by other courts and by judges of high authority, and, where its determination has not been controlled by specific constitutional or statutory provisions expressly empowering the jury to determine both law and facts, the principle by which courts and juries are to be guided in the exercise of their respective functions has become firmly established. If this be true, this court should not announce a different rule, unless impelled to do so by reasons so cogent and controlling that they cannot properly be overlooked or disregarded. Some of the members of this court, after much consideration and upon an extended review of the authorities, are of opinion that the conclusion reached by this court is erroneous both upon principle and authority. For this reason, and because the question is of great importance in the administration of justice, and also involves human life, we deem it appropriate to state with more fulness than under other circumstances would be necessary the grounds upon which our judgment will rest — looking first to cases determined in the courts of the United States.

In *Georgia* v. *Brailsford*, 3 Dall. 1, 4, a case in this court tried by a special jury upon an amicable issue, Chief Justice Jay is reported to have said : " It may not be amiss here, gentlemen, to remind you of the good old rule, that on questions of fact it is the province of the jury, on questions of law it is the province of the court to decide. But it must be observed that by the same law, which recognizes this reasonable distribution of jurisdiction, you have nevertheless a right to take

upon yourselves to judge of both, and to determine the law as well as the fact in controversy. On this, and on every other occasion, however, we have no doubt you will pay that respect which is due to the opinion of the court; for as, on the one hand, it is presumed that juries are best judges of facts, it is, on the other hand, presumable that the courts are the best judges of law. But still both objects are lawfully within your power of decision." Of the correctness of this report, Mr. Justice Curtis in *United States* v. *Morris*, 1 Curtis, 23, 58, expressed much doubt, for the reason that the Chief Justice is reported as saying that, in *civil* cases, and that was a civil case, the jury had the right to decide the law, and because, also, the different parts of the charge conflict with each other; the Chief Justice, according to the report, saying at the outset that it is the province of the jury to decide questions of fact and of the court to decide questions of law, and in the succeeding sentence informing the jury that they had the *right* to take upon themselves the determination of *both* law and fact. If the Chief Justice said that it was the *province* of the court to *decide* questions of law, and the *province* of the jury to *decide* questions of fact, he could not have said that the jury had the *right*, in a civil case, to *judge of* and *determine* both law and fact. "The whole case," Mr. Justice Curtis said, " is an anomaly. It purports to be a trial by jury in the Supreme Court of the United States of certain issues out of chancery. And the Chief Justice begins by telling the jury that the facts are all agreed, and the only question is a matter of law, and upon that the whole court were agreed. If it be correctly reported, I can only say it is not in accordance with the views of any other court, so far as I know, in this country or in England, and is certainly not in accordance with the course of the Supreme Court for many years."

Certain observations of Chief Justice Marshall in the course of the trial of Burr have sometimes been referred to in support of the contention that the jury in a criminal case are under no legal obligation to accept the law as laid down by the court. But nothing said by him at that trial was inconsistent with the views expressed by eminent jurists in cases

to be presently cited.  In the course of an opinion relating merely to the order of evidence, the Chief Justice said: "Levying of war is a fact which must be decided by the jury.  The court may give general instructions on this as on every other question brought before them, but the jury must decide upon it *as compounded of fact and law.*"  1 *Burr's Trial*, 470.  This language is supposed to justify the contention that the jury in a criminal case are entitled, of right, to determine questions of pure law adversely to the direction of the court.  But that no such thought was in the mind of the Chief Justice is manifest from his written charge to the jury at a subsequent stage of the trial — the accuracy of the report of which has never been disputed — in which he discussed, in the light of the authorities, the question as to what constituted treason.

In the course of that charge he indicated quite distinctly his view of the respective functions of court and jury.  "It has been thought proper," he said, " to discuss this question at large and to review the opinion of the Supreme Court, [*Ex parte Bollman and Swartwout,* 4 Cranch, 75,] although this court would be more disposed to leave the question of *fact* whether an overt act of levying war were committed on Blannerhassett's Island to the jury *under this explanation of the law,* and *to instruct* them that unless the assemblage on Blannerhassett's Island was an assemblage in force, was a military assemblage in a condition to make war, it was not levying war, and that *they could not construe it* into an act of war, than to arrest the further testimony which might be offered to connect the prisoner with that assemblage, or to prove the intention of those who assembled together at that place.  This point, however, is not to be understood as decided.  It will, perhaps, constitute an essential inquiry in another case."  2 *Burr's Trial*, 422.  This language is wholly inconsistent with the theory that the Chief Justice recognized the right of the jury to disregard the court's view of the law upon any question arising in the case before them.  It was consistent only with the theory that the court could speak authoritatively as to the law, while the function of the jury

was to respond as to the facts. Again : " It is further the opinion of the court *that there is no testimony whatever* which tends to prove that the accused was actually or constructively present when that assemblage did take·place ; indeed, the contrary is most apparent." Ib. 439. " The opinion of this court on the order of testimony has frequently been adverted to as deciding this question against the motion. If a contradiction between the two opinions exist, the court cannot perceive it. It was said that levying war is an act *compounded of law and fact ;* of which the jury, aided by the court, must judge. To that declaration the court still adheres." Ib. 444. He concluded his memorable charge ·in these words : " The jury have now heard the opinion of the court on the *law* of the case. They *will apply that law to the facts*, and will find a verdict of guilty or not guilty as their own consciences may direct." Ib. 445. Again, according to the only recognized report of that trial ever published, the Chief Justice, in response to certain inquiries of counsel made after the jury returned their verdict, said : " Without doubt the court intended to deliver merely a legal opinion as to what acts amounted in law to an overt act of levying war ; and not whether such an overt act has or has not been proved. It merely stated the law, *to which the jury would apply the facts proved.* It is their province to say whether *according to this statement and the evidence* an overt act has been proved or not." Ib. 448. The language of the Chief Justice plainly imports that while the jury must of necessity often pass upon a question, " compounded of fact and law," their duty, when considering the evidence, was to apply the law, as given by the court, to the facts proved ; and, *thus applying the law*, return a verdict of guilty or not guilty as their consciences might direct. If he had believed that the jury were entitled, of right, whatever might be the views of the court, to determine for themselves the law of the case, it is impossible that he could have said that " they will apply that law " — the law as he declared it to be — " to the facts." On the contrary, he observed that the province of the jury was to determine whether the accused was guilty or not guilty, according to his statement of the law as applied to the evidence.

Of course, this court has no means of determining what were the views of Chief Justice Marshall, except by referring to such authorized publications as show what he said while discharging judicial functions. In none of his opinions delivered at the Circuit Court and published can there be found anything at all in conflict with his declarations at the trial of Burr. And it may be observed that the circumstances attending that trial were such as to induce him to weigh every word embodied in his elaborate written charge to the jury. That he understood the gravity of the occasion, so far as it related to the conduct of the trial, is manifest from his referring in the following language to certain considerations that had been advanced in argument: "That this court dares not usurp power is most true. That this court dares not shrink from its duty is not less true. No man is desirous of placing himself in a disagreeable situation. No man is desirous of becoming the peculiar subject of calumny. No man, might he let the bitter cup pass from him without self-reproach, would drain it to the bottom. But if he had no choice in the case, if there be no alternative presented to him but a dereliction of duty or the opprobrium of those who are denominated the world, he merits the contempt as well as the indignation of his country who can hesitate which to embrace. That gentlemen, in a case the most interesting, in the zeal with which they advocate particular opinions, and under the conviction in some measure produced by that zeal, should on each side press their arguments too far, should be impatient at any deliberation in the court, and should suspect or fear the operation of motives to which alone they can ascribe that deliberation, is perhaps a frailty incident to human nature; but, if any conduct on the part of the court could warrant a sentiment that it would deviate to the one side or the other from the line prescribed by duty and by law, that conduct would be viewed by the judges themselves with an eye of extreme severity, and would long be recollected with deep and serious regret," pp. 444, 445.

In *Henfield's case*, Mr. Justice Wilson, with whom sat Mr. Justice Iredell, stated that the jury, in a general verdict, must

decide both law and fact, but that " this did not authorize them to decide it as they pleased," and that " the questions of law coming into *joint consideration* with the facts, it is the duty of the court to explain the law to the jury, and give it to them *in direction.*" Wharton's State Trials, 48, 84. This statement of the principle is sometimes referred to in support of the proposition that the jury is not under a legal duty to accept the law as declared by the court in a criminal case. We think it tends to show that it is the province and duty of the jury to apply to the facts of the case the law as given to them by the court " in direction."

There is nothing in conflict with this in the lectures on law delivered by Mr. Justice Wilson. In one of those lectures, referring to the duties of jurors in criminal cases, he said : " On questions of law, his [the juror's] deficiencies will be supplied by the professional directions of the judges, whose *duty* and *whose business it is professionally* to *direct* him. For, as we have seen, verdicts, in criminal cases, generally determine the question of law as well as the question of fact. Questions of *fact* it is his exclusive province to determine. With the consideration of evidence unconnected with the question which he is to try, his attention will not be distracted ; for everything of that nature, we presume, will be excluded by the court. The collected powers of his mind, therefore, will be fixed, steadily and without interruption, upon the issue which *he* is sworn to try. *This issue* is an issue *of fact.*" 2 Wilson's Works, 386. Other observations found in these lectures, if considered alone, are not so explicit upon the question of the respective functions of court and jury ; but taken in connection with all that he said, it is reasonably clear that when Mr. Justice Wilson spoke of the determination by a jury, in a criminal case, of both law and fact, he meant only that a general verdict of guilty or not guilty, of necessity, decided every question before them which involved a *joint consideration* of law and fact ; not that the jury could ignore the directions of the court, and take the law into their own hands.

The observations of Mr. Justice Samuel Chase in the *case of John Fries,* tried for treason, in 1800, are supposed to sustain

the broad proposition that the jury may, of right, disregard the law as expounded by the court. He undoubtedly did say that while it was the duty of the court, in all criminal cases, to state the law arising on the facts, the jury were. to decide "both the law and the facts, on their consideration of the whole case." Chase's Trial, App. 44. But on the trial, in the same year, in the Circuit Court of the United States for the Virginia District, of *James Thompson Callender* for seditious libel, Wharton's State Trials, 688, he was appalled at the suggestion by learned counsel that the jury were entitled, of right, to determine the constitutional validity of the act of Congress under which the accused was indicted. Mr. Wirt, counsel for the defendant, said: "Since, then, the jury have a right to consider the law, and since the Constitution is law, the conclusion is certainly syllogistic that the jury have a right to consider the Constitution." Ib. 710. But Mr. Justice Chase declined to accept this view. He said: "The statute on which the traverser is indicted enacts 'that the jury who shall try the cause shall have a right to determine the law and the fact, under the direction of the court, *as in other cases.*' By this provision I understand that a right is given to the jury to determine what the law is in the case before them; and not to decide whether a statute of the United States produced to them is a law or not, or whether it is void, under an opinion that it is unconstitutional, that is, contrary to the Constitution of the United States. I admit that the jury are to *compare* the statute with the facts proved, and then to decide whether the acts done are prohibited by *the law;* and whether they amount to the offence described in the indictment. This power the jury necessarily possesses, in order to enable them to decide on the guilt or innocence of the person accused. It is one thing to decide what the law is on the facts proved, and another and a very different thing to determine that the statute produced is no law. To decide what the law is on the facts, is an admission that the law exists. If there be no law in the case there can be no comparison between it and the facts; and it is unnecessary to establish facts before it is ascertained that there is a law to punish the commission of them." Ib. 713.

"It was never pretended," he continued, "as I ever heard, before this time, that a petit jury in England (from whence our common law is derived) or in any part of the United States, ever exercised such power. If a petit jury can rightfully exercise this power over one statute of Congress, they must have an equal right and power over any other statute, and indeed over all the statutes; for no line can be drawn, no restriction imposed on the exercise of such power; it must rest in discretion only. If this power be once admitted, petit jurors will be superior to the national legislature, and its laws will be subject to their control. The power to abrogate or to make laws nugatory is equal to the authority of making them. The evident consequences of this right in juries will be, that a law of Congress will be in operation in one State and not in another. A law to impose taxes will be obeyed in one State, and not in another, unless force be employed to compel submission. The doing of certain acts will be held criminal, and punished in one State, and similar acts may be held innocent, and even approved and applauded in another. The effects of the exercise of this power by petit jurors may be readily conceived. It appears to me that the right now claimed has a direct tendency to dissolve the Union of the United States, on which, under divine Providence, our political safety, happiness, and prosperity depend." Ib. 714. He concluded his opinion in these words: "I consider it of the greatest consequence to the administration of justice that the powers of the court and the powers of the petit jury should be kept *distinct* and *separate*. I have uniformly delivered the opinion 'that the petit jury have a right to decide the law as well as the fact in criminal cases;' but it never entered into my mind that they, therefore, had a right to determine the constitutionality of any statute of the United States." Ib. 718.

What Mr. Justice Chase said is quite sufficient to show the mischievous consequences that would flow from the doctrine that the jury may, of right, disregard the directions of the court, and determine the law for themselves. For if, as is contended, the jury in criminal cases are not bound to take the law from the court, it is impossible to deny their absolute

right in a case depending entirely upon an act of Congress, or a statute of a State, to determine, upon their own responsibility, whether that act or statute is or is not law, that is, whether it is or is not in violation of the Constitution.

Mr. Justice Thompson, who became a member of this court in 1823, concurred in the opinion delivered by Kent, J., in *People* v. *Croswell*, (1804,) 3 Johns. Cas. 337, 362, where the court was equally divided, Chief Justice Lewis and Judge Brockholst Livingston, afterwards a Justice of this court, holding that to questions of law the court, to questions of fact the jury, must respond. But in his opinion in *Pierce* v. *State*, 13 N. H. 536, 564, Chief Justice Parker, referring to Judge Kent's opinion in *People* v. *Croswell*, said: "Mr. Justice Thompson, who concurred in that opinion, must have understood that concurrence to be merely in the points necessary to the decision of that cause, or have subsequently changed his views; for I have his authority for saying that he has repeatedly ruled that the jury are not judges of the law in criminal cases." And in the dissenting opinion of Judge Bennett in *State* v. *Croteau*, 23 Vermont, 14, 63, (where it was held that the jury, in criminal cases, could rightfully decide questions of both law and fact, but which case has been overruled, 65 Vermont 1, 34,) it was said: "Judge Thompson, whose judicial learning and experience, while on the bench of the Supreme Court of New York, and on the bench of the United States, were very extensive, thus wrote to a friend some short time before his death: 'I have repeatedly ruled on the trial of criminal cases, that it was the *right* as well as the duty of the court to decide questions of law; and any other rule, it appears to me, would be at war with our whole judicial system, and introduce the utmost confusion in criminal trials. It is true, the jury may disregard the instructions of the court, and in some cases there may be no remedy. But it is still the right of the court to instruct the jury on the law, and the duty of the jury to obey the instructions.'" See also Wharton's Cr. Pl. & Pr. § 810, note 3.

The remarks of Mr. Justice Baldwin in *United States* v. *Wilson and Porter,* 1 Baldwin, 78, 100, 108, have sometimes

been referred to as in conflict with the rule that it is the duty of the jury to accept the law as expounded by the court. It is quite true that in the charge in *Wilson's case*, Mr. Justice Baldwin said that if the jury were prepared to say that the law was different from what the court had announced, they were in the exercise of their constitutional right to do so. But in his charge in *Porter's case*, he explained what was said in *Wilson's case*. After remarking, that if a jury find a prisoner guilty against the court's opinion of the law of the case, *a new trial would be granted*, as no court would pronounce a judgment on a prisoner against what it believes to be the law, he said : " This, then, you will understand to be what is meant by your *power* to decide on the law; but you will still bear in mind that it is a very old, sound, and valuable maxim in law that the court answers to questions of law, and the jury to facts. Every day's experience evinces the wisdom of this rule." Subsequently in *United States* v. *Shive*, 1 Baldwin, 510, 513, which was an indictment for passing a counterfeit note of the Bank of the United States, and when the question arose as to the right of the jury to pass upon the constitutionality of the act of Congress on which the prosecution was founded, Mr. Justice Baldwin said, in his charge : "*If juries once exercise this power, we are without a Constitution or laws,* one jury has the same power as another, you cannot bind those who may take your places, what you declare constitutional to-day another jury may declare unconstitutional to-morrow."

The question before us received full consideration by Mr. Justice Story in *United States* v. *Battiste*, 2 Sumner, 240, 243, 244. That was an indictment for a capital offence, and the question was directly presented whether in criminal cases, especially in capital cases, the jury were the judges of the law as well as of the facts. He said : " My opinion is that the jury are no more judges of the law in a capital or other criminal case, upon the plea of not guilty, than they are in every civil case tried upon the general issue. In each of these cases, their verdict, when general, is necessarily compounded of law and of fact; and includes both. In each they must necessarily

determine the law as well as the fact. In each they have the physical power to disregard the law, as laid down to them by the court. But I deny that, in any case, civil or criminal, they have the moral right to decide the law according to their own notions or pleasure. On the contrary, I hold it the most sacred constitutional right of every party accused of a crime that the jury should respond as to the facts, and the court as to the law. It is the duty of the court to instruct the jury as to the law and it is the duty of the jury to follow the law as it is laid down by the court. This is the right of every citizen, and it is his only protection. If the jury were at liberty to settle the law for themselves, the effect would be, not only that the law itself would be most uncertain, from the different views which different juries might take of it, but in case of error there would be no remedy or redress by the injured party; for the court would not have any right to review the law as it had been settled by the jury. Every person accused as a criminal has a right to be tried according to the law of the land, the fixed law of the land; and not by the law as a jury may understand it, or choose, from wantonness or ignorance or accidental mistake, to interpret it. If I thought that the jury were the proper judges of the law in criminal cases, I should hold it my duty to abstain from the responsibility of stating the law to them upon any such trial. But believing, as I do, that every citizen has a right to be tried by the law, and according to the law; that it is his privilege and truest shield against oppression and wrong; I feel it my duty to state my views fully and openly on the present occasion."

In *United States* v. *Morris*, 1 Curtis, 23, 52–58, the question, in all of its aspects, was examined by Mr. Justice Curtis with his accustomed care. In that case the contention was that every jury, impanelled in a court of the United States, was the rightful judge of the existence, construction, and effect of every law that was material in a criminal case, and could, of right, and if it did its duty must, decide finally on the constitutional validity of any act of Congress which the trial brought in question. Touching the rightful powers and duties of the court and the jury under the Constitution in criminal cases,

Mr. Justice Curtis, among other things, said : " The sixth article, after declaring that the Constitution, laws, and treaties of the United States shall be the supreme law of the land, proceeds, ' and the *judges*, in every State, shall be bound thereby.' But was it not intended that the Constitution, laws, and treaties of the United States should be the supreme law in *criminal* as well as in *civil* cases? If a state law should make it penal for an officer of the United States to do what an act of Congress commands him to do, was not the latter to be supreme over the former? And if so, and in such cases, juries finally and rightfully determine the law, and the Constitution so means when it speaks of a trial by jury, why was this command laid on the judges alone, who are thus mere advisers of the jury, and may be bound to give sound advice, but have no real power in the matter? It was evidently the intention of the Constitution that all persons engaged in making, expounding, and executing the laws, not only under the authority of the United States but of the several States, should be bound by oath or affirmation to support the Constitution of the United States. But no such oath or affirmation is required of jurors, to whom it is alleged the Constitution confides the power of expounding that instrument; and not only construing, but holding invalid any law which may come in question on a criminal trial." " In my opinion," the learned justice proceeded, " it is the duty of the court to decide every question of law which arises in a criminal trial; if the question touches any matter affecting the course of the trial, such as the competency of a witness, the admissibility of evidence, and the like, the jury receive no direction concerning it; it affects the materials out of which they are to form their verdict, but they have no more concern with it than they would have had if the question had arisen in some other trial. If the question of law enters into the issue, and forms part of it, the jury are to be told what the law is, and they are bound to consider that they are told truly ; that law they apply to the facts, as they find them, and thus, passing both on the law and the fact, they, from both, frame their general verdict of guilty or not guilty. Such is my view of the respective duties of the differ-

ent parts of this tribunal in the trial of criminal cases, and I
have not found a single decision of any court in England, prior
to the formation of the Constitution, which conflicts with it."

It was also contended that the clause in the act of Congress,
known as the Sedition Law of July 14, 1798, c. 74, § 3, 1 Stat.
596, 597, declaring that "the jury who shall try the cause shall
have a right to determine the law and the fact, under the di-
rection of the court, as in other cases," implied that the jury
"in other cases" might decide the law contrary to the direc-
tion of the court. But in response to this view Mr. Justice
Curtis said: "I draw from this the opposite inference; for
where was the necessity of this provision if, by force of the
Constitution, juries, as such, have both the power and the
right to determine all questions in criminal cases; and why
are they to be directed by the court?" See also *Montgomery*
v. *State*, 11 Ohio, 427.

But Mr. Justice Curtis considered the question from another
point of view, and gave reasons which appear to us entirely
conclusive against the proposition that it is for the jury, in
every criminal case, to say authoritatively what is the law by
which they are to be governed in finding their verdict. He
said: "There is, however, another act of Congress which bears
directly on this question. The act of the 29th of April, 1802,
in section 6, after enacting that, in case of a division of opin-
ion between the judges of the Circuit Court on any question,
such question may be certified to the Supreme Court, pro-
ceeds, 'and shall by the said court be *finally decided*. And
the decision of the Supreme Court and their order in the
premises shall be remitted to the Circuit Court and be there
entered of record and have effect according to the nature of
such judgment and order.' The residue of this section proves
that criminal as well as civil cases are embraced in it, and
under it many questions arising in criminal cases have been
certified to and decided by the Supreme Court, and persons
have been executed by reason of such decisions. Now, can it
be that, after a question arising in a criminal trial has been
certified to the Supreme Court, and there, in the language of
this act, finally decided, and their order remitted here and en-

tered of record, that when the trial comes on the jury may rightfully revise and reverse this final decision? Suppose, in the course of this trial, the judges had divided in opinion upon the question of the constitutionality of the act of 1850, and that, after a final decision thereon by the Supreme Court and the receipt of its mandate here, the trial should come on before a jury, does the Constitution of the United States, which established that Supreme Court, intend that a jury may, as matter of right, revise and reverse that decision? And, if not, what becomes of this supposed right? Are the decisions of the Supreme Court binding on juries, and not the decisions of inferior courts? This will hardly be pretended; and if it were, how is it to be determined whether the Supreme Court has or has not, in some former case, in effect settled a particular question of law? In my judgment this act of Congress is in accordance with the Constitution, and designed to effect one of its important and even necessary objects — a uniform exposition and interpretation of the law of the United States — by providing means for a final decision of any question of law; final as respects every tribunal and every part of any tribunal in the country; and if so, it is not only wholly inconsistent with the alleged power of juries, to the extent of all questions so decided, but it tends strongly to prove that no such right as is claimed does or can exist."

Again: " Considering the intense interest excited, the talent and learning employed, and consequently the careful researches made, in England, near the close of the last century, when the law of libel was under discussion in the courts and in Parliament, it cannot be doubted that, if any decision, having the least weight, could have been produced in support of the general proposition, that juries are judges of the law in criminal cases, it would then have been brought forward. I am not aware that any such was produced. And the decision of the King's Bench in *Rex* v. *The Dean of St. Asaph,* 3 T. R. 428, and the answers of the twelve judges to the questions propounded by the House of Lords, assume as a necessary postulate, what Lord Mansfield so clearly declares in terms, that, by the law of England, juries cannot rightfully decide a ques-

tion of law. Passing over what was said by ardent partisans and eloquent counsel, it will be found that the great contest, concerning what is known as Mr. Fox's Libel Bill, was carried on upon quite a different ground by its leading friends; a ground which, while it admits that the jury are not to decide the law, denies that the libellous intent is matter of law; and asserts that it is so mixed with the fact that, under the general issue, it is for the jury to find it as a fact. 34 An. Reg. 170; 29 Parl. His. Debates in the Lords. Such I understand to be the effect of that famous declaratory law. 32 Geo. 3, c. 60. . . . I conclude, then, that when the Constitution of the United States was founded, it was a settled rule of the common law that, in criminal as well as civil cases, the court decided the law, and the jury the facts; and it cannot be doubted that this must have an important effect in determining what is meant by the Constitution when it adopts a trial by jury."

That eminent jurist, whose retirement from judicial station has never ceased to be a matter of deep regret to the bench and bar of this country, closed his great opinion with an expression of a firm conviction that, under the Constitution of the United States, juries in criminal cases have not the right to decide any question of law, and that, in rendering a general verdict, their duty and their oath require them to apply to the facts, as they find them, the law given to them by the court. And in so declaring he substantially repeated what Chief Justice Marshall had said in *Burr's case.*

In *United States* v. *Greathouse,* 4 Sawyer, 457, 464, which was an indictment for treason, Mr. Justice Field said: "There prevails a very general, but an erroneous, opinion that in all criminal cases the jury are the judges as well of the law as of the fact — that is, that they have the right to disregard the law as laid down by the court, and to follow their own notions on the subject. Such is not the right of the jury." "It is their duty to take the law from the court and apply it to the facts of the case. It is the province of the court, and of the court alone, to determine all questions of law arising in the progress of a trial; and it is the province of the jury to

pass upon the evidence and determine all contested questions of fact. The responsibility of deciding correctly as to the law rests solely with the court, and the responsibility of finding correctly the facts rests solely with the jury."

These principles were applied by Judge Shipman in *United States* v. *Riley*, 5 Blatchford, 204, and by Judge Cranch, upon an extended review of the authorities, in *Stettinius* v. *United States*, 5 Cranch C. C. 573. They were also applied by Judge Jackson, in the District of West Virginia, in *United States* v. *Keller*, 19 Fed. Rep. 633, in which case it was said that although an acquittal in a criminal case was final, even if the jury arbitrarily disregarded the instructions of the court on the law of the case, a jury, in order to discharge its whole duty, must take the law from the court and apply it to the facts of the case.

Turning now to cases in the state courts, we find that in *Commonwealth* v. *Porter*, 10 Met. (Mass.) 263, 276, the Supreme Judicial Court of Massachusetts, speaking by Chief Justice Shaw delivering the unanimous judgment of the court composed of himself and Justices Wilde, Dewey, and Hubbard, held that it was a well-settled principle, lying at the foundation of jury trials, admitted and recognized ever since jury trial had been adopted as an established and settled mode of proceeding in courts of justice, that it was the proper province and duty of judges to consider and decide all questions of law, and the proper province and duty of the jury to decide all questions of fact. In the same case, the court, observing that the safety, efficiency, and purity of jury trial depend upon the steady maintenance and practical application of this principle, and adverting to the fact that a jury, in rendering a general verdict, must necessarily pass upon the whole issue, compounded of the law and of the fact, and thus *incidentally* pass on questions of law, said: "It is the duty of the court to instruct the jury on all questions of law which appear to arise in the cause, and also upon all questions, pertinent to the issue, upon which either party may request the direction of the court upon matters of law. And it is the duty of the jury to receive the law from the court, and to conform their judg-

ment and decision to such instructions, as far as they understand them, in applying the law to the facts to be found by them; and it is not within the legitimate province of the jury to revise, reconsider, or decide contrary to such opinion or direction of the court in matter of law." p. 286.

Perhaps the fullest examination of the question upon principle, as well as upon authority, to be found in the decisions of any state court, was made in *Commonwealth* v. *Anthes*, 5 Gray, 185, 208, 218, where Chief Justice Shaw, speaking for a majority of the court, said that the true theory and fundamental principle of the common law, both in its civil and criminal departments, was, that the judges should adjudicate finally, upon the whole question of law, and the jury upon the whole question of fact.

Considering, in the light of the authorities, the grounds upon which a verdict of guilty or not guilty, in a criminal case, was held, at common law, to be conclusive, he observed that though the jury have the power they had not the right to decide, that is, to adjudicate on both law and evidence. He said: "The result of these several rules and principles is, that, in practice, the verdict of a jury, both upon the law and the fact, is conclusive; because, from the nature of the proceeding, there is no judicial power by which the conclusion of law thus brought upon the record by that verdict can be reversed, set aside, or inquired into. A general verdict, either of conviction or acquittal, does embody and declare the result of both the law and the fact, and there is no mode of separating them on the record so as to ascertain whether the jury passed their judgment on the law or only on the evidence. The law authorized them to adjudicate definitively on the evidence; the law presumes that they acted upon correct rules of law given them by the judge; the verdict therefore stands conclusive and unquestionable, in point both of law and fact. In a certain limited sense, therefore, it may be said that the jury have a power and a legal right to pass upon both the law and the fact. And this is sufficient to account for many and most of the *dicta* in which the proposition is stated. But it would be more accurate to state, that it is the right of the jury to return

a general verdict; this draws after it, as a necessary consequence, that they *incidentally* pass upon the law. But here again is the question, what is intended by 'passing upon the law?' I think it is by embracing it in their verdict, and thus bringing it upon the record, with their finding of the facts. But does it follow that they may rightfully and by authority of the common law, by which all are conscientiously bound to govern their conduct, proceed upon the same grounds and principles in the one case as the other? What the jury have a right to do, and what are the grounds and principles upon which they are in duty and conscience bound to act and govern themselves in the exercise of that right, are two very distinct questions. The latter is the one we have to deal with. Suppose they have a right to find a general verdict, and by that verdict to conclude the prosecutor in the matter of law, still it is an open and very different question, whether, *in making up that verdict* and thereby embracing the law, they have the same right to exercise their own reason and judgment, against the statement of the law by the judge, to adjudicate on the law, as unquestionably they have on the fact. The affirmative of this proposition is maintained by the defendant in this case, and by others in many of the cases before us. If I am right in the assumption that the judge is to adjudge the law and the jury the fact only, it furnishes the answer to this question, to what extent the jury adjudicate the law; and it is, that they receive authoritative directions from the court, and act in conformity with them, though by their verdict they thus embrace the law with the fact, which they may rightfully adjudicate."

Alluding to the history of this question in England, and particularly, as did Mr. Justice Curtis, to the controversy in *King* v. *Dean of St. Asaph*, 3 T. R. 428, and which resulted in the passage by Parliament, after the separation of this country from Great Britain, of the Libel Act, 32 G. 3, and observing that both parties to that controversy assumed the force and existence of the rule as the ancient rule of the common law, the court said: " The court and high prerogative party say, judges answer to the law and jurors to the fact; the question

of guilty or not, in the peculiar form of a criminal prosecution
for libel, after the jury have found the fact of publication and
truth of the innuendoes, is a question of law, and therefore
must be declared exclusively by the court. The popular party,
assuming the same major proposition, say, the question of
guilty or not is a question of fact, and can be found only by
the jury. It appears to me, therefore, as I stated on the out-
set, that considering the course of the controversy, the earnest-
ness and ability with which every point was contested, and the
thorough examination of the ancient authorities, this concur-
rence of views on the point in question affords strong proof
that, up to the period of our separation from England, the
fundamental definition of trials by jury depended on the uni-
versal maxim, without an exception, *ad quæstionem facti re-
spondent juratores, ad quæstionem juris respondent judices.*"

The *Anthes case*, it may be observed, arose under a statute
enacted in 1855, after the decision in the *Porter case*. But
the court held that that statute did not confer upon juries, in
criminal trials, the power of determining questions of law
against the instructions of the court. And the Chief Justice
said — Justices Metcalf and Merrick concurring — that if the
statute could be so interpreted as to prescribe that the jury,
consistently with their duty, may decide the law upon their
judgment contrary to the decision and instruction of the court
before whom the trial was had, such enactment would be
beyond the scope of legitimate legislative power, repugnant
to the Constitution, and, of course, inoperative and void. See
also *Commonwealth v. Rock*, 10 Gray, 4, where the doctrines
announced in *Commonwealth v. Anthes* were reaffirmed, no
one of the members of the court expressing a dissent.

This question was also fully considered in *Montee v. Com-
monwealth*, 3 J. J. Marsh. 132, 149, 151, in which case Chief
Justice Robertson said: "The Circuit Judge would be a
cypher, and a criminal trial before him a farce, if he had no
right to decide all questions of law which might arise in the
progress of the case. The jury are the exclusive judges of
*the facts*. In this particular they cannot be controlled, and
ought not to be instructed by the court. They are, also, *ex*

*necessitate*, the ultimate judges, in one respect, of the law; if they acquit, the judge cannot grant a new trial, how much soever they have misconceived or disregarded the law." "If the court had no right to decide on the law, error, confusion, uncertainty, and licentiousness would characterize the criminal trials; and the safety of the accused might be as much endangered as the stability of public justice would certainly be." In *Pierce* v. *State*, 13 N. H. 536, 554, it was held to be inconsistent with the spirit of the Constitution that questions of law, and still less, questions of constitutional law, should be decided by the verdict of the jury, contrary to the instructions of the court.

In *Duffy* v. *People*, 26 N. Y. 588, 592, Judge Selden, speaking for the Court of Appeals of New York, said: "The unquestionable power of juries to find general verdicts, involving both law and fact, furnishes the foundation for the opinion that they are judges of the law, as well as of the facts, and gives some plausibility to that opinion. They are not, however, compelled to decide legal questions, having the right to find special verdicts, giving the facts, and leaving the legal conclusions, which result from such facts, to the court. When they find general verdicts, I think it is their duty to be governed by the instructions of the court as to all legal questions involved in such verdicts. They have the power to do otherwise, but the exercise of such power cannot be regarded as rightful, although the law has provided no means, in criminal cases, of reviewing their decisions whether of law or fact, or of ascertaining the grounds upon which their verdicts are based." See also *People* v. *Finnegan*, 1 Parker's Cr. Cas. 147, 152; *Safford* v. *People*, 1 Parker's Cr. Cas. 474, 480.

So in *Hamilton* v. *People*, 29 Michigan, 173, 192, Mr. Justice Campbell, as the organ of the court, said: "We understand the uniform practice and the decided weight of opinion to require that the judge give his views of the law to the jury as authority, and not as a matter to be submitted to their review." And in *People* v. *Anderson*, 44 California, 65, 70: "In this State it is so well settled as no longer to be open to debate, that it is the duty of a jury in a criminal case to take the law from the court."

The principle was accurately stated by Chief Justice Ames, speaking for the Supreme Court of Rhode Island, when he said : " The line between the duties of a court and jury in the trial of causes at law, both civil and criminal, is perfectly well defined; and the rigid observance of it is of the last import- ance to the administration of systematic justice. Whilst, on the one hand, the jury are the sole ultimate judges of the facts, they are, on the other, to receive the law applicable to the case before them solely from the publicly given instruc- tions of the court. In this way court and jury are made re- sponsible, each in its appropriate department, for the part taken by each in the trial and decision of causes, and in this way alone can errors of fact and errors of law be traced, for the purpose of correction, to their proper sources. If the jury can receive the law of a case on trial in any other mode than from the instructions of the court given in the presence of parties and counsel, how are their errors of law, with any cer- tainty, to be detected, and how, with any certainty, therefore, to be corrected ? It is a statute right of parties here, follow- ing, too, the ancient course of the common law, to have the law given by the court, in their presence, to the jury, to guide their decision, in order that every error in matter of law may be known and corrected." *State* v. *Smith*, 6 R. I. 33, 34.

In Pennsylvania, in the case of *Commonwealth* v. *Sherry*, (reported in the Appendix to Wharton on Homicide, pp. 481, 482) Judge Rogers, a jurist of high reputation, thus charged the jury in a capital case: " You are, it is true, judges in a crim- inal case, in one sense, of both law and fact; for your verdict, as in civil cases, must pass on law and fact together. If you acquit, you interpose a final bar to a second prosecution, no matter how entirely your verdict may have been in opposition to the views expressed by the court. . . . It is important for you to keep this distinction in mind, remembering that, while you have the physical power, by an acquittal, to dis- charge a defendant from further prosecution, you have no moral power to do so against the law laid down by the court. . . . For your part, your duty is to receive the law, for the purposes of this trial, from the court. If an error injurious to

the prisoner occurs, it will be rectified by the revision of the court *in banc.* But an error resulting from either a conviction or acquittal, against the law, can never be rectified. In the first case, an unnecessary stigma is affixed to the character of a man who was not guilty of the offence with which he is charged. In the second case, a serious injury is effected by the arbitrary and irremediable discharge of a guilty man. You will see from these considerations the great importance of the preservation, in criminal as well as in civil cases, of the maxim that the law belongs to the court and the facts to the jury." About the same time Judge Sergeant charged a jury : " The point, if you believe the evidence on both sides, is one of law, on which it is your duty to receive the instructions of the court. If you believe the evidence in the whole case, you must find the defendant guilty." *Commonwealth* v. *Vansickle,* Brightly, (Penn.,) 69, 73, 75. To the same effect substantially was the language of Chief Justice Gibson, who, when closing a charge in a capital case, said : " If the evidence on these points fail the prisoner, the conclusion of his guilt will be irresistible, and it will be your duty to draw it." *Commonwealth* v. *Harman,* 4 Penn. St. 269. In a more recent case, *Kane* v. *Commonwealth,* 89 Penn. St. 522, Sharswood, C. J., said that the power of the jury to judge of the law in a criminal case was one of the most valuable securities guaranteed by the bill of rights of Pennsylvania. But in a later case, *Nicholson* v. *Commonwealth,* 96 Penn. St. 503, 505, it was said: " The court had an undoubted right to instruct the jury as to the law, and to warn them as they did against finding contrary to it. This is very different from telling them that they *must* find the defendant guilty, which is what is meant by a binding instruction in criminal cases." In *Commonwealth* v. *McManus,* 143 Penn. St. 64, 85, it was adjudged that the statement by the court was the best evidence of the law within the reach of the jury, and that the jury should be guided by what the court said as to the law. And this view the court, speaking by Chief Justice Paxson, said was in harmony with *Kane* v. *Commonwealth.*

The question has recently been examined by the Supreme Court of Vermont, and after an elaborate review of the

authorities, English and American, that court, by a unanimous judgment — overruling *State* v. *Croteau*, 23 Vermont, 14, and all the previous cases which had followed that case — said: "We are thus led to the conclusion that the doctrine that jurors are the judges of the law in criminal cases is untenable; that it is contrary to the fundamental maxims of the common law from which it is claimed to take its origin; contrary to the uniform practice and decisions of the courts of Great Britain, where our jury system had its beginning, and where it matured; contrary to the great weight of authority in this country; contrary to the spirit and meaning of the Constitution of the United States; repugnant to the constitution of this State; repugnant to our statute relative to the reservation of questions of law in criminal cases and passing the same to the Supreme Court for final decision." *State* v. *Burpee*, 65 Vermont, 1, 34.

These principles are supported by a very large number of adjudications, as will be seen by an examination of the cases cited in the margin.[1]

To the same purport are the text writers. "In theory, therefore," says Judge Cooley, "the rule of law would seem to be, that it is the duty of the jury to receive and follow the law as delivered to them by the court; and such is the clear weight of authority." Const. Lim. 323, 324. Greenleaf, in his treatise on the Law of Evidence, says: "In trials by jury, it is the province of the presiding judge to determine all ques-

---

[1] *People* v. *Wright*, 93 Cal. 564; *Brown* v. *Commonwealth*, 87 Va. 215; *People* v. *Barry*, 90 Cal. 41; *People* v. *Madden*, 76 Cal. 521; *State* v. *Jeandell*, 5 Harr. (Del.) 475; *State* v. *Wright*, 53 Maine, 328; *Commonwealth* v. *Van Tuyl*, 1 Met. (Ky.) 1; *Montgomery* v. *State*, 11 Ohio, 427; *Adams* v. *State*, 29 Ohio St. 412; *Robbins* v. *State*, 8 Ohio St. 131, 167; *Williams* v. *State*, 32 Miss. 389, 396; *Pleasant* v. *State*, 13 Ark. 360, 372; *Robinson* v. *State*, 66 Geo. 517; *Brown* v. *State*, 40 Geo. 689, 695; *Hunt* v. *State*, 81 Geo. 140; *State* v. *Drawdy*, 14 Rich. (S. C.) 87; *Nels* v. *State*, 2 Tex. 280; *Myers* v. *State*, 33 Tex. 525; *State* v. *Jones*, 64 Mo. 391; *Hardy* v. *State*, 7 Mo. 607; *State* v. *Elwood*, 73 N. C. 189; *State* v. *McLain*, 104 N. C. 894; *People* v. *Neuman*, 85 Mich. 98; *State* v. *Johnson*, 30 La. Ann. 904; *State* v. *Ford*, 37 La. Ann. 443, 465; *Fisher* v. *Railway Co.*, 131 Penn. St. 292, 297; *Union Pacific Railway* v. *Hutchinson*, 40 Kansas, 51.

tions on the admissibility of evidence to the jury, as well as to instruct them in the rules of law, by which it is to be weighed. Whether there be any evidence or not is a question for the judge; whether it is sufficient evidence is a question for the jury." "Where the question is mixed, consisting of law and fact, so intimately blended as not to be easily susceptible of separate decision, it is submitted to the jury, who are first instructed by the judge in the principles and rules of law, by which they are to be governed in finding a verdict, and these instructions they are bound to follow." Vol. 1, § 49. Starkie, in his treatise on Evidence, observes: "Where the jury find a general verdict they are bound to apply the law as delivered by the court, in criminal as well as civil cases." p. 816. So in Phillips on Evidence: "They [the jury] are not in general, either in civil or criminal cases, judges of the law. They are bound to find the law as it is propounded to them by the court. They may, indeed, find a general verdict, including both law and fact; but if, in such verdict, they find the law contrary to the instructions of the court, they thereby violate their oath." Vol. 3, Hill & Cowen's Notes, part 2, 1501. See also 1 Taylor on Ev. §§ 21 to 24; 1 Best's Ev. Morgan's ed. § 82.

In 1 Crim. Law Mag. 51 will be found a valuable note to the case of *Kane* v. *Commonwealth*, prepared by Mr. Wharton, in which the authorities are fully examined, and in which he says: "It would be absurd to say that the determination of the law belongs to the jury, not court, if the court has power to set aside that which the jury determines. We must hold, to enable us to avoid the inconsistency, that, subject to the qualification that all *acquittals* are final, the law in criminal cases is to be determined by the court. In this way we have our liberties and rights determined, not by an irresponsible, but by a responsible, tribunal; not by a tribunal ignorant of the law, but by a tribunal trained to and disciplined by the law; not by an irreversible tribunal, but by a reversible tribunal; not by a tribunal which makes its own law, but by a tribunal that obeys the law as made. In this way we maintain two fundamental maxims. The first is, that while to

facts answer juries, to the law answers the court. The second, which is still more important, is ' *nullum crimen, nulla pœna, sine lege.*' Unless there be a violation of law preannounced, and this by a constant and responsible tribunal, there is no crime, and can be no punishment." 1 Crim. Law Mag. 56. The same author, in his treatise on Pleadings and Practice, concludes his examination of the question in these words: " The conclusion we must, therefore, accept is, that the jury are no more judges of law in criminal than in civil cases, with the qualification that owing to the peculiar doctrine of *autrefois acquit*, a criminal *acquitted* cannot be overhauled by the court. In the Federal courts such is now the established rule." §§ 809, 810.

Forsyth, in his History of Trial by Jury — a work of merit — discusses the doctrine advanced by some that the jury were entitled in all cases, where no special pleas have been put on the record, to give a general verdict according to their own views of the law, in criminal as well as in civil cases. He says: " It is impossible to uphold the doctrine. It is founded on a confusion between the ideas of *power* and *right.*" "Indeed, it is difficult to understand how any one acquainted with the principles and settled practice of the English law can assert that it sanctions the doctrine which is here combated." Again: " The distinction between the province of the judge and that of the jury is, in the English law, clearly defined, and observed with jealous accuracy. The jury must in all cases determine the value and effect of evidence which is submitted to them. They must decide what degree of credit is to be given to a witness, and hold the balance between conflicting probabilities. The law throws upon them the whole responsibility of ascertaining *facts* in dispute, and the judge does not attempt to interfere with the exercise of their unfettered discretion in this respect. But, on the other hand, the judge has his peculiar duty in the conduct of a trial. He must determine whether the kind of evidence offered is such as ought or ought not to be submitted to the jury, and what liabilities it imposes. When any questions of law arise, he alone determines them, and their consideration is absolutely

withdrawn from the jury, who must in such cases follow the direction of the judge; or if they perversely refuse to do so, their verdict (in civil cases) will be set aside, and a new trial granted." London ed. 1852, pp. 261, 262, 282; Morgan's ed. pp. 235, 236.

Worthington, in his Inquiry into the Power of Juries, an English work published in 1825, and often cited in the adjudged cases, says: "Were they [the jury] permitted to decide the law, the principles of justice would be subverted; the law would become as variable as the prejudices, the inclinations and the passions of men. If they could legally *decide* upon questions of law, their decision must of necessity be final and conclusive, which would involve an absurdity in all judicial proceedings, and would be contradictory to the fundamental principles of our jurisprudence." "The jury, when called upon to decide facts which are complicated with law, are therefore constitutionally, and must be, from the nature and intention of the institution, bound to seek and to obey the direction of the judge with respect to the law. It becomes their duty to apply to the law thus explained to them the facts, (which it is their exclusive province to find,) and thus they deliver a verdict compounded of law and fact; but they do not determine or decide upon the law in any case." pp. 193, 194.

Judge Thompson, in his work on Trials, §§ 1016, 1017, thus states the principles: "The judge decides questions of law; the jury questions of fact." So in Proffat on Trial by Jury, § 375: "The preponderance of judicial authority in this country is in favor of the doctrine that the jury should take the law from the court and apply it to the evidence under its direction."

The language of some judges and statesmen in the early history of the country, implying that the jury were entitled to disregard the law as expounded by the court, is, perhaps, to be explained by the fact that "in many of the States the arbitrary temper of the colonial judges, holding office directly from the Crown, had made the independence of the jury in law as well as in fact of much popular importance." Whar-

ton's Cr. Pl. & Pr. 8th ed. § 806; *Williams* v. *State*, 32 Mississippi, 389, 396.

Notwithstanding the declarations of eminent jurists and of numerous courts, as disclosed in the authorities cited, it is sometimes confidently asserted that they all erred when adjudging that the rule at common law was that the jury in criminal cases could not properly disregard the law as given by the court. We are of opinion that the law in England at the date of our separation from that country was as declared in the authorities we have cited. The contrary view rests, as we think, in large part upon expressions of certain judges and writers enforcing the principle, that when the question is *compounded of law and fact*, a general verdict, *ex necessitate*, disposes of the case in hand, both as to law and fact. That is what Lord Somers meant when he said in his essay on " The Security of Englishmen's Lives, or the Trust, Power, and Duty of the Grand Juries of England," that jurors only "are the judges from whose sentence the indicted are to expect life or death," and that "by finding guilty or not guilty, they do complicately resolve both law and fact." In the speeches of many statesmen and in the utterances of many jurists will be found the general observation that when law and fact are "blended" their combined consideration is for the jury, and a verdict of guilty or not guilty will determine both for the particular case in hand. But this falls far short of the contention that the jury, in applying the law to the facts, may rightfully refuse to act upon the principles of law announced by the court.

It is to be observed that those who have maintained the broad position that a jury may, of right, disregard the law as declared by the court, cite the judgment of Chief Justice Vaughan in *Bushell's case*, Vaughan, 135. In that case the accused were acquitted by a general verdict in opposition, *as it was charged*, to the directions of the court. And the question presented upon *habeas corpus* was, whether, for so doing, they were subject to be fined and committed to prison until the fine was paid. Upon a careful examination of the elaborate opinion in that case, it will become clear that the funda-

mental proposition decided was that, in view of the different functions of court and jury, and because a general verdict of necessity resolves " both law and fact complicately, and not the fact by itself," it could never be proved, where the case went to the jury upon both law and facts, that the jurors did not proceed upon their view *of the evidence.* Chief Justice Vaughan said that the words in the warrant, " that the jury did acquit against the direction of the court in matter of law, literally taken, and *de plano*, are insignificant and not intelligible; for no issue can be joined of matter in law, *no jury can be charged with the trial of matter in law barely, no evidence ever was or can be given to a jury of what is law or not; nor no such oath can be given to or taken by a jury, to try matter in law;* nor no attaint can lie for such a false oath." Vaughan, 143. Touching the distinction between the oath cf a witness and that of a juror, he said : " A witness swears but to what . . . hath fallen under his senses. But a juryman swears to what he can infer and conclude from the testimony of such witnesses, by the act and force of his own understanding, to be the fact inquired after, which differs nothing in the reason, though much in the punishment, from what a judge, out of various cases considered by him, infers to be law in the question before him." p. 142.

In referring to the opinion in *Bushell's* case, Mr. Justice Curtis well observed that it would be found that Chief Justice Vaughan " confines himself to a narrow though, for the case, a conclusive line of argument, that the general issue embracing fact as well as law, it can never be proved that the jury believed the testimony on which the fact depended, and in reference to which the direction was given, and so they cannot be shown to be guilty of any legal misdemeanor in returning a verdict, though apparently against the direction of the court in matter of law." And this is the view of the opinion in *Bushell's case* expressed by Hallam in his Constitutional History of England. c. 13.

A similar criticism was made by the Supreme Judicial Court of Massachusetts in the case of *Anthes.* Chief Justice Shaw, after stating the principles involved in *Bushell's case*,

said : " It may be remarked that from the improved views of
the nature of jury trials, during the two hundred years which
have elapsed since the decision of Chief Justice Vaughan, the
juror is now in no more danger of punishment, for giving an
erroneous judgment in matter of fact, than a judge is for
giving an erroneous judgment in matter of law. But his
statement clearly implies that the judge, within his appropri-
ate sphere, is to act by the force of his reason and understand-
ing, and, by the aid of his knowledge of the law and all ap-
propriate means, to adjudge all questions of law, and direct
the jury thereon ; and in like manner the jury, by the force
of their reason and understanding, acting upon all the com-
petent evidence in the case, to reason, weigh evidence, draw
inferences, and adjudge the question of fact embraced in the
issue. Again : 'In these cases the jury, and not the judge,
resolve and find what the fact is. Therefore, always, in dis-
creet and lawful assistance of the jury, the judge's direction
is hypothetical and upon supposition, and not positive upon
coercion, namely : If you find the fact thus, (leaving it to
them what to find,) then you are to find for the plaintiff; but
if you find the fact thus, then it is for the defendant.'
Vaughan, 144." "It is strange," Chief Justice Shaw felt
constrained to say, " that the authority of Vaughan, C. J.,
in this case should be cited, as it has been, to prove that a
juror in finding a general verdict, embracing law and fact,
being sworn to try the issue, must find his verdict upon his
own conviction and conscience, relying, in support of the
proposition, upon the following words of Vaughan, C. J.:
'A man cannot see by another's eye, nor hear by another's
ear; no more can a man decide and infer the thing to be
resolved by another's understanding or reasoning.' Vaughan,
148." Had these words been applied to *the whole issue*
embraced in a general verdict, as would be implied from the
manner of referring to them, they would have countenanced
the proposition ; but they are used expressly to illustrate the
position, that the jury cannot be required *implicitly* to give a
verdict by *the dictates and authority* of the judge. ." I refer,"
Chief Justice Shaw continued, "only to one other passage,

which serves as a key to the whole judgment. He says: 'That *decantatum* in our books, *ad quæstionem facti non respondent judices, ad quæstionem legis non respondent juratores,* literally taken, is true, for if it be demanded, What is the fact? the judge cannot answer; if it be asked, *What is the law in the case? the jury cannot answer it.*' Vaughan, 149." All this tends to show that the leading thought in the opinion of Chief Justice Vaughan was that while the jury cannot answer as to the law, nor the court as to the fact, a general verdict, compounded of law and fact, of necessity determines both as to the case on trial.

In *Townsend's case,* an office taken by virtue of a writ of mandamus, and decided in the sixteenth century, the court said: " For the office of twelve men is no other than to inquire of matters of fact, and not to adjudge what the law is, for that is the office of the court, and not of the jury, and if they find the matter of fact at large, and further say that thereupon the law is so, where in truth the law is not so, the judges shall adjudge according to the matter of fact, and not according to the conclusion of the jury." 1 Plowd. 111, 114. In *Willion* v. *Berkley,* 1 Plowd. 223, 231, also a civil case: " Matters of fact being traversed, shall be tried by twelve men, and if the plaintiff should take a traverse here, it would be to make twelve illiterate men try a matter of law whereof they have no knowledge. It is not their office to try matters of law, but only to try matters of fact; for at the beginning of our law it was ordained that matters of fact should be tried by twelve men of the country where the matter arises, and matters of law by twelve judges of the law, for which purpose there were six judges here, and six in the King's Bench, who, upon matters of law, used to assemble together in a certain place, in order to discuss what the law was therein. So that if a traverse should be here taken, it would be to make twelve ignorant men of the country try that whereof they are not judges, and which does not belong to them to try." See also *Grendon* v. *Bishop of London,* 2 Plowd. 493, 496.

As early as 1727, Raymond, C. J., delivering the unanimous opinion of the twelve judges of the King's Bench in a

case of murder, said that the jury are judges only of the fact, and the court of the law. *Rex* v. *Oneby*, 2 Str. 766, 773. The force of this language as to the functions of judge and jury is not materially weakened by the fact that the case was before the judges upon a special verdict, for it was expressly declared that jurors were judges only of the fact.

Within a few years after *Oneby's case* was determined, in 1734, the case of *King* v. *Poole*, which was a criminal information in the nature of a *quo warranto*, came before Lord Hardwicke. In passing upon a motion for a new trial that famous judge, than whom there could be no higher authority as to what was the settled law of England, said : " The thing that governs greatly in this determination is, that the point of law is not to be determined by juries ; juries have a power by law to determine matters of fact only : and it is of the greatest consequence to the law of England and to the subject, that these powers of the judge and the jury are kept distinct ; that the judge determine the law, and the jury the fact ; and if ever they come to be confounded, it will prove the confusion and destruction of the law of England." Cas. Temp. Hardwicke, 23, 27, 28.

Upon the question here under examination Mr. Foster, to whose work Chief Justice Marshall frequently refers in his opinion or charge delivered in *Burr's case*, says, in the first edition of his work, which appeared in 1762, and again in the third edition, which appeared in 1792.: " In every case where the point turneth upon the question whether the homicide was committed wilfully and maliciously, or under circumstances justifying, excusing, or alleviating the matter of fact, viz., *whether the facts alleged by way of justification, excuse, or alleviation are true*, is the proper and only province of the jury. But whether, upon a supposition of the truth of facts, such homicide be justified, excused, or alleviated must be submitted to the judgment of the court ; for the construction the law putteth upon facts stated and agreed, or found by a jury is in this, as in all other cases, undoubtedly the proper province of the court. In cases of doubt and real difficulty it is commonly recommended to the jury to state facts and circum-

stances in a special verdict. But where the law is clear, the jury, under the direction of the court *in point of law*, matters of fact being still left to their determination, may, and, if they are well advised, always will find a general verdict, conformably to such direction." Foster's Crown Law, 255, 256, 3d ed. See also *The King* v. *Withers*, (Lord Kenyon,) 3 T. R. 428; Bacon's Abridg. Title Juries, M. 2; 2 Hawkins' P. C. c. 22, § 21; 1 Duncomb, Trials per Pais, (Dublin, 1793,) pp. 229, 231.

In Wynne's Eunomus, or Dialogues Concerning the Law and Constitution of England, a work of considerable reputation, the first edition having been published about the time of the adoption of our Constitution, the principle is thus stated : " All that I have said or have to say upon the subject of juries is agreeable to this established maxim, that ' juries must answer to questions of fact and judges to questions of law.' This is the fundamental maxim acknowledged by the Constitution." " It is undoubtedly true that the *jury* are judges, the only judges of the *fact ;* is it not equally within the spirit of the maxim that *judges only* have the competent cognizance of the *law ?* Can it be contended that the jury have, in reality, an adequate knowledge of law? Or, that the Constitution ever designed they should?" "Well — ' but the law and the fact are often complicated ' — then it is the province of the judge to distinguish them ; to tell the jury, that supposing such and such facts were done, what the law is in such circumstances. This is an unbiassed direction ; this keeps the province of judge and jury distinct ; the facts are left altogether to the jury, and the law does not control the fact, but arises from it." " Every verdict is compounded of law and fact, but the law and fact are always distinct in their nature." Wynne's Eunomus, Dialogue III, § 53, 5th ed. 1822, pp. 523, 527, 528 ; 3d ed. 1809, Vol. 2, pp. 142, 144.

Mr. Stephens, in his great work on the History of the Criminal Law of England, in discussing the powers of juries in France, says : " The right of the counsel for the defence to address the jury on questions of law, as, for instance, whether killing in a duel is *meurtre*, is one of the features in which the

administration of justice in France differs essentially from the administration of justice in England. In England the judge's duty is to direct the jury in all matters of law, and any arguments of counsel upon the subject must be addressed to him and not to the jury. This is not only perfectly well established as matter of law, but it is as a fact acquiesced in by all whom it concerns." Vol. 1, p. 551.

To the same effect is *Levi* v. *Milne,* 4 Bing. 195, reported as *Levy* v. *Milne,* 12 J. B. Moore, 418, and decided in 1827. That was an action of libel. Mr. Sergeant Wilde, a counsel in the case, contended that in cases of libel the jury are judges of the law as well as of the fact. But Lord Chief Justice Best said: " If the jury were to be made judges of the law as well as of fact, parties would be always liable to suffer from an arbitrary decision. In the present case, the jury have made themselves judges of the law, and have found against it." " My brother Wilde has stated that in cases of libel the jury are judges of the law as well as of fact; but I beg to deny that. Juries are not judges of the law, or at any rate not in civil actions. The authority on which the learned Sergeant has probably grounded his supposition is the 32d. G. 3, c. 60, which was the famous bill brought in by Mr. Fox, or, more properly, by Lord Erskine. But whoever reads that act will see that it does not apply to civil actions — it applies only to criminal cases. There is nothing in it that in any way touches civil actions, and the jury, with respect to them, stand in the same situation as they ever have done. I mean, however, to protest against juries, *even in criminal cases*, becoming judges of the law: the act only says that they may find a general verdict. Has a jury then a right to act against the opinion of the judge, and to return a verdict on their own construction of the law? I am clearly of opinion that they have not." The report by Moore of this opinion is not as full as the report in Bingham, but the two reports do not differ in any material respect.

But a later decision was that by Lord Abinger, Chief Baron, in 1837, in *Regina* v. *Parish,* 8 Carr. & P. 94. That was an indictment for offering, disposing of, and putting off a forged

bill of exchange. In the course of his argument to the jury the counsel for the accused read the observations of Mr. Justice Coleridge in a certain case as sustaining his view of the law. He was interrupted by the judge, who said : " I cannot allow you to read cases to the jury. *It is the duty of the jury to take the law from the judge.* It no doubt often happens that, in an address to the jury, counsel cite cases; but then it is considered that that part of the speech of the counsel is addressed to the judge. That cannot be so here, as you very properly in the first instance referred me to the case, and you have my opinion upon it ; you can therefore make no further legitimate use of the case, and the only effect of reading it would be to discuss propositions of law with the jury, *with which they have nothing to do, and which they ought to take from me.*"

The case of *Parmiter* v. *Coupland,* 6 M. & W. 104, 106, 108, which was an action for libel, is not without value as tending to show that Fox's Libel Bill, so far from changing the rule, as generally applicable in criminal cases, only required the same practice to be pursued in prosecutions for libel as in other criminal cases. In the course of the argument of counsel, Parke, B., said : " In criminal cases, the judge is to *define* the crime, and the jury are to find whether the party has committed that offence. Mr. Fox's act made it the same in cases of libel, the practice having been otherwise before." Again : " But it has been the course for a long time for a judge, in cases of libel, as in other cases of a criminal nature, first to give *a legal definition of the offence,* and then to leave it to the jury to say whether *the facts* necessary to constitute *that offence* are proved to their satisfaction ; and that, whether the libel is the subject of a criminal prosecution, or civil action. A publication, without justification or lawful excuse, which is calculated to injure the reputation of another, by exposing him to hatred, contempt, or ridicule, is a libel. Whether the particular publication, the subject of inquiry, is of that character, and would be likely to produce that effect, is a question upon which a jury is to exercise their judgment, and pronounce their opinion, *as a question of fact.* The judge,

as a matter of advice to them in deciding *that* question, might have given his own opinion as to the nature of the publication, but was not bound to do so as a matter of law. Mr. Fox's Libel Bill was a declaratory act, and put prosecution for libel on the same footing as other criminal cases." Alderson, B., concurring, said that the judge " ought — having defined what is a libel — to refer to the jury the consideration of the particular publication, *whether falling within that* definition or not."

It is, therefore, a mistake to suppose that the English Libel Act changed in any degree the general common law rule in criminal cases, as to the right of the court to decide the law, and the duty of the jury to apply the law thus given to the facts, subject to the condition, inseparable from the jury system, that the jury by a general verdict of necessity determined in the particular case both law and fact as compounded in the issue submitted to them. That act provides that " the court or judge, before whom such indictment or information shall be tried, shall, according to their or his discretion, give their or his *opinion and directions* to the jury on the matter in issue between the King and the defendant, *in like manner as in other criminal cases.*" " This seems," Mr. Justice Curtis well said, " to carry the clearest implication that, in this and all other criminal cases, the jury may be *directed* by the judge; and that, while the object of the statute was to declare that there was *other matter of fact* besides publication and the innuendoes to *be decided by the jury*, it was not intended to interfere with the proper province of the judge to decide all matters of law." 1 Curtis, 55. And this accords with the views expressed by Lord Abinger in *Reeves* v. *Templar*, 2 Jur. 137, 138. He said : " Before that statute a practice had arisen of considering that the question, libel or no libel, was always for the court, independent of the intention and meaning of the party publishing. That statute corrected the error; and now, if the intention does not appear on the body of the libel, a variety of circumstances are to be left to the jury from which to infer it; but it was never intended to take from the court the power of deciding whether certain words are *per se* libellous or not."

The rule that jurors do not respond to questions of law was illustrated in *Bishop of Meath* v. *Marquis of Winchester,* 4 Cl. & Fin. 445, 557, where Lord Chief Justice Tindal, delivering the unanimous opinion of the judges, said : " With respect to the second question lastly above proposed to us, viz., whether if the fine were received in evidence it ought to be left to the jury to say whether it barred the action of *quare impedit,* we all think that the legal effect of such fine as a bar to the action of *quare impedit* is a matter of law merely, and not in any way a matter of fact; and, consequently, the judge who tried the cause should state to the jury whether in point of law the fine had that effect, or what other effect on the rights of the litigant parties, upon the general and acknowledged principle *ad quæstionem juris non respondent juratores.*"

Briefly stated, the contention of the accused is that *although there may not have been any evidence whatever* to support a verdict of guilty of an offence less than the one charged — and such was the case here — yet, to charge the jury, as matter of law, that the evidence in the case did not authorize any verdict except one of guilty or one of not guilty of the particular offence charged, was an interference with their legitimate functions, and, therefore, with the constitutional right of the accused to be tried by a jury.

The error in the argument, on behalf of the accused, is in making the general rule as to the respective functions of court and jury, applicable equally to a case in which there is some substantial evidence to support the particular right asserted, and a case in which there is *an entire absence of evidence* to establish such right. In the former class of cases the court may not, without impairing the constitutional right of trial by jury, do what, in the latter cases, it may often do without at all entrenching upon the constitutional functions of the jury. The law makes it the duty of the jury to return a verdict according to the evidence in the particular case before them. But if there are no facts in evidence bearing upon the issue to be determined, it is the duty of the court, especially when so requested, to instruct them as to the law arising out of that state of case. So, if there be some evidence bearing upon a

particular issue in a cause, but it is so meagre as not, in law, to justify a verdict in favor of the party producing it, the court is in the line of duty when it so declares to the jury. *Pleasants* v. *Fant*, 22 Wall. 116, 121; *Montclair* v. *Dana*, 107 U. S. 162; *Randall* v. *Baltimore & Ohio Railroad*, 109 U. S. 478, 482; *Schofield* v. *Chicago & St. Paul Railway*, 114 U. S. 615, 619; *Marshall* v. *Hubbard*, 117 U. S. 415, 419; *Meehan* v. *Valentine*, 145 U. S. 611, 625.

The cases just cited were, it is true, of a civil nature; but the rules they announce are, with few exceptions, applicable to criminal causes, and indicate the true test for determining the respective functions of court and jury. Who can doubt, for instance, that the court has the right even in a capital case to instruct the jury as matter of law to return a verdict of acquittal on the evidence adduced by the prosecution. Could it be said, in view of the established principles of criminal law, that such an instruction entrenched upon the province of the jury to determine from the evidence whether the accused was guilty or not guilty of the offence charged, or of some lesser offence included in the one charged? Under a given state of facts, outlined in an instruction to the jury, certain legal presumptions may arise. May not the court tell the jury what those presumptions are, and should not the jury assume that they are told truly? If the court excludes evidence given in the hearing of the jury, and instructs them to disregard it altogether, is it not their duty to obey that instruction, whatever may be their view of the admissibility of such evidence? In *Famous Smith* v. *United States*, 151 U. S. 50, 55, which was an indictment for the murder, in the Indian Territory, of one Gentry, "a white man and not an Indian," we said: "That Gentry was a white man, and not an Indian, was a fact which the government was bound to establish, and if it failed to introduce any evidence upon that point, defendant was entitled to an instruction to that effect. Without expressing any opinion as to the correctness of the legal propositions embodied in this charge, we think there was no testimony which authorized the court to submit to the jury the question whether Gentry was a white man and not an Indian.

The objection went to the jurisdiction of the court, and if no other reasonable inference could have been drawn from the evidence than that Gentry was an Indian, defendant was entitled, as matter of law, to an acquittal " — citing *Pleasants* v. *Fant*, 22 Wall. 116; *County Commissioners* v. *Clark*, 94 U. S. 278, and *Marshall* v. *Hubbard*, 117 U. S. 415. So, in this case, it was competent for the court to say to the jury that *on account of the absence of all evidence* tending to show that the defendants were guilty of manslaughter, they could not, consistently with law, return a verdict of guilty of *that* crime.

Any other rule than that indicated in the above observations would bring confusion and uncertainty in the administration of the criminal law. Indeed, if a jury may rightfully disregard the direction of the court in matter of law, and determine for themselves what the law is in the particular case before them, it is difficult to perceive any legal ground upon which a verdict of conviction can be set aside by the court as being against law. If it be the function of the jury to decide the law as well as the facts — if the function of the court be only advisory as to the law — why should the court interfere for the protection of the accused against what it deems an error of the jury in matter of law.

Public and private safety alike would be in peril, if the principle be established that juries in criminal cases may, of right, disregard the law as expounded to them by the court and become a law unto themselves. Under such a system, the principal function of the judge would be to preside and keep order while jurymen, untrained in the law, would determine questions affecting life, liberty, or property according to such legal principles as in their judgment were applicable to the particular case being tried. If because, generally speaking, it is the function of the jury to determine the guilt or innocence of the accused according to the evidence, of the truth or weight of which they are to judge, the court should be held bound to instruct them upon a point in respect to which there was no evidence whatever, or to forbear stating what the law is upon a given state of facts, the result would be that the enforcement of the law against criminals and the protection of

citizens against unjust and groundless prosecutions, would depend entirely upon juries uncontrolled by any settled, fixed, legal principles. And if it be true that jurors in a criminal case are under no legal obligation to take the law from the court, and may determine for themselves what the law is, it necessarily results that counsel for the accused may, of right, in the presence of both court and jury, contend that what the court declares to be the law applicable to the case in hand is not the law, and, in support of his contention, read to the jury the reports of adjudged cases and the views of elementary writers. Undoubtedly, in some jurisdictions, where juries in criminal cases have the right, in virtue of constitutional or statutory provisions, to decide both law and facts upon their own judgment as to what the law is, and as to what the facts are, it may be the privilege of counsel to read and discuss adjudged cases before the jury. And in a few jurisdictions, in which it is held that the court alone responds as to the law, that practice is allowed in deference to long usage. But upon principle, where the matter is not controlled by express constitutional or statutory provisions, it cannot be regarded as the right of counsel to dispute before the jury the law as declared by the court. Under the contrary view — if it be held that the court may not authoritatively decide all questions of law arising in criminal cases — the result will be that when a new trial in a criminal case is ordered, even by this court, the jury, upon such trial, may of right return a verdict based upon the assumption that what this court has adjudged to be law is not law. We cannot give our sanction to any rule that will lead to such a result. We must hold firmly to the doctrine that in the courts of the United States it is the duty of juries in criminal cases to take the law from the court and apply that law to the facts as they find them to be from the evidence. Upon the court rests the responsibility of declaring the law; upon the jury, the responsibility of applying the law so declared to the facts as they, upon their conscience, believe them to be. Under any other system, the courts, although established in order to declare the law, would for every practical purpose be eliminated from our system of government as instrumen-

talities devised for the protection equally of society and of individuals in their essential rights. When that occurs our government will cease to be a government of laws, and become a government of men. Liberty regulated by law is the underlying principle of our institutions.

To instruct the jury in a criminal case that the defendant cannot properly be convicted of a crime less than that charged, or to refuse to instruct them in respect to the lesser offences that might, under some circumstances, be included in the one so charged — there being no evidence whatever upon which any verdict could be properly returned except one of guilty or one of not guilty of the particular offence charged — is not error; for the instructing or refusing to instruct, under the circumstances named, rests upon legal principles or presumptions which it is the province of the court to declare for the guidance of the jury. In the case supposed the court is as clearly in the exercise of its legitimate functions, as it is when ruling that particular evidence offered is not competent, or that evidence once admitted shall be stricken out and not be considered by the jury, or when it withdraws from the jury all proof of confessions by the accused upon the ground that such confessions, not having been made freely and voluntarily, are inadmissible under the law as evidence against the accused.

These views are sustained by a very great weight of authority in this country. In *People* v. *Barry*, 90 California, 41, which was a criminal prosecution for an assault with intent to commit robbery, the accused having been twice before convicted of petit larceny, it was held not to be error to refuse to instruct the jury that under the charge they might find him guilty of simple assault, because "the evidence tended to show that he was guilty of the crime charged or of no offence at all," and, therefore, "the instruction asked was not applicable to the facts of the case;" in *People* v. *McNutt*, 93 California, 658, the offence charged being an assault with a deadly weapon and with intent to commit murder, that an instruction that the jury might convict of a simple assault could have been properly refused, because "under the evidence he

was either guilty of an offence more serious than simple assault or he was not guilty;" in *Clark* v. *Commonwealth*, 123 Penn. St. 81, a case of murder, that the omission of an instruction on the law of voluntary manslaughter, and the power of the jury to find it, was not error, because the murder was deliberate murder, and "there was no evidence on which it could be reduced to a milder form of homicide;" in *State* v. *Lane*, 64 Missouri, 319, 324, which was an indictment for murder in the first degree, that "if the evidence makes out a case of murder in the first degree, and applies to that kind of killing, and no other, the court would commit no error in confining its instructions to that offence and refusing to instruct either as to murder in the second degree or manslaughter in any of its various degrees," and when an instruction " is given for any less grade of offence, and there is no evidence upon which to base it," the judgment should be reversed for error; in *McCoy* v. *State*, 27 Texas App. 415, the charge being murder of the first degree, that the refusal to charge the law of murder in the second degree was not error, for the reason that if the defendant was "criminally responsible at all for the homicide, the grade of the offence under the facts is not short of murder of the first degree;" in *State* v. *McKinney*, 111 N. C. 683, a murder case, that as there was no testimony on either side tending to show manslaughter, a charge that there was no element of manslaughter in the case, and that the defendant was guilty of murder or not guilty of anything at all, as the jury should find the facts, was strictly in accordance with the testimony and the precedents; in *State* v. *Musick*, 101 Missouri, 260, 270, where the charge was an assault with malice aforethought, punishable by confinement in the penitentiary, that an instruction looking to a conviction for a lower grade included in the offence charged, was proper where there was evidence justifying it; in *State* v. *Casford*, 76 Iowa, 330, 332, that the defendant, so charged in an indictment that he could be convicted of rape, an assault to commit rape, or an assault and battery, was not prejudiced by the omission of the court to instruct the jury that he could be convicted of a simple assault, there being no evidence to au-

thorize a verdict for the latter offence; in *Jones* v. *State*, 52 Arkansas, 345, a murder case, that it was not error to refuse to charge as to a lower grade of .offence, there being "no evidence of any crime less than murder in the first degree," and the defendant being therefore guilty of "murder in the first degree, or innocent;" in *McClevnard* v. *Commonwealth*, (Kentucky,) 12 S. W. Rep. 148, and in *O'Brien* v. *Commonwealth*, 89 Kentucky, 354, murder cases, that an instruction as to manslaughter need not be given, unless there is evidence to justify it; in *State* v. *Estep*, 44 Kansas, 572, 575, a case of murder of the first degree, that there was no testimony tending to show that the defendant was guilty of manslaughter in either the first, second, or fourth degrees, instructions as to those degrees should not have been given; and in *Robinson* v. *State*, 84 Georgia, 674, a case of assault with intent to murder, that the refusal to instruct the jury that the defendant could have been found guilty of an assault, or of assault and battery, was not error, "for there was nothing in the evidence to justify the court in so instructing the jury."

We have said that, with few exceptions, the rules which obtain in civil cases in relation to the authority of the court to instruct the jury upon all matters of law arising upon the issues to be tried, are applicable in the trial of criminal cases. The most important of those exceptions is that it is not competent for the court, in a criminal case, to instruct the jury peremptorily to find the accused guilty of the offence charged or of any criminal offence less than that charged. The grounds upon which this exception rests were well stated by Judge McCrary, Mr. Justice Miller concurring, in *United States* v. *Taylor*, 3 McCrary, 500, 505. It was there said: "In a civil case, the court may set aside the verdict, whether it be for the plaintiff or defendant, upon the ground that it is contrary to the law as given by the court; but in a criminal case, if the verdict is one of acquittal, the court has no power to set it aside. It would be a useless form for a court to submit a civil case involving only questions of law to the consideration of a jury, where the verdict, when found, if not in accordance with the court's view of the law, would be set aside. The same result

is accomplished by an instruction given in advance to find a verdict in accordance with the court's opinion of the law. But not so in criminal cases. A verdict of acquittal cannot be set aside; and therefore, if the court can direct a verdict of guilty, it can do indirectly that which it has no power to do directly."

We are of opinion that the court below did not err in saying to the jury that they could not consistently with the law arising from the evidence find the defendants guilty of manslaughter or of any offence less than the one charged; that if the defendants were not guilty of the offence charged, the duty of the jury was to return a verdict of not guilty. No instruction was given that questioned the right of the jury to determine whether the witnesses were to be believed or not, nor whether the defendant was guilty or not guilty of the offence charged. On the contrary, the court was careful to say that the jury were the exclusive judges of the facts, and that they were to determine — applying to the facts the principles of law announced by the court — whether the evidence established the guilt or innocence of the defendants of the charge set out in the indictment.

The trial was thus conducted upon the theory that it was the duty of the court to expound the law and that of the jury to apply the law as thus declared to the facts as ascertained by them. In this separation of the functions of court and jury is found the chief value, as well as safety, of the jury system. Those functions cannot be confounded or disregarded without endangering the stability of public justice, as well as the security of private and personal rights.

The main reason ordinarily assigned for a recognition of the right of the jury, in a criminal case, to take the law into their own hands, and to disregard the directions of the court in matters of law, is that the safety and liberty of the citizen will be thereby more certainly secured. That view was urged upon Mr. Justice Curtis. After stating that if he conceived the reason assigned to be well founded, he would pause long before denying the existence of the power claimed, he said that a good deal of reflection had convinced him that the

argument was the other way.   He wisely observed, that "as long as the judges of the United States are obliged to express their opinions publicly, to give their reasons for them when called upon in the usual mode, and to stand responsible for them, not only to public opinion, but to a court of impeachment, I can apprehend very little danger of the laws being wrested to purposes of injustice.   But, on the other hand, I do consider that this power and corresponding duty of the court, authoritatively to declare the law, is one of the highest safeguards of the citizen.   The sole end of courts of justice is to enforce the laws uniformly and impartially, without respect of persons or times or the opinions of men.   To enforce popular laws is easy.   But when an unpopular cause is a just cause; when a law, unpopular in some locality, is to be enforced, there then comes the strain upon the administration of justice; and few unprejudiced men would hesitate as to where that strain would be most firmly borne." *United States* v. *Morris,* 1 Curtis, 23, 62, 63.

The questions above referred to are the only ones that need be considered on this writ of error.

Mr. Justice Jackson participated in the decision of this case and concurs in the views herein expressed.

*The judgment of the Circuit Court is affirmed as to Hansen, but is reversed as to Sparf, with directions for a new trial as to him.*

Mr. Justice Brewer, with whom concurred Mr. Justice Brown, dissenting.

I concur in the views expressed in the opinion of the court as to the separate functions of court and jury, and in the judgment of affirmance against Hansen; but I do not concur in holding that the trial court erred in admitting evidence of confessions, or in the judgment of reversal as to Sparf.

The facts briefly stated are these: There was a single indictment charging the defendants jointly with the crime of murder.   There was a single case on trial, a case in which the government was the party on one side and the two defendants

the party on the other. These two defendants were repre-
sented by the same counsel. Three witnesses testified to con-
fessions of Hansen. Counsel for defendants objected to each
of these confessions. These objections were in the same form.
They purported to be for the defendants jointly, and not
separately for each. Two of the confessions were given in
the presence of Sparf, and in admitting them it is not pre-
tended that there was any error. One was made in the
absence of Sparf, and it is held that the court erred in over-
ruling the objection to it. The objection was that the testi-
mony offered was "irrelevant, immaterial, and incompetent,
and upon the ground that any statement made by Hansen
was not and could not be voluntary." It will be noticed that
this objection was both general and special; the special
ground, that which would naturally arrest the attention of
the court, being that the confession was not voluntary. This
ground of objection it is admitted was not well taken. If
there was any error it was in overruling the general objection
that the testimony was irrelevant, immaterial, and incompe-
tent. But it is conceded that this confession was material,
relevant, and competent, was properly admitted in evidence
on the single trial then pending, and properly heard by the
jury. The real burden of complaint is that when the court
admitted the testimony it ought to have instructed the jury
that it was evidence only against Hansen, and not against
Sparf. But in common fairness ought not the attention of
the court to have been called to the difference, and a ruling
had upon that difference? Cannot parties present a joint
objection to testimony and rest their case upon such objection?
Is it the duty of the court to consider a matter which is not
called to its attention, and make a ruling which it is not asked
to make? Is it not the duty of the court to be impartial
between the government and the defendant, and decide
simply the questions which each party presents? Is it its
duty to watch over the interests of either party, and to put
into the mouth of counsel an objection which he does not
make? To my mind such a doctrine is both novel and dan-
gerous. I do not question the proposition that a confession

made by one of two defendants in the absence of the other is to be considered by the jury only as against the one making it, and I admit that if a separate objection had been made by Sparf the court would have been called upon to formally sustain such objection, and instruct the jury that such testimony was to be considered by them only as against Hansen. If an instruction had been asked, as is the proper way, the attention of the court would have been directed to the matter, and an adverse ruling would have rightly presented the error which is now relied upon. But I need not refer to the oft-repeated decisions of this court that there is no error in failing to give an instruction which is not asked, unless it be one of those which a statute in terms requires the court to give, and there is no pretence of any such statute. *Lewis* v. *Lee County*, 66 Alabama, 480, 489, was decided in accordance with the views which I have expressed. The court in that case say:

"The witness Frazier's testimony, as to his conversation with the defendant Lewis, regarding the condition of his accounts as county treasurer, was properly admitted in evidence. It was certainly good as an admission against him, and could not be excluded because not admissible against the sureties, who were his codefendants in the action. The practice on this point is well settled in this State, that the only remedy of a codefendant, in such a case, is to request a charge from the court to the jury, limiting the operation of the evidence, so as to confine its influence only to the defendant against whom it is admissible."

So in *State* v. *Brite*, 73 N. C. 26, 28, a similar ruling was made, the court saying:

"The defendant's first exception is that his honor allowed Culpepper, a codefendant, to introduce witnesses to prove his (Brite's) declarations while in jail, which tended to exonerate Culpepper."

"While these declarations are not evidence, either for or against Culpepper, being, as to him, *res inter alios acta*, and made by one not under oath, and subject to cross-examination, yet they are clearly admissible against Brite, and it makes no difference whether they were called forth by the State, or by

Culpepper, without objection, or rather with the sanction of the State."

I have been able to find no case laying down a contrary doctrine. In *Mutual Life Ins. Co.* v. *Hillmon,* 145 U. S. 285, each defendant separately for itself presented the objection, and each, therefore, had the right to avail itself of the ruling made by the. court. Indeed, I think this will be found to be the first case in which it has been held that, while the court properly allowed testimony to go to the jury on the trial of a case, the judgment has been reversed because it failed to call the attention of the jury to the bearing of that evidence upon the different parties when such parties never asked the court to so instruct the jury.

I am authorized to say that MR. JUSTICE BROWN concurs in these views.

MR. JUSTICE GRAY, with whom concurred MR. JUSTICE SHIRAS, dissenting.

Mr. Justice Shiras and myself concur in so much of the opinion of the majority of the court as awards a new trial to one of the defendants, by reason of the admission in evidence against him of confessions made in his absence by the other.

But from the greater part of that opinion, and from the affirmance of the conviction of the other defendant, we are compelled to dissent, because, in our judgment, the case, involving the question of life or death to the prisoners, was not submitted to the decision of the jury as required by the Constitution and laws of the United States.

The two defendants, Herman Sparf and Hans Hansen, together with Thomas St. Clair, seamen on board the brig Hesper, an American vessel, were indicted for the murder of Maurice Fitzgerald, the second mate, on the high seas, on January 13, 1893, by striking him with a weapon and by throwing him overboard and drowning him.

St. Clair was separately tried, convicted and sentenced, and his conviction was affirmed by this court at the last term. 154 U. S. 134.

At the trial of Sparf and Hansen, there was no direct testimony of any eye-witness to the killing, or to any assault or affray. There was evidence that, at ten o'clock in the evening of the day in question, the second mate was at the wheel, in charge of the starboard watch, consisting of St. Clair, Sparf, Hansen and another seaman; and that, when the watch was changed at midnight, the second mate could not be found, and there was much blood on the deck, as well as a bloody broomstick and a wooden bludgeon. The rest of the evidence consisted of testimony of other seamen to acts and statements of each defendant and of St. Clair, before and after the disappearance of the second mate, tending to prove a conspiracy to kill him; and to subsequent confessions of Hansen, tending to show that the killing was premeditated.

The judge, in his charge to the jury, gave the following instructions: "The indictment is based upon section 5339 of the Revised Statutes, which provides, among other things, that 'every person who commits murder' 'upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin, or bay, within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular State, or who upon any of such waters maliciously strikes, stabs, wounds, poisons, or shoots at any other person, of which striking, stabbing, wounding, poisoning, or shooting such other person dies, either on land or at sea, within or without the United States, shall suffer death.'"

"Murder is the unlawful killing of a human being in the peace of the State, with malice aforethought, express or implied." "Express malice" was defined as "deliberate premeditation and design, formed in advance to kill or to do bodily harm, the premeditation and design being implied from external circumstances capable of proof, such as lying in wait, antecedent threats, and concerted schemes against a victim;" and "implied malice" as "an inference of the law from any deliberate and cruel act committed by one person against another," "that is, malice is inferred when one kills another without provocation, or when the provocation is not great." "Manslaughter is the unlawful killing of

a human being, without malice, either expressed or implied. I do not consider it necessary, gentlemen, to explain it further; for, if a felonious homicide has been committed, of which you are to be the judges from the proof, there is nothing in this case to reduce it below the grade of murder." "Every person present at a murder, willingly aiding or abetting its perpetration, is guilty of murder, and may be indicted and convicted as principal in the first degree." "It is not my purpose, nor is it my function, to assume any fact to be proven, nor to suggest to you that any fact has been proven. You are the exclusive judges of the facts."

The defendants requested the judge to instruct the jury that "under the indictment in this case the defendants may be convicted of murder, or manslaughter, or of an attempt to commit murder or manslaughter; and if, after a full and careful consideration of all the evidence before you, you believe beyond a reasonable doubt that the defendants are guilty either of manslaughter, or of an assault with intent to commit murder or manslaughter, you should so find your verdict." The judge refused to give this instruction, and the defendants excepted to the refusal.

The jury, after deliberating on the case for some time, returned into court, and being asked whether they had agreed upon a verdict, the foreman said that one of the jurors wished to be instructed upon certain points under the laws of the United States as to murder upon the high seas. One of the jurors then said that he "would like to know, in regard to the interpretation of the laws of the United States in regard to manslaughter, as to whether the defendants can be found guilty of manslaughter, or that the defendants must be found guilty," evidently meaning "of murder," the whole offence charged in the indictment. The judge then read again section 5339 of the Revised Statutes. The juror asked: "Are the two words 'aiding' or 'abetting' defined?" The judge replied: "The words 'aiding' or 'abetting' are not defined. But I have instructed you as to the legal effect of aiding and abetting, and this you should accept as law. If I have made an error, there is a higher tribunal to correct it." The juror

said: "I am the spokesman for two of us. We desire to clearly understand the matter. It is a barrier in our mind to our determining the matter. The question arising amongst us is as to aiding and abetting. Furthermore, as I understand, it must be one thing or the other. It must be either guilty or not guilty." The judge replied: "Yes; under the instructions I have given you." The judge then, after repeating the general definitions, as before given, of murder and of manslaughter, said: "If a felonious homicide has been committed by either of the defendants, of which you are to be the judges from the proof, there is nothing in this case to reduce it below the grade of murder;" and, in answer to further questions of the juror, repeated this again and again, and said: "In a proper case, it may be murder, or it may be manslaughter; but in this case it cannot properly be manslaughter." The defendants excepted to these instructions. And finally, in answer to the juror's direct question, "Then there is no other verdict we can bring in, except guilty or not guilty?" the judge said: "In a proper case, a verdict for manslaughter may be rendered, as the district attorney has stated; and even in this case you have the physical power to do so; but, as one of the tribunals of the country, a jury is expected to be governed by law, and the law it should receive from the court." The juror then said: "There has been a misunderstanding amongst us. Now it is clearly interpreted to us, and no doubt we can now agree on certain facts." Thereupon a verdict of guilty of murder was returned against both defendants, and they were sentenced to death, and sued out this writ of error.

The judge, by instructing the jury that they were bound to accept the law as given to them by the court, denied their right to decide the law. And by instructing them that, if a felonious homicide by the defendants was proved, there was nothing in the case to reduce it below the grade of murder, and they could not properly find it to be manslaughter, and by declining to submit to them the question whether the defendants were guilty of manslaughter only, he denied their right to decide the fact. The colloquy between the judge and the

jurors, when they came in for further instructions, clearly shows that the jury, after deliberating upon the case, were in doubt whether the crime which the defendants had committed was murder or manslaughter; and that it was solely by reason of these instructions of the judge, that they returned a verdict of the higher crime.

It is our deep and settled conviction, confirmed by a reëxamination of the authorities under the responsibility of taking part in the consideration and decision of the capital case now before the court, that the jury, upon the general issue of guilty or not guilty in a criminal case, have the right, as well as the power, to decide, according to their own judgment and consciences, all questions, whether of law or of fact, involved in that issue.

The question of the right of the jury to decide the law in criminal cases has been the subject of earnest and repeated controversy in England and America, and eminent jurists have differed in their conclusions upon the question. In this country, the opposing views have been fully and strongly set forth by Chancellor Kent in favor of the right of the jury, and by Chief Justice Lewis against it, in *People* v. *Croswell*, 3 Johns. Cas. 337; by Judge Hall in favor of the right, and by Judge Bennett against it, in *State* v. *Croteau*, 23 Vermont, 14; and by Chief Justice Shaw against the right, and by Mr. Justice Thomas in its favor, in *Commonwealth* v. *Anthes*, 5 Gray, 185.

The question of the right of the jury under the Constitution of the United States cannot be usefully or satisfactorily discussed without examining and stating the authorities which bear upon the scope and effect of the provisions of the Constitution regarding this subject. In pursuing this inquiry, it will be convenient to consider, first, the English authorities; secondly, the authorities in the several Colonies and States of America; and lastly, the authorities under the national government of the United States.

By Magna Charta, no person could be taken or imprisoned, or deprived of his freehold or of his liberties or free customs, unless by the lawful judgment of his peers, or the law of the

land — *nisi per legale judicium parium suorum, vel per legem terræ.* Accordingly, by the law of England, at the time of the discovery and settlement of this country by Englishmen, every subject (not a member of the House of Lords) indicted for treason, murder or other felony, had the right to plead the general issue of not guilty, and thereupon to be tried by a jury; and, if they acquitted him, the verdict of acquittal was conclusive, in his favor, of both the law and the fact involved in the issue. The jury, in any case, criminal or civil, might indeed, by finding a special verdict reciting the facts, refer a pure question of law to the court; but they were not bound and could not be compelled to do so, even in a civil action.

By the statute of Westm. 2, (13 Edw. I,) c. 30, "it is ordained, that the justices assigned to take assizes shall not compel the jurors to say precisely whether it be disseisin or not, so that they do shew the truth of the fact, and require aid of the justices; but if they of their own head will say, that it is or is not disseisin, their verdict shall be admitted at their own peril." 1 Statutes of the Realm, 86. That statute, as Lord Coke tells us, was declaratory of the common law; and before its enactment some justices directed juries to return general verdicts, thus subjecting them to the peril of an attaint if they mistook the law. 2 Inst. 422, 425.

Littleton, speaking of civil actions in which the jury, upon the general issue pleaded, might return a special verdict, says that "if they will take upon them the knowledge of the law upon the matter, they may give their verdict generally, as is put in their charge." Lit. § 368. And accordingly Lord Coke says: "Although the jury, if they will take upon them (as Littleton here saith) the knowledge of the law, may give a general verdict, yet it is dangerous for them so to do, for if they do mistake the law, they run into the danger of an attaint; therefore to find the special verdict is the safest where the case is doubtful." Co. Lit. 227 *b.*

Lord Coke elsewhere says that "the jury ought, if they will not find the special matter, to find 'at their peril' according to law." *Rawlyns's case*, 4 Rep. 52 *a,* 53 *b.* And Lord Chief Justice Hobart says: "Legally it will be hard to quit

a jury that finds against the law, either common law or several statute law, whereof all men were to take knowledge, and whereupon verdict is to be given, whether any evidence be given to them or not," and "though no man informed them what the law was in that case." *Needler* v. *Bishop of Winchester*, Hob. 220, 227.

The peril or danger, above spoken of, into which the jury ran by taking upon themselves the knowledge of the law, and undertaking to decide by a general verdict the law involved in the issue of fact submitted to them, was the peril of an attaint, upon which their verdict might be set aside and themselves punished. Upon the attaint, however, the trial was not by the court, but by a jury of twenty-four; it was only by a verdict of the second jury, and not by judgment of the court only, that the first verdict could be set aside; and, if not so set aside, the second verdict was final and conclusive. Co. Lit. 293 *a*, 294 *b*; Vin. Ab., Attaint, A. (6); Com. Dig., Attaint, B. Moreover, no attaint lay in a criminal case. *Bushell's case*, Vaughan, 135, 146; *The King* v. *Shipley*, 4 Doug. 73, 115.

Lord Bacon, in his History of Henry VII, (originally written and published in English, and afterwards translated into Latin by himself or under his supervision,) speaking of the Parliament held in the eleventh year of his reign, says: "This Parliament also made that good law, which gave the attaint upon a false verdict between party and party, which before was a kind of evangile, irremediable — in the Latin, *judicia juratorum, quæ veredicta vocantur, quæ ante illud tempus evangelii cujusdam instar erant, atque plane irrevocabilia.* It extends not to causes capital; as well because they are for the most part at the King's suit, as because in them, if they be followed in course of indictment, there passeth a double jury, the indictors and the triers, and so not twelve men, but four and twenty. But it seemeth that was not the only reason; for this reason holdeth not in the appeal — *ubi causa capitalis a parte gravata peragitur.* [That is, the appeal of murder, brought by the heir of the deceased. See *Louisville & St. Louis Railroad* v. *Clarke*, 152 U. S. 230,

239.]  But the great reason was, lest it should tend to the discouragement of jurors in cases of life and death — *ne forte juratores in causis capitalibus timidius se gererent* — if they should be subject to suit and penalty, where the favour of life maketh against them."   6 Bacon's Works, (ed. 1858,) 5, 7, 160, 161 ; 5 Bacon's Works, (ed. 1803,) 117 ; 9 Id. 483.

Lord Bacon was mistaken in assuming that the attaint was introduced by the St. of 11 Hen. VII, c. 24 ; for it existed at common law in writs of assize, and had been regulated and extended to other civil actions by many earlier statutes. 2 Inst. 130, 237, 427 ; Finch, Law, lib. 4, c. 47.

But the mistake does not diminish the force of Lord Bacon's statements that, wherever an attaint did not lie, the " judgment of the jury, commonly called verdict, was considered as a kind of gospel ; " and that the reasons why an attaint did not lie in a capital case were, not only that two juries, the indictors and the triers, had passed upon the case, but chiefly that juries, in cases of life and death, should not be discouraged, or act timidly, by being subjected to suit and penalty if they decided in favor of life.

John Milton, in his Defence of the People of England, after speaking of the King's power in his courts and through his judges, adds :  " Nay, all the ordinary power is rather the people's, who determine all controversies themselves by juries of twelve men.   And hence it is that when a malefactor is asked at his arraignment, *How will you be tried ?* he answers always according to law and custom, *By God and my country ;* not by God and the King, or the King's deputy."  8 Milton's Works, (Pickering's ed.) 198, 199.   The idea is as old as Bracton.   Bract. 119.

In the reign of Charles II, some judges undertook to instruct juries that they must take the law from the court, and to punish them if they returned a verdict in favor of the accused against the judge's instructions.   But, as often as application was made to higher judicial authority, the punishments were set aside, and the rights of juries vindicated.

In 1665, upon the trial of an indictment against three Quakers for an unlawful conventicle, Wagstaffe and other

jurors were fined by Chief Justice Kelyng for acquitting
" against full evidence, and against the direction of the court
in matter of law, in said court openly given and declared " —
*contra plenam evidentiam, et contra directionem curiæ in
materia legis, in dicta curia ibidem aperte datam et declaratam.*
His reasons for this (as stated in his own manuscript note of
the case, not included in the first edition of his reports, pub-
lished by Lord Holt in 1708) were " that they and others may
know that a wilful jury cannot make an act of Parliament or
the law of England of no effect but they are accountable and
punishable for it ; " and " that in criminal cases the court may
fine a jury who will give a verdict contrary to their evidence ;
and the reason (as I take it) is that otherwise a headstrong jury
might overthrow all the course of justice, for no attaint lieth
in criminal causes, and also one verdict is peremptory, and a
new trial cannot be granted in criminal causes, and therefore
the judges have always punished such wilful juries by fine and
imprisonment, and binding them to their good behaviour."
But at the end of his report is this memorandum : " Note, the
whole case of the Quakers, as to fining jury, now not law."  J.
Kel. (3d ed.) 69–75.  And Lord Hale, then Chief Baron, tells
us that the jurors " were thereupon committed, and brought
their *habeas corpus* in the Court of Common Bench, and all
the judges of England were assembled to consider of the
legality of this fine, and the imprisonment thereupon ; " and
the jurors were discharged of their imprisonment, for the fol-
lowing reasons :

" It was agreed by all the judges of England (one only dis-
senting) that this fine was not legally set upon the jury, for
they are the judges of matters of fact ; and although it was
inserted in the fine, that it was *contra directionem curiæ in
materia legis,* this mended not the matter, for it was impossi-
ble any matter of law could come in question, till the matter
of fact were settled and stated and agreed by the jury, and of
such matter of fact they were the only competent judges.
And although the witnesses might perchance swear the fact
to the satisfaction of the court, yet the jury are judges, as
well of the credibility of the witnesses, as of the truth of the

fact; for possibly they might know somewhat of their own knowledge, that what was sworn was untrue, and possibly they might know the witnesses to be such as they could not believe, and it is the conscience of the jury that must pronounce the prisoner guilty or not guilty. And to say the truth, it were the most unhappy case that could be to the judge, if he at his peril must take upon him the guilt or innocence of the prisoner; and if the judge's opinion must rule the matter of fact, the trial by jury would be useless." 2 Hale P. C. 312, 313.

Lord Hale's apparent meaning is that, at a trial upon the plea of not guilty, the jury are the judges of the issue of fact thereby presented, and it is the conscience of the jury that must pronounce the prisoner guilty or not guilty; that, as no matter of law can come in question unless the facts are first found by the jury in a special verdict, it were idle to say that a general verdict was against the judge's direction or opinion in matter of law; and that if the judge's opinion in matter of law must rule the issue of fact submitted to the jury, the trial by jury would be useless.

The reasons are more fully brought out in *Bushell's case*, in 1670, not mentioned in the text of Lord Hale's treatise, and doubtless decided after that was written. William Penn and William Mead having been indicted and tried for a similar offence, and acquitted against the instructions of the court, Bushell and the other jurors who tried them were fined by Sir John Howell, Recorder of London, and Bushell was committed to prison, in like terms, for not paying his fine, and sued out a writ of *habeas corpus*. *Penn & Mead's case*, 6 Howell's State Trials, 951; *Bushell's case*, Vaughan, 135; *S. C.* 6 Howell's State Trials, 999; 1 Freeman, 1; T. Jones, 13.

At the hearing thereon, Scroggs, the King's serjeant, argued: "It is granted, that in matters of fact only, the jury are to be judges; but when the matter of fact is mixed with matter of law, the law is to guide the fact, and they are to be guided by the court. The jury are at no inconvenience, for if they please they may find the special matter; but if they will

take upon them to know the law, and do mistake, they are punishable." 1 Freeman, 3.

But Bushell was discharged from imprisonment, for reasons stated in the judgment delivered by Sir John Vaughan, Chief Justice of the Common Pleas, after a conference of all the judges of England, including Lord Hale, and with the concurrence of all except Chief Justice Kelyng. Vaughan, 144, 145; 1 Freeman, 5; Lord Holt, in *Groenwelt* v. *Burwell*, 1 Ld. Raym. 454, 470.

In that great judgment, as reported by himself, Chief Justice Vaughan discussed separately the two parts of the return; first, that the acquittal was " against full and manifest evidence; " and, second, that it was " against the direction of the court in matter of law."

It was in discussing the first part, that he observed " that the verdict of a jury, and evidence of a witness, are very different things, in the truth and falsehood of them. A witness swears but to what he hath heard or seen; generally or more largely, to what hath fallen under his senses. But a juryman swears to what he can infer and conclude from the testimony of such witnesses, by the act and force of his understanding, to be the fact inquired after, which differs nothing in the reason, though much in the punishment, from what a judge, out of various cases considered by him, infers to be the law in the question before him." Vaughan, 142.

After disposing of that part of the return, he proceeds as follows: " We come now to the next part of the return, viz. *That the jury acquitted those indicted, against the direction of the court in matter of law, openly given and declared to them in court.*

" The words, *that the jury did acquit, against the direction of the court in matter of law*, literally taken, and *de plano*, are insignificant and not intelligible; for no issue can be joined of matter in law, no jury can be charged with the trial of matter in law barely, no evidence ever was, or can be, given to a jury of what is law, or not; nor no such oath can be given to, or taken by, a jury to try matter in law; nor no attaint can lie for such a false oath.

" Therefore we must take off this vail and colour of words, which make a shew of being something, and in truth are nothing.

" If the meaning of these words, *finding against the direction of the court in matter of law*, be, that if the judge, having heard the evidence given in court (for he knows no other) shall tell the jury, upon this evidence, the law is for the plaintiff, or for the defendant, and you are under the pain of fine and imprisonment to find accordingly, then the jury ought of duty so to do : Every man sees that the jury is but a troublesome delay, great charge, and of no use in determining right and wrong, and therefore the trials by them may be better abolished than continued ; which were a strange new-found conclusion, after a trial so celebrated for many hundreds of years.

" For if the judge, from the evidence, shall by his own judgment first resolve upon any trial what the fact is, and so knowing the fact, shall then resolve what the law is, and order the jury penally to find accordingly, what either necessary or convenient use can be fancied of juries, or to continue trials by them at all?

" But if the jury be not obliged in all trials to follow such directions, if given, but only in some sort of trials (as, for instance, in trials for criminal matters upon indictments or appeals) why then the consequence will be, though not in all, yet in criminal trials, the jury (as of no material use) ought to be either omitted or abolished, which were the greater mischief to the people, than to abolish them in civil trials.

" And how the jury should, in any other manner, according to the course of trials used, find against the direction of the court in matter of law, is really not conceptible." Vaughan, 143, 144.

He then observes: " This is ordinary, when the jury find unexpectedly for the plaintiff or defendant, the judge will ask, How do you find such a fact in particular? and upon their answer he will say, then it is for the defendant, though they find for the plaintiff, or *e contrario*, and thereupon they rectify their verdict. And in these cases, the jury, and not the

judge, resolve and find what the fact is. Therefore always, in discreet and lawful assistance of the jury, the judge's direction is hypothetical, and upon supposition, and not positive and upon coercion, viz.: If you find the fact thus (leaving it to them what to find) then you are to find for the plaintiff; but if you find the fact thus, then it is for the defendant." But he is careful to add that, "whatsoever they have answered the judge upon an interlocutory question or discourse, they may lawfully vary from it if they find cause, and are not thereby concluded." pp. 144, 145.

It is difficult to exhibit the strength of Chief Justice Vaughan's reasoning by detached extracts from his opinion. But a few other passages are directly in point:

"A man cannot see by another's eye, nor hear by another's ear; no more can a man conclude or infer the thing to be resolved by another's understanding or reasoning; and though the verdict be right the jury give, yet they, being not assured it is so from their own understanding, are forsworn, at least *in foro conscientiæ*." p. 148.

"That *decantatum* in our books, *ad quæstionem facti non respondent judices, ad quæstionem legis non respondent juratores*, literally taken, is true: for if it be demanded, What is the fact? the judge cannot answer it; if it be asked, What is the law in the case? the jury cannot answer it." He then explains this by showing that upon demurrers, special verdicts, or motions in arrest of judgment, "the jury inform the naked fact, and the court deliver the law." "But upon all general issues; as upon *not culpable* pleaded in trespass, *nil debet* in debt, *nul tort, nul disseisin* in assize, *ne disturba pas* in *quare impedit*, and the like; though it be matter of law whether the defendant be a trespasser, a debtor, disseisor, or disturber, in the particular cases in issue, yet the jury find not (as in a special verdict) the fact of every case by itself, leaving the law to the court, but find for the plaintiff or defendant upon the issue to be tried, wherein they resolve both law and fact complicately, and not the fact by itself; so as though they answer not singly to the question what is the law, yet they determine the law in all matters, where issue is joined and tried in the principal

case, but [*i.e.* except] where the verdict is special." pp. 149, 150.

He then observes that " to this purpose the Lord Hobart in *Needler's case against the Bishop of Winchester* is very apposite," citing the passage quoted near the beginning of this opinion; and concludes his main argument as follows:

" The legal verdict of the jury, to be recorded, is finding for the plaintiff. or defendant; what they answer, if asked, to questions concerning some particular fact, is not of their verdict essentially, nor are they bound to agree in such particulars; if they all agree to find their issue for the plaintiff or defendant, they may differ in the motives wherefore [therefor], as well as judges, in giving judgment for the plaintiff or defendant, may differ in the reasons wherefore they give that judgment, which is very ordinary." p. 150.

That judgment thus clearly appears to have been rested, not merely on the comparatively technical ground, that upon the general issue no matter of law could come in question until the facts have been found by the jury; nor yet upon the old theory that the jurors might have personal knowledge of some facts not appearing in evidence; but mainly on the broad reasons, that if the jury, especially in criminal trials, were obliged to follow the directions of the court in matter of law, no necessary or convenient use could be found of juries, or to continue trials by them at all; that though the verdict of the jury be right according to the law as laid down by the court, yet if they are not assured by their own understanding that it is so, they are forsworn, at least *in foro conscientiæ;* and that the *decantatum* in our books, *ad quæstionem facti non respondent judices, ad quæstionem juris non respondent juratores,* means that issues of law, as upon demurrers, special verdicts, or motions in arrest of judgment, are to be decided by the court; but that upon general issues of fact, involving matter of law, the jury resolve both law and fact complicately, and so determine the law.

Notwithstanding that authoritative declaration of the right of the jury, upon the general issue, to determine the law, Chief Justice Scroggs, upon the trial of Harris for a seditious libel in 1680, (7 Howell's State Trials, 925, 930,) insisted that

the jury must take the law from the court; and Chief Justice Jeffreys, presiding at the trial of Algernon Sidney in 1683, charged the jury as follows: "It is our duty upon our oaths to declare the law to you, and you are bound to receive our declaration of law, and upon this declaration to inquire whether there be a fact, sufficiently proved, to find the prisoner guilty of the high treason of which he stands indicted." And Sidney was convicted, sentenced, and executed. 9 Howell's State Trials, 817, 889.

In the last year of the reign of James II, the *Trial of the Seven Bishops*, reported 12 Howell's State Trials, 183, took place upon an information for a seditious libel contained in their petition to the King, praying that he would be pleased not to insist on their distributing and reading in the churches his declaration dispensing with the penal statutes concerning the exercise of religion. The trial was at bar before all the Justices of the King's Bench, upon a general plea of not guilty. A principal ground of defence was, that the King had no dispensing power, and therefore the petition of the bishops to him was an innocent exercise of the right of petition, and was not a libel. In support of this defence, ancient acts of Parliament were given in evidence; and, upon the offer of one in Norman French, the Chief Justice said, "Read it in English, for the jury to understand it," and it was so read by a sworn interpreter. pp. 374, 375. And when the Attorney General argued that these matters were not pertinent to the case, the Chief Justice, interrupting him, said: "Yes, Mr. Attorney, I'll tell you what they offer, which it will lie upon you to give an answer to; they would have you show how this has disturbed the government, or diminished the King's authority." p. 399.

At the close of the arguments, each of the four judges in turn charged the jury. Lord Chief Justice Wright said: "The only question before me is, and so it is before you, gentlemen, it being a question of fact, whether here be a certain proof of a publication? And then the next question is a question of law indeed, whether if there be a publication proved, it be a libel?" "Now, gentlemen, anything that

shall disturb the government, or make mischief and a stir among the people, is certainly within the case of *Libellis Famosis;* and I must in short give you my opinion, I do take it to be a libel. Now this being a point of law, if my brothers have anything to say to it, I suppose they will deliver their opinions."

Mr. Justice Holloway said: "If you are satisfied there was an ill intention of sedition, or the like, you ought to find them guilty; but if there be nothing in the case that you find, but only that they did deliver a petition to save themselves harmless and to free themselves from blame, by showing the reason of their disobedience to the King's command, which they apprehended to be a grievance to them, and which they could not in conscience give obedience to, I cannot think it is a libel. It is left to you, gentlemen, but that is my opinion."

Mr. Justice Powell also expressed his opinion that the paper was not a libel; and said: "Now, gentlemen, the matter of it is before you; you are to consider of it, and it is worth your consideration." He then expressed his opinion that the King had no dispensing power; and concluded: "If this be once allowed of, there will need no Parliament; all the legislation will be in the King, which is a thing worth considering, and I leave the issue to God and your consciences."

Mr. Justice Allybone, after saying, "The single question that falls to my share is, to give my sense of this petition, whether it shall be in construction of law a libel in itself, or a thing of great innocence," expressed his opinion that it was a libel.

The jury on retiring, requested, and were allowed by the court, to take with them the statute book, the information, the petition of the bishops, and the declaration of the King; and they returned a verdict of not guilty, whereat there was great popular rejoicing in London and throughout England. 12 Howell's State Trials, 425–431; 1 Burnet's Own Time, 744.

It thus clearly appears that upon that trial, one of the most important in English history, deeply affecting the liberties of the people, the four judges of the King's Bench, while differing among themselves upon the question whether the petition

of the bishops was a libel, concurred in submitting that question, as a question of law, to the decision of the jury, not as umpires between those judges who thought the paper was a libel and those judges who thought it was not, but as the tribunal vested by the law of England with the power and the right of ultimately determining, as between the Crown and the accused, all matters of law, as well as of fact, involved in the general issue of guilty or not guilty.

Upon the accession of William and Mary, Parliament declared the King's power of dispensing with the laws to be unlawful; and reversed the conviction of Algernon Sidney, "for a partial and unjust construction of the statute" of treasons in the instructions by which his conviction had been procured. Stat. 1 W. & M. sess. 2, c. 2; 6 Statutes of the Realm, 143, 155; 9 Howell's State Trials, 996. And early in the new reign Holt was appointed Lord Chief Justice, and Somers, Lord Keeper.

Lord Somers, in the opening pages of his essay on The Security of Englishmen's Lives, or the Trust, Power and Duty of the Grand Juries of England, (first published in 1681, and republished in 1714, towards the end of his life, after he had been Lord Chancellor,) lays down in the clearest terms the right of the jury to decide the law, saying: "It is made a fundamental in our government, that (unless it be by Parliament) no man's life shall be touched for any crime whatsoever, save by the judgment of at least twenty-four men; that is, twelve or more, to find the bill of indictment, whether he be peer of the realm, or commoner; and twelve peers or above, if a lord, if not, twelve commoners, to give the judgment upon the general issue of not guilty joined." "The office and power of these juries is *judicial*, they only are the judges from whose sentence the indicted are to expect life or death: Upon their integrity and understanding, the lives of all that are brought into judgment do ultimately depend; from their verdict there lies no appeal; by finding guilty or not guilty, they do complicately resolve both law and fact. As it hath been the law, so it hath always been the custom and practice of these juries, upon all general issues, pleaded

in cases, civil as well as criminal, to judge both of the law and fact." "Our ancestors were careful, that all men of the like condition and quality, presumed to be sensible of each other's infirmity, should mutually be judges of each other's lives, and alternately taste of subjection and rule, every man being equally liable to be accused or indicted, and perhaps to be suddenly judged by the party, of whom he is at present judge, if he be found innocent."

Lord Chief Justice Holt declared that "in all cases and in all actions the jury may give a general or special verdict, as well in causes criminal as civil, and the court ought to receive it, if pertinent to the point in issue, for if the jury doubt they may refer themselves to the court, but are not bound so to do." *Anon.* (1697) 3 Salk. 373. And upon the trial of an information for a seditious libel, while he expressed his opinion that the paper was upon its face a criminal libel, he submitted the question whether it was such to the jury, saying, "Now you are to consider whether these words I have read to you do not tend to beget an ill opinion of the administration of the government." *Tutchin's case*, (1704) 14 Howell's State Trials, 1095, 1128. Although he concluded his charge with the words, "If you are satisfied that he is guilty of composing and publishing these papers at London, you are to find him guilty," yet, as Mr. Starkie well observes, "these words have immediate reference to the ground of defence upon which Mr. Tutchin's counsel meant to rely, namely, that the offence had not been proved to have been committed in London; and cannot be considered as used for the purpose of withdrawing the attention of the jury from the quality of the publication, upon which they had just before received instructions; and indeed to suppose it had so meant would prove too much, since, if so, the jury were directed not to find the truth of the innuendoes." Starkie on Slander, 56.

Some decisions, often cited as against the right of the jury by a general verdict to determine matter of law involved in the general issue of guilty or not guilty, were upon special verdicts presenting pure questions of law. Such were *Townsend's case*, (1554) 1 Plowd. 111; and *The King* v. *Oneby*,

(1726) 2 Ld. Raym. 1485; *S. C.* 2 Stra. 766; 1 Barnard. 17; 17 Howell's State Trials, 29.

After the accession of George II, Lord Chief Justice Raymond, on trials at *nisi prius* for seditious libels, (ignoring the cases of Tutchin and of The Seven Bishops,) told juries that they were bound to take the law from the court, and that the question, whether the paper which the defendant was accused of writing and publishing was a libel, was a mere question of law with which the jury had nothing to do. *Clarke's case,* (1729) 17 Howell's State Trials, 667, note; *S. C.* 1 Barnard. 304; *Francklin's case,* (1731) 17 Howell's State Trials, 625, 672.

In 1734, upon an information in the nature of a *quo warranto* against the defendant to show cause by what authority he acted as mayor of Liverpool, his motion for a new trial, because the jury had found a general verdict for the Crown against the instructions of the judge, and notwithstanding he ordered them to return a special verdict, was granted by the Court of King's Bench, Lord Chief Justice Hardwicke saying: "The general rule is, that if the judge of *nisi prius* directs the jury on the point of law, and they think fit obstinately to find a verdict contrary to his direction, that is sufficient ground for granting a new trial; and when the judge upon a doubt of law directs the jury to bring in the matter specially, and they find a general verdict, that also is a sufficient foundation for a new trial." "The thing that governs greatly in this determination is, that the point of law is not to be determined by juries; juries have a power by law to determine matters of fact only; and it is of the greatest consequence to the law of England and to the subject, that these powers of the judge and jury are kept distinct; that the judge determines the law, and the jury the fact; and if ever they come to be confounded, it will prove the confusion and destruction of the law of England." *The King* v. *Poole,* Cas. temp. Hardw. 23, 26, 28; *S. C.* Cunningham, 11, 14, 16.

But such an information to try title to a civil office (though it had some of the forms of a criminal prosecution) was brought for the mere purpose of trying a civil right, and was consid-

ered as in the nature of a civil proceeding.   3 Bl. Com. 263;
*The King* v. *Francis*, 2 T. R. 484; *Ames* v. *Kansas*, 111 U. S.
449, 460, 461.   And, as appears by the first passage above
cited from Lord Hardwicke's opinion, it was evidently so
treated by the court, under the practice of granting new trials
on motion of either party to a civil case, which had gradually
grown up within the century preceding, as a substitute for
attaints.   *Bell* v. *Wardell*, (1740) Willes, 204, 206; *Witham*
v. *Lewis*, (1744) 1 Wilson, 48, 55; *Bright* v. *Eynon*, (1757) 1
Burrow, 390, 394.   In a criminal case, certainly, the court
could not compel the jury to return a special verdict.   Noth-
ing, therefore, was adjudged in *Poole's case* as to the right of
the jury to decide the law in prosecutions for crime.   And it
is significant that, although both reports of that case were
published in 1770, it was not cited by Lord Mansfield, in 1784,
when collecting the authorities against the right of the jury
in criminal cases.   *The King* v. *Shipley*, 4 Doug. 73, 168.

Lord Hardwicke's own opinion, indeed, may be presumed
to have been against the right of the jury; for when Attorney
General he had so argued in *Francklin's case*, above cited, 17
Howell's State Trials, 669; and he was, as justly observed by
Mr. Hallam, "a regularly bred crown lawyer, and in his whole
life disposed to hold very high the authority of government."
3 Hallam's Const. Hist. (9th ed.) 287.   His opinion, therefore,
is of less weight upon a constitutional question affecting the
liberty of the subject, than upon other questions of law or of
equity.

The later history of the law of England upon the right of
the jury to decide the law in criminal cases is illustrated by a
long conflict between the views of Mr. Murray, afterwards
Lord Mansfield, against the right, and of Mr. Pratt, after-
wards Lord Camden, in its favor, which, after the public
sentiment had been aroused by the great argument of Mr.
Erskine in *The Dean of St. Asaph's case*, was finally settled,
in accordance with Lord Camden's view, by a declaratory act
of Parliament.

Upon the Trial of Owen, in 1752, for publishing a libel,
Mr. Murray, as Solicitor General, argued to the jury that if

they determined the question of fact of publication, the judge determined the law. But Mr. Pratt, of counsel for the defendant, argued the whole matter to the jury; and, although the publication was fully proved, and Chief Justice Lee told the jury that, this being so, they could not avoid bringing in the defendant guilty, they returned and persisted in a general verdict of acquittal. 18 Howell's State Trials, 1203, 1223, 1227, 1228; 29 Parl. Hist. 1408.

In the like case of Nutt, in 1754, (Starkie on Slander, 615,) conducted by Mr. Murray as Attorney General, the like direction was given to the jury by Chief Justice Ryder. Lord Mansfield, in *The King* v. *Shipley*, 4 Doug. 168.

In the similar case of Shebbeare, in 1758, (Starkie on Slander, 56, 616,) Mr. Pratt, as Attorney General, when moving before Lord Mansfield for leave to file the information, said: "It is merely to put the matter in a way of trial; for I admit, and his lordship well knows, that the jury are judges of the law as well as the fact, and have an undoubted right to consider whether, upon the whole, the pamphlet in question be or be not published with a wicked, seditious intent, and be or not a false, malicious, and scandalous libel." Second Postscript to Letter to Mr. Almon on Libels, (1770) p. 7; 4 Collection of Tracts 1763–1770, p. 162. And at the trial, as he afterwards said in the House of Lords, he "went into court predetermined to insist on the jury taking the whole of the libel into consideration," and, "so little did he attend to the authority of the judges on that subject, that he turned his back on them, and directed all he had to say to the jury." 29 Parl. Hist. 1408. And see 20 Howell's State Trials, 709. But Lord Mansfield instructed the jury that the question whether the publication was a libel was to be determined by the court. 4 Doug. 169.

Lord Camden, when Chief Justice of the Common Pleas, presiding at criminal trials, instructed the jury that they were judges of the law as well as the fact. Pettingal on Juries (1769) cited in 21 Howell's State Trials, 853; 29 Parl. Hist. 1404, 1408.

In the prosecutions, in the summer of 1770, of Miller and

Woodfall for publishing the letter of Junius to the King, Lord Mansfield instructed the jury in the same way as in *Shebbeare's case*. In *Miller's case*, the jury returned a verdict of not guilty. In *Woodfall's case*, the jury returned a verdict of "guilty of printing and publishing only;" and the court therefore granted a motion for a new trial. But Lord Mansfield, on November 20, 1770, in delivering a judgment upon that motion, took occasion to say that the court was of opinion "that the direction is right and according to law." *Miller's case*, 20 Howell's State Trials, 869, 893, 895; *Woodfall's case*, Id. 895, 901–903, 918, 920; *S. C.* 5 Burrow, 2661, 2666, 2668.

On December 5, 1770, in the House of Lords, the judgment in *Woodfall's case* was attacked by Lord Chatham, and defended by Lord Mansfield, in replying to whom Lord Chatham said: "This, my lords, I never understood to be the law of England, but the contrary. I always understood that the jury were competent judges of the law as well as the fact; and, indeed, if they were not, I can see no essential benefit from their institution to the community." And Lord Camden, after observing that it would be highly necessary to have an authentic statement of the direction to the jury in that case laid before the House, said: "If we can obtain this direction, and obtain it fully stated, I shall very readily deliver my opinion upon the doctrines it inculcates, and if they appear to me contrary to the known and the established principles of the constitution, I shall not scruple to tell the author of his mistake in the open face of this assembly." 16 Parl. Hist. 1302–1307.

On the next day, a warm debate took place in the House of Commons upon a motion by Serjeant Glynn for a committee "to inquire into the administration of criminal justice, and the proceedings of the judges in Westminster Hall, particularly in cases relating to the liberty of the press and the constitutional power and duty of juries," in the course of which Mr. Dunning, then the leader of the bar, and afterwards Lord Ashburton, emphatically denied that the doctrine of Lord Raymond and Lord Mansfield was the established law of the land. 16 Parl. Hist. 1212, 1276. See also 2 Cavendish's Debates, 141, 369.

Pursuant to a wish expressed by Lord Mansfield on the day after, the House of Lords met on December 10, when he informed the House that he had left with its clerk a copy of the judgment of the court in *Woodfall's case.* Lord Camden thereupon said that he considered the paper as a challenge directed personally to him, which he accepted, and said : " In direct contradiction to him, I maintain that his doctrine is not the law of England. I am ready to enter into the debate whenever the noble lord will fix a day for it." And he proposed questions in writing to Lord Mansfield, framed with the view of ascertaining how far that judgment denied the right of the jury, by a general verdict in a criminal case, to determine the law as well as the fact. Lord Mansfield evaded answering the questions, and, while declaring himself ready to discuss them at some future day, declined to name one. And the matter dropped for the time. 16 Parl. Hist. 1312–1322.

In 1783, after the Independence of the United States had been recognized by Great Britain, came the case of *Rex* v. *Shipley,* commonly known as *The Dean of St. Asaph's case,* fully reported in 4 Doug. 73, and in 21 Howell's State Trials, 847, and briefly stated in 3 T. R. 428, note, which was a criminal prosecution for a seditious libel contained in a pamphlet written by Sir William Jones. Mr. Justice Buller, at the trial, told the jury that the only questions for them were whether the defendant published the pamphlet, and whether the innuendoes in the indictment were true ; and that the question of libel or no libel was a question of law for the court, and not for the jury, upon which he declined to express any opinion, but that it would be open for the consideration of the court upon a motion in arrest of judgment. The jury returned a verdict of " guilty of publishing only," but were persuaded by the judge to put it in this form : " Guilty of publishing, but whether a libel or not the jury do not find." 4 Doug. 81, 82, 85, 86 ; 21 Howell's State Trials, 946, 950–955. The effect of all this was that the defendant was found guilty of publishing a paper, which neither the judge nor the jury had held to be a libel ; and judgment was ultimately arrested

upon the ground that, as set out in the indictment, it was not libellous.   21 Howell's State Trials, 1044.

But, before the motion in arrest of judgment was argued, Mr. Erskine obtained a rule to show cause why a new trial should not be granted, principally upon the ground that the judge told the jury that the question whether libel or not was not for their decision; whereas the jury, upon the general issue, had not only the power, but the right, to decide the law. It was upon this rule that Mr. Erskine made his famous argument in support of the rights of juries, and that Lord Mansfield delivered the judgment, in which Mr. Justice Ashurst concurred, which has since been the principal reliance of those who deny the right of the jury to decide the law involved in the general issue in a criminal case.

It should not be overlooked, that at the hearing of this motion, Mr. Bearcroft, the leading counsel for the Crown, said he " agreed with the counsel for the defendant, that it is the right of the jury, if they please, on the plea of not guilty, to take upon themselves the decision of every question of law necessary to the acquittal of the defendant; and Lord Mansfield observing that he should call it the *power*, not the *right*, he adhered to the latter expression; and added, that he thought it an important privilege, and which, on particular occasions, as, for instance, if a proper censure of the measures of the servants of the Crown were to be construed by a judge to be libellous, it would be laudable and justifiable in them to exercise."   4 Doug. 94, note.   See also p. 108.

Mr. Justice Willes, dissenting from the opinion of the court, said he was sure that these statements of Mr. Bearcroft expressed " the sentiments of the greater part of Westminster Hall;" and declared: "I conceive it to be the law of this country, that the jury, upon a plea of not guilty, or upon the general issue, upon an indictment or an information for a libel, have a constitutional right, if they think fit, to examine the innocence or criminality of the paper, notwithstanding there is sufficient proof given of the publication."   "I believe no man will venture to say they have not the *power*, but I mean expressly to say they have the *right*.   Where a civil power of

this sort has been exercised without control, it presumes, nay, by continual usage, it *gives* the right.   It was the *right* which juries exercised in those times of violence when the Seven Bishops were tried, and which even the partial judges who then presided did not dispute, but authorized them to exercise upon the subject-matter of the libel; and the jury, by their solemn verdict upon that occasion, became one of the happy instruments, under Providence, of the salvation of this country. This privilege has been assumed by the jury in a variety of ancient and modern instances, and particularly in the case of *Rex* v. *Owen*, without any correction or even reprimand of the court.   It is a right, for the most cogent reasons, lodged in the jury ; as without this restraint the subject in bad times would have no security for his life, liberty, or property." And he concurred in refusing a new trial, solely because in his opinion neither the counsel for the prosecution, nor the judge presiding at the trial, had impugned these doctrines, and the verdict returned by the jury was in the nature of a special verdict, in effect submitting the law to the court.   4 Doug. 171–175.

In 1789, in *The King* v. *Withers*, 3 T. R. 428, Lord Kenyon instructed a jury in the same way that Mr. Justice Buller had done in *The Dean of St. Asaph's case.*

In 1791, the declaratory statute, entitled "An act to remove doubts respecting the functions of juries in cases of libel," and known as Fox's Libel Act, was introduced in Parliament, and was passed in 1792.   Stat. 32 Geo. III, c. 60.

By that act, "the legislature," as lately observed by Lord Blackburn in the House of Lords, "adopted almost the words and quite the substance" of that passage of the opinion of Mr. Justice Willes, first quoted above.   *Capital and Counties Bank* v. *Henty*, 7 App. Cas. 741, 775.

The doubts which the act was passed to remove were, as recited at the beginning of the act, upon the question whether upon the trial of an indictment or information for libel, on the plea of not guilty, "it be competent to the jury impanelled to try the same to give their verdict upon the whole matter put in issue ; " and it was "therefore declared and enacted," (not merely enacted, but declared to be the law as already

existing,) "that on every such trial the jury sworn to try the issue may give a general verdict of guilty or not guilty upon the whole matter put in issue upon such indictment or information ; and shall not be required or directed, by the court or judge before whom such indictment or information shall be tried, to find the defendant or defendants guilty, merely on the proof of the publication by such defendant or defendants of the paper charged to be a libel, and of the sense ascribed to the same in such indictment or information."

The act then provides, first, that the presiding judge may, at his discretion, give instructions to the jury ; second, that the jury may, at their discretion, return a special verdict ; and third, that the defendant, if found guilty, may move in arrest of judgment. The first of these provisos, and the only one requiring particular notice, is that the judge shall, at his discretion, give " his opinion and directions to the jury on the matter at issue," " in like manner as in other criminal cases." His " opinion and directions " clearly means by way of advice and instruction only, and not by way of order or command; and the explanation, " in like manner as in other criminal cases," shows that no peculiar rule was intended to be laid down in the case of libel. And that this was the understanding at the time is apparent from the debate on the proviso, which was adopted on the motion of Sir John Scott, (then Solicitor General, and afterwards Lord Eldon,) just before the bill passed the House of Commons in 1791. 29 Parl. Hist. 594–602.

The clear effect of the whole act is to declare that the jury (after receiving the instructions of the judge, if he sees fit to give any instructions) may decide, by a general verdict, " the whole matter put in issue," which necessarily includes all questions of law, as well as of fact, involved in the general issue of guilty or not guilty ; and to recognize the same rule as existing in all criminal cases.

Not only is this the clear meaning of the words of the act ; but that such was its intent and effect is shown by the grounds taken by its supporters and its opponents in Parliament, as well as by subsequent judicial opinions in England.

Mr. Fox, upon moving the introduction of the bill in the House of Commons in 1791, after observing that he was not ignorant that power and right were not convertible terms, said that, "if a power was vested in any person, it was surely meant to be exercised;" that "there was a power vested in the jury to judge the law and fact, as often as they were united; and if the jury were not to be understood to have a right to exercise that power, the constitution would never have entrusted them with it;" "but they knew it was the province of the jury to judge of law and fact; and this was the case not of murder only, but of felony, high treason, and of every other criminal indictment;" and that "it must be left in all cases to a jury to infer the guilt of men, and an English subject could not lose his life but by a judgment of his peers." 29 Parl. Hist. 564, 565, 597. And Mr. Pitt, in supporting the bill, declared that his own opinion was against the practice of the judges, "and that he saw no reason why, in the trial of a libel, the whole consideration of the case might not go precisely to the unfettered judgment of twelve men, sworn to give their verdict honestly and conscientiously, as it did in matters of felony and other crimes of a high nature." 29 Parl. Hist. 588.

In the debate in the House of Lords, on a motion of Lord Chancellor Thurlow to put off the reading of the bill, Lord Camden said, "He would venture to affirm, and should not be afraid of being contradicted by any professional man, that by the law of England as it now stood, the jury had a right, in deciding on a libel, to judge whether it was criminal or not; and juries not only possessed that right, but they had exercised it in various instances." He added, as "a matter which he conceived should be imprinted on every juror's mind, that if they found a verdict of the publishing, and left the criminality to the judge, they had to answer to God and their consciences for the punishment that might, by such judge, be inflicted on the defendant, whether it was fine, imprisonment, loss of ears, whipping, or any other disgrace, which was the sentence of the court." After further enforcing his opinion, he said: "I will affirm that they have that right, and that there is no

power by the law of this country to prevent them from the exercise of that right, if they think fit to maintain it; and when they are pleased to acquit any defendant, their acquittal will stand good until the law of England is changed." "My lords," said he, "give to the jury or to the judge the right of trial of the subjects of this country; you must give it to one of them, and I think you can have no difficulty which to prefer." And he concluded by saying that "he did not apprehend that the bill had a tendency to alter the law, but merely to remove doubts that ought never to have been entertained, and therefore the bill had his hearty concurrence; but, as he was assured that the proposed delay was not hostile to the principle of the bill, but only to take it into serious consideration, and to bring it again forward, he had no objection to the motion of the Lord Chancellor." 29 Parl. Hist. 729, 730, 732.

In the House of Lords in 1792, the bill having again passed the House of Commons, Lord Loughborough, for many years Chief Justice of the Common Pleas, said that he " had ever deemed it his duty, in cases of libel, to state the law as it bore on the facts, and to refer the combined consideration to the jury;" and that "their decision was final. There was no control upon them in their verdict. The evident reason and good sense of this was, that every man was held to be acquainted with the criminal law of the land. Ignorance was no plea for the commission of a crime; and no man was therefore supposed to be ignorant of judging upon the evidence adduced of the guilt or innocence of a defendant. It was the admitted maxim of law, *ad quœstionem juris respondeant judices, ad quœstionem facti juratores ;* but when the law and the fact were blended, it was the undoubted right of the jury to decide. If the law was put to them fairly, there was undoubtedly not one case in a thousand on which they would not decide properly. If they were kept in the dark, they were sometimes led into wrong, through mere jealousy of their own right." 29 Parl. Hist. 1296, 1297.

Pending the debate, the House of Lords put questions to the judges, who returned an opinion, in which, after saying that "the general criminal law of England is the law of

libel," they laid down, as a fundamental proposition, applicable to treason as well as to other crimes, "that the criminality or innocence of any act done (which includes any paper written) is the result of the judgment which the law pronounces upon that act, and must therefore be in all cases, and under all circumstances, matter of law and not matter of fact." With such a basis, it is hardly to be wondered at that they "conceived the law to be that the judge is to declare to the jury what the law is," and "that it is the duty of the jury, if they will find a general verdict upon the whole matter in issue, to compound that verdict of the fact as it appears in evidence before them, and of the law as it is declared to them by the judge." The judges, however, "took this occasion to observe" that they had "offered no opinion which will have the effect of taking matter of law out of a general issue, or out of a general verdict;" and "disclaimed the folly of undertaking to prove that a jury, who can find a general verdict, cannot take upon themselves to deal with matter of law arising in a general issue, and to hazard a verdict made up of the fact, and of the matter of law, according to their conception of that law, against all direction by the judge." 29 Parl. Hist. 1361–1369.

On Lord Camden's motion, the bill was postponed, in order to enable the House to consider the opinion of the judges; and was then proceeded with, when Lord Camden "exposed the fallacy of the pretended distinction between law and fact, in the question of guilty or not guilty of printing and publishing a libel; they were united as much as intent and action in the consideration of all other criminal proceedings. Without an implied malice a man could not be found guilty, even of murder. The simple killing a man was nothing, until it was proved that the act arose from malice. A man might kill another in his own defence, or under various circumstances which rendered the killing no murder. How were these things to be explained? by the circumstances of the case. What was the ruling principle? the intention of the party. Who were the judges of the intention of the party; the judge? No; the jury. So that the jury were allowed to judge of the

intention upon an indictment for murder, and not to judge of the intention of the party upon libel." And Lord Loughborough, as well as Lord Camden, distinctly affirmed, and Lord Thurlow as distinctly denied, that upon the general issue in criminal cases, after the judge had stated the law to the jury, the jury were to decide both the question of law and the question of fact. 29 Parl. Hist. 1370, 1405, 1406, 1426, 1429.

Towards the close of the debate, Lord Thurlow moved to amend the bill by inserting the words "that the judge state to the jury the legal effect of the record." Lord Camden successfully opposed the amendment, "as an attempt indirectly to convert the bill into the very opposite of what it was intended to be, and to give the judges a power ten times greater than they had ever yet exercised;" and said, "He must contend, that the jury had an undoubted right to form their verdict themselves according to their consciences, applying the law to the fact; if it were otherwise, the first principle of the law of England would be defeated and overthrown. If the twelve judges were to assert the contrary again and again, he would deny it utterly, because every Englishman was to be tried by his country; and who was his country but his twelve peers, sworn to condemn or acquit according to their consciences? If the opposite doctrine were to obtain, trial by jury would be a nominal trial, a mere form; for, in fact, the judge, and not the jury, would try the man. He would contend for the truth of this argument to the latest hour of his life, *manibus pedibusque.* With regard to the judge stating to the jury what the law was upon each particular case, it was his undoubted duty so to do; but having done so, the jury were to take both law and fact into their consideration, and to exercise their discretion and discharge their consciences." 29 Parl. Hist. 1535, 1536.

The first ground of the protest of Lord Thurlow, Lord Bathurst, Lord Kenyon and three other lords against the passage of the act was "because the rule laid down by the bill, contrary to the determination of the judges and the unvaried practice of ages, subverts a fundamental and important principle of English jurisprudence, which, leaving to the jury

the trial of the fact, reserves to the court the decision of the law." 29 Parl. Hist. 1537.

Lord Brougham, in his sketch of Lord Camden, declares that "the manly firmness which he uniformly displayed in maintaining the free principles of the constitution, wholly unmixed with any leaning towards extravagant popular opinions, or any disposition to court vulgar favour, justly entitles him to the very highest place among the judges of England;" and, speaking of his conduct in carrying the libel bill through the House of Lords, says that "nothing can be more refreshing to the lovers of liberty, or more gratifying to those who venerate the judicial character, than to contemplate the glorious struggle for his long-cherished principles with which Lord Camden's illustrious life closed;" and quotes some of his statements, above cited, as passages upon which "the mind fondly and reverently dwells," "hopeful that future lawyers and future judges may emulate the glory and the virtue of this great man." 3 Brougham's Statesmen of George III, (ed. 1843,) 156, 178, 179.

In the well known case of *The King* v. *Burdett*, 3 B. & Ald. 717, and 4 B. & Ald. 95; *S. C.* 1 State Trials (N. S.) 1; for publishing a seditious libel, Mr. Justice Best (afterwards Chief Justice of the Common Pleas, and Lord Wynford) told the jury that in his opinion the publication was a libel; that they were to decide whether they would adopt his opinion; but that they were to take the law from him, unless they were satisfied that he was wrong. 4 B. & Ald. 131, 147, 183. The defendant having been convicted, the Court of King's Bench, upon a motion for a new trial, held, after advisement, that this instruction was correct.

Mr. Justice Best said: "It must not be supposed that the statute of George III made the question of libel a question of fact. If it had, instead of removing an anomaly, it would have created one. Libel is a question of law, and the judge is the judge of the law in libel as in all other cases, the jury having the power of acting agreeably to his statement of the law or not. All that the statute does is to prevent the question from being left to the jury in the narrow way in which

it was left before that time.   The jury were then only to find the fact of the publication, and the truth of the innuendoes; for the judges used to tell them that the intent was an inference of law, to be drawn from the paper, with which the jury had nothing to do.   The legislature has said that that is not so, but that the whole case is to be left to the jury..   But judges are in express terms directed to lay down the law *as in other cases.*   In all cases the jury may find a general verdict; they do so in cases of murder and treason, but there the judge tells them what is the law, though they may find against him, unless they are satisfied with his opinion.   And this is plain from the words of the statute."   4 B. & Ald. 131, 132.

Justices Holroyd and Bayley and Chief Justice Abbott (afterwards Lord Tenterden) expressed the same view.   4 B. & Ald. 145–147, 183, 184.   Mr. Justice Bayley said: "The old rule of law is, *ad quæstionem juris respondent judices, ad quæstionem facti respondent juratores;* and I take it to be the bounden duty of the judge to lay down the law as it strikes him, and that of the jury to accede to it, unless they have superior knowledge on the subject: and the direction in this case did not take away from the jury the power of acting on their own judgment."   And the Chief Justice said: "If the judge is to give his opinion to the jury, as in other criminal cases, it must be not only competent but proper for him to tell the jury, if the case will so warrant, that in his opinion the publication before them is of the character and tendency attributed to it by the indictment; and that, if it be so in their opinion, the publication is an offence against the law."   "The statute was not intended to confine the matter in issue exclusively to the jury without hearing the opinion of the judge, but to declare that they should be at liberty to exercise their own judgment upon the whole matter in issue, after receiving thereupon the opinion and directions of the judge."

The weight of this deliberate and unanimous declaration of the rightful power of the jury to decide the law in criminal cases is not impaired by the *obiter dictum* hastily uttered and promptly recalled by Chief Justice Best in the civil case, summarily decided upon a narrower point, of *Levi* v. *Milne,* and

reported so differently in 4 Bing. 195, and in 12 J. B. Moore, 418, as to leave it doubtful what he really said. And according to later English authorities, even in civil actions, the question of libel or no libel may be submitted by the judge to the jury without expressing his own opinion upon it. *Parmiter* v. *Coupland*, 6 M. & W. 105, 108; *Baylis* v. *Lawrence*, 11 Ad. & El. 920; *S. C.* 3 Per. & Dav. 526; *Cox* v. *Lee*, L. R. 4 Ex. 284.

It is to be remembered, that by the law of England, a person convicted of treason or felony could not appeal, or move for a new trial, or file a bill of exceptions, or in any other manner obtain a judicial review of rulings or instructions not appearing upon the record, unless the judge himself saw fit to reserve the question for the opinion of all the judges. In short, as observed by Dr. Lushington in delivering judgment in the Privy Council, "The prisoner has no legal right, in the proper sense of the term, to demand a reconsideration, by a court of law, of the verdict, or of any legal objection raised at the trial." *The Queen* v. *Eduljee Byramjee*, 5 Moore P. C. 276, 287; *The Queen* v. *Bertrand*, L. R. 1 P. C. 520; 1 Chit. Crim. Law, 622, 654; 3 Russell on Crimes, (9th ed.,) 212. Consequently, a prisoner tried before an arbitrary, corrupt or ignorant judge had no protection but in the conscience and the firmness of the jury.

There is no occasion further to pursue the examination of modern English authorities, because in this country, from the time of its settlement until more than half a century after the Declaration of Independence, the law as to the rights of juries, as generally understood and put in practice, was more in accord with the views of Bacon, Hale, Vaughan, Somers, Holt and Camden, than with those of Kelyng, Scroggs, Jeffreys, Raymond, Hardwicke and Mansfield. Upon a constitutional question, affecting the liberty of the subject, there can be no doubt that the opinions of Somers and of Camden, especially, were of the very highest authority, and were so considered by the founders of the Republic.

In Massachusetts, the leading authorities upon the question, nearest the time of the Declaration of Independence and the

adoption of the Constitution of the United States, are John Adams and Theophilus Parsons, each of whom was appointed, with the general approval of the bar and the people, Chief Justice of the State; the one, appointed to that office by the revolutionary government in 1775, resigning it the next year, remaining in the Continental Congress to support the Declaration of Independence, and afterwards the first Vice-President and the second President of the United States; the other, a leading supporter of the Constitution of the United States in the convention of 1788 by which Massachusetts ratified the Constitution, appointed by President Adams in 1801 Attorney General of the United States, but declining that office, and becoming Chief Justice of Massachusetts in 1806.

John Adams, writing in 1771, said: "Juries are taken, by lot or by suffrage, from the mass of the people, and no man can be condemned of life, or limb, or property, or reputation, without the concurrence of the voice of the people." "The British empire has been much alarmed, of late years, with doctrines concerning juries, their powers and duties, which have been said, in printed papers and pamphlets, to have been delivered from the highest tribunals of justice. Whether these accusations are just or not, it is certain that many persons are misguided and deluded by them to such a degree, that we often hear in conversation doctrines advanced for law, which, if true, would render juries a mere ostentation and pageantry, and the court absolute judges of law and fact." "Whenever a general verdict is found, it assuredly determines both the fact and the law. It was never yet disputed or doubted that a general verdict, given *under the direction of the court* in point of law, was a legal determination of the issue. Therefore the jury have the power of deciding an issue upon a general verdict. And, if they have, is it not an absurdity to suppose that the law would oblige them to find a verdict according to the direction of the court, against their own opinion, judgment and conscience?" "The general rules of law and common regulations of society, under which ordinary transactions arrange themselves, are well enough known to ordinary jurors. The great principles of the constitution

are intimately known; they are sensibly felt by every Briton; it is scarcely extravagant to say they are drawn in and imbibed with the nurse's milk and first air. Now, should the melancholy case arise that the judges should give their opinions to the jury against one of these fundamental principles, is a juror obliged to give his verdict generally, according to this direction, or even to find the fact specially, and submit the law to the court? Every man, of any feeling or conscience, will answer, No. It is not only his right, but his duty, in that case, to find the verdict according to his own best understanding, judgment, and conscience, though in direct opposition to the direction of the court." "The English law obliges no man to decide a cause upon oath against his own judgment." 2 John Adams's Works, 253–255.

Theophilus Parsons, in the Massachusetts convention of 1788, answering the objection that the Constitution of the United States, as submitted to the people for adoption, contained no bill of rights, said: "The people themselves have it in their power effectually to resist usurpation, without being driven to an appeal to arms. An act of usurpation is not obligatory; it is not law; and any man may be justified in his resistance. Let him be considered as a criminal by the general government, yet only his fellow-citizens can convict him; they are his jury, and if they pronounce him innocent, not all the powers of Congress can hurt him; and innocent they certainly will pronounce him, if the supposed law he resisted was an act of usurpation." 2 Elliot's Debates, 94; 2 Bancroft's History of the Constitution, 267.

In 1808, Chief Justice Parsons, in delivering judgment in a civil action for slander, said: "Both parties have submitted the trial of this issue to a jury. The issue involved both law and fact, and the jury must decide the law and the fact. To enable them to settle the fact, they were to weigh the testimony; that they might truly decide the law, they were entitled to the assistance of the judge. If the judge had declined his aid in a matter of law, yet the jury must have formed their conclusion of law as correctly as they were able." And, as the reporter states, "In this opinion of the

Chief Justice, the other judges, viz. Sedgwick, Sewall, Thatcher and Parker, severally declared their full and entire concurrence." *Coffin* v. *Coffin*, 4 Mass. 1, 25, 37.

In 1816, upon the trial of an indictment for murder, the Supreme Judicial Court of Massachusetts, held by Chief Justice Parker and Justices Jackson and Putnam, instructed the jury as follows: "In all capital cases, the jury are the judges of the law and fact. The court are to direct them in matters of law, and although it is safer for them to rely on the instructions derived from that source, still, gentlemen, they are to decide for themselves." Bowen's Trial, 51.

In 1826, Mr. Justice Wilde, speaking for the whole court, assumed, as unquestionable, that "in criminal prosecutions the jury are the judges of both law and fact." *Commonwealth* v. *Worcester*, 3 Pick. 462, 475.

In 1830, in a celebrated trial for murder, before Justices Putnam, Wilde and Morton, the right and duty of the jury to decide the law as well as the fact involved in the general issue were recognized and affirmed in the charge to the jury, and were distinguished from the right of deciding questions of evidence, as follows: " As the jury have the right, and if required by the prisoner are bound, to return a general verdict of guilty or not guilty, they must necessarily, in the discharge of this duty, decide such questions of law, as well as of fact, as are involved in this general question; and there is no mode in which their opinions upon questions of law can be reviewed by this court or by any other tribunal. But this does not diminish the obligation resting upon the court to explain the law, or their responsibility for the correctness of the principles of law by them laid down. The instructions of the court in matters of law may safely guide the consciences of the jury, unless they know them to be wrong. And when the jury undertake to decide the law (as they undoubtedly have the power to do) in opposition to the advice of the court, they assume a high responsibility, and should be very careful to see clearly that they are right. Although the jury have the power, and it is their duty, to decide all points of law which are involved in the general question of the guilt or

innocence of the prisoner, yet when questions of law arise in the arraignment of the prisoner, or in the progress of the trial, in relation to the admissibility of evidence, they must be decided by the court, and may not afterwards be reviewed by the jury." *Commonwealth* v. *Knapp*, 10 Pick. 477, 496.

Many other Massachusetts authorities, from the earliest times to the date last mentioned, tending to maintain the right of the jury to decide the law involved in ' the general issue, are collected in the opinion of Mr. Justice Thomas in 5 Gray, 275–280, and in a note to Quincy's Reports, 558–560, 563–567.

To that date, or later, the right of the jury in criminal cases to decide both the law and the fact, even against the directions of the court, was certainly recognized and acted on through-out New England, unless in Rhode Island. *State* v. *Snow*, (1841) 18 Maine, 346; Doe, C. J., in *State* v. *Hodge*, 50 N. H. 510, 523; *State* v. *Wilkinson*, (1829) 2 Vermont, 480, 488; *State* v. *Croteau*, (1849) 23 Vermont, 14; *Witter* v. *Brewster* (1788) Kirby, 422; *Bartholomew* v. *Clark*, (1816) 1 Connecti-cut, 472, 481; *State* v. *Buckley*, (1873) 40 Connecticut, 246. See Laws of 1647 in 1 Rhode Island Col. Rec. 157, 195, 203, 204.

In the Province of New York, in 1702, on the trial of Colo-nel Nicholas Bayard for high treason, it was argued by his counsel, and not denied by the court, that the jury, upon the general issue of not guilty, were judges as well of matter of law as of matter of fact. 14 Howell's State Trials, 471, 502, 503, 505.

In the same Province, in 1735, upon the trial of John Peter Zenger, for a seditious libel, his counsel, Andrew Hamilton, of Philadelphia, while admitting that the jury might, if they pleased, find the defendant guilty of printing and publishing, and leave it to the court to judge whether the words were libellous, said, without contradiction by the court: " But I do likewise know they may do otherwise. ' I know they have the right, beyond all dispute, to determine both the law and the fact; and where they do not doubt of the law, they ought to do so." The court afterwards submitted to the jury, in the

words of Lord Chief Justice Holt, in *Tutchin's case*, 14 How-
ell's State Trials, 1128, above cited, the question whether the
words set forth were libellous.    And Zenger was acquitted by
the jury.    17 Howell's State Trials, 675, 706, 716, 722.

Upon the trial in the Supreme Court of the State of New
York, in 1803, of an indictment for a libel on the President of
the United States, Chief Justice Lewis instructed the jury,
among other things, that the question of libel or no libel was
an inference of law from the fact, and that the law as laid
down by Lord Mansfield in *The Dean of St. Asaph's case* was
the law of this State.    The defendant was convicted, and
brought the question of the correctness of these instructions
before the full court in 1804, upon a motion for a new trial.
*People* v. *Croswell*, 3 Johns. Cas. 337, 341, 342.

Alexander Hamilton was of counsel for the defendant.
Two reports of his argument upon that motion have come
down to us, the one in 3 Johns. Cas. 352–362, the other in a
contemporary pamphlet of the speeches in the case, pp. 62–78,
and reprinted in 7 Hamilton's Works, (ed. 1886,) 336–373.
But the most compact and trustworthy statement of his posi-
tion upon the general question, unsurpassed for precision and
force by anything on the subject to be found elsewhere, is in
three propositions upon his brief, (7 Hamilton's Works, 335,
336,) read by him in recapitulating his argument, (3 Johns.
Cas. 361, 362,) which were as follows :

"That in the general distribution of powers in our system
of jurisprudence, the cognizance of law belongs to the court,
of fact to the jury ; that as often as they are not blended, the
power of the court is absolute and exclusive.    That in civil
cases it is always so, and may rightfully be so exerted.    That
in criminal cases, the law and fact being always blended, the
jury, for reasons of a political and peculiar nature, for the
security of life and liberty, is entrusted with the power of de-
ciding both law and fact.

"That this distinction results : 1, from the ancient forms of
pleading in civil cases, none but special pleas being allowed in
matter of law; in criminal, none but the general issue ; 2,
from the liability of the jury to attaint in civil cases, and the

general power of the court as its substitute in granting new trials, and from the exemption of the jury from attaint in criminal cases, and the defect of power to control their verdicts by new trials, the test of every legal power being its capacity to produce a definitive effect, liable neither to punishment nor control.

"That in criminal cases, nevertheless, the court are the constitutional advisers of the jury in matter of law; who may compromit their conscience by lightly or rashly disregarding that advice, but may still more compromit their consciences by following it, if exercising their judgments with discretion and honesty they have a clear conviction that the charge of the court is wrong."

The court was equally divided in opinion, Judge Kent (afterwards Chief Justice and Chancellor) and Judge Thompson being in favor of a new trial, and Chief Justice Lewis and Judge Livingston against it. Judge Kent drew up a careful opinion, in which he reviewed the leading English authorities, and from which the following passages are taken:

"In every criminal case, upon the plea of not guilty, the jury may, and indeed they must, unless they choose to find a special verdict, take upon themselves the decision of the law, as well as the fact, and bring in a verdict as comprehensive as the issue; because, in every such case, they are charged with the deliverance of the defendant from the crime of which he is accused." "The law and fact are so involved, that the jury are under an indispensable necessity to decide both, unless they separate them by a special verdict. This right in the jury to determine the law as well as the fact has received the sanction of some of the highest authorities in the law."

"But while the *power* of the jury is admitted, it is denied that they can *rightfully* or *lawfully* exercise it, without compromitting their consciences, and that they are bound implicitly, in all cases, to receive the law from the court. The law must, however, have intended, in granting this power to a jury, to grant them a lawful and rightful power, or it would have provided a remedy against the undue exercise of it. The true criterion of a legal power is its capacity to produce

a definitive effect, liable neither to censure nor review. And the verdict of not guilty, in a criminal case, is, in every respect, absolutely final. The jury are not liable to punishment, nor the verdict to control. No attaint lies, nor can a new trial be awarded. The exercise of this power in the jury has been sanctioned, and upheld in constant activity, from the earliest ages." 3 Johns. Cas. 366–368.

"The result from this view is, to my mind, a firm conviction that this court is not bound by the decisions of Lord Raymond and his successors. By withdrawing from the jury the consideration of the essence of the charge, they render their function nugatory and contemptible. Those opinions are repugnant to the more ancient authorities which had given to the jury the power, and with it the right, to judge of the law and fact, when they were blended by the issue, and which rendered their decisions, in criminal cases, final and conclusive. The English bar steadily resisted those decisions, as usurpations on the rights of the jury. Some of the judges treated the doctrine as erroneous, and the Parliament, at last, declared it an innovation, by restoring the trial by jury, in cases of libel, to that ancient vigour and independence, by which it had grown so precious to the nation, as the guardian of liberty and life, against the power of the court, the vindictive persecution of the prosecutor, and the oppression of the government.

"I am aware of the objection to the fitness and competency of a jury to decide upon questions of law, and, especially, with a power to overrule the directions of the judge. In the first place, however, it is not likely often to happen, that the jury will resist the opinion of the court on the matter of law. That opinion will generally receive its due weight and effect; and in civil cases it can, and always ought to be ultimately enforced by the power of setting aside the verdict. But in human institutions, the question is not, whether every evil contingency can be avoided, but what arrangement will be productive of the least inconvenience. And it appears to be most consistent with the permanent security of the subject, that in criminal cases the jury should, after receiving the

advice and assistance of the judge as to the law, take into their consideration all the circumstances of the case, and the intention with which the act was done, and to determine upon the whole, whether the act done be, or be not, within the meaning of the law. This distribution of power, by which the court and jury mutually assist, and mutually check each other, seems to be the safest, and consequently the wisest arrangement, in respect to the trial of crimes. The constructions of judges, on the intention of the party, may often be (with the most upright motives) too speculative and refined, and not altogether just in their application to every case. Their rules may have too technical a cast, and become, in their operation, severe and oppressive. To judge accurately of motives and intentions does not require a master's skill in the science of the law. It depends more on a knowledge of the passions, and of the springs of human action, and may be the lot of ordinary experience and sagacity." 3 Johns. Cas. 375, 376.

In April, 1805, the legislature of New York passed a statute, very like Fox's Libel Act, declaring that upon an indictment or information for libel, "the jury who shall try the same shall have a right to determine the law and the fact, under the direction of the court, in like manner as in other criminal cases." And the reporter notes that, "in consequence of this declaratory statute, the court, in August term, 1805, (no motion having been made for judgment on the verdict,) unanimously awarded a new trial in the above cause." 3 Johns. Cas. 412, 413.

In 1825, Judge Walworth (afterwards Chancellor) presiding in a court of oyer and terminer, at trials of indictments for murder, instructed the jury "that in criminal trials, they had a right to decide both as to the law and the facts of the case; that the court was bound, by the oaths of office of its judges, honestly and impartially to decide the questions of law arising in the case, and state them to the jury; but the jury had a right to disregard the decision of the court upon questions of law, especially in favor of life, if they were fully satisfied that such decision was wrong." *People* v. *Thayers*, 1 Parker's Crim. Cas. 595, 598; *People* v. *Videto*, Id. 603, 604.

In New Jersey, by Provincial laws of 1676 and 1681, it was not only enacted " that the trial of all causes, civil and criminal, shall be heard and decided by the verdict of twelve honest men of the neighbourhood ;" but also " that there shall be, in every court, three justices or commissioners, who shall sit with the twelve men of the neighbourhood, with them to hear all causes, and to assist the said twelve men of the neighbourhood in case of law ; and that they the said justices shall pronounce such judgment as they shall receive from, and be directed by the said twelve men, in whom only the judgment resides, and not otherwise ; and, in case of their neglect and refusal, that then one of the twelve, by consent of the rest, pronounce their own judgment as the justices should have done." Leaming & Spicer's Laws, pp. 396–398, 428, 429. How far, under the present constitution and laws of the State, juries, in criminal cases, have the right to decide the law for themselves, disregarding the instructions of the judge presiding at the trial, does not appear to be settled. *State* v. *Jay*, (1871) 5 Vroom, (34 N. J. Law,) 368 ; *Drake* v. *State*, (1890) 24 Vroom, (53 N. J. Law,) 23.

In Pennsylvania, Chief Justice Sharswood said : " No one acquainted with the life of the founder of this Commonwealth can entertain any doubt of his opinion or that of his friends and followers " — referring to the case of Penn and Mead before the Recorder of London, and to that of Bushell upon *habeas corpus*, cited in the earlier part of this opinion, as well as to the argument of Andrew Hamilton, of Philadelphia, " certainly the foremost lawyer of the Colonies," in *Zenger's case*, above cited. And the right of the jury in criminal cases to decide both law and fact (notwithstanding opinions to the contrary, expressed near the end of the last century by a judge of a county court in charging juries and grand juries, Addison's Reports, pp. 160, 257, and Charges, pp. 57–63) was long and generally recognized in that State. *Kane* v. *Commonwealth*, 89 Penn. St. 522, 526 ; Testimony of William Lewis and Edward Tilghman, Chase's Trial, (Evans's ed.) 20, 21, 27.

In Maryland, the provision of the constitution of 1851, art.

10, sec. 5, repeated in the constitutions of 1864, art. 12, sec. 4, and of 1867, art. 15, sec. 5, that "in the trial of all criminal cases the jury shall be the judges of law as well as fact," has been held by the Court of Appeals to be merely declaratory of the preëxisting law, but not applicable to the question of the constitutionality of a statute. 1 Charters and Constitutions, 858, 885, 918; *Franklin* v. *State*, (1858) 12 Maryland, 236, 249. As has been said by that court, speaking by Mr. Justice Alvey, "the jury are made the *judges* of law as well as of fact, in the trial of criminal cases, under the constitution of this State; and any instruction given by the court, as to the law of the *crime*, is but advisory, and in no manner binding upon the jury, except in regard to questions as to what shall be considered as evidence." *Wheeler* v. *State*, (1875) 42 Maryland, 563, 570. See also *Broll* v. *State*, (1876) 45 Maryland, 356; *Bloomer* v. *State*, (1878) 48 Maryland, 521, 538, 539; *World* v. *State*, (1878) 50 Maryland, 49, 55.

In Virginia, the doctrine that the jury, upon the general issue in a criminal case, had the right, as well as the power, to decide both law and fact, appears to have been generally admitted and practised upon until 1829, when, to the surprise of the bar, it was treated by the Court of Appeals as doubtful. *Dance's case*, (1817) 5 Munf. 349, 363; *Baker* v. *Preston*, (1821) Gilmer, 235, 303; *Davenport* v. *Commonwealth*, (1829) 1 Leigh, 588, 596; *Commonwealth* v. *Garth*, (1831) 3 Leigh, 761, 770; 3 Rob. Va. Pract. (1839) c. 23.

In Georgia, Alabama and Louisiana, the right of the jury was formerly recognized. *McGuffie* v. *State*, (1855) 17 Georgia, 497, 513; *McDaniel* v. *State*, (1860) 30 Georgia, 853; *State* v. *Jones*, (1843) 5 Alabama, 666; *Bostwick* v. *Gasquet*, (1836) 10 Louisiana, 80; *State* v. *Scott*, (1856) 11 La. Ann. 429; *State* v. *Jurche*, (1865) 17 La. Ann. 71.

The Ordinance of the Continental Congress of 1787 for the government of the Northwest Territory provided that the inhabitants of the Territory should always be entitled to the benefit of the trial by jury, and that no man should be deprived of his liberty or property, but by the judgment of his peers or the law of the land; and the constitutions of the

State of Indiana in 1816, and of Illinois in 1818 and 1848, contained similar provisions. 1 Charters and Constitutions, 431, 446, 447, 466, 500, 501.

In Indiana, the Supreme Court, under the constitution of 1816, having alternately denied and affirmed the right of the jury in criminal cases to decide the law, the people, by the constitution which took effect in November, 1851, declared that "in all criminal cases whatever the jury shall have the right to determine the law and the facts ; " and this right has since been maintained by that court, even when the constitutionality of a statute was involved. *Townsend* v. *State,* (1828) 2 Blackford, 151 ; *Warren* v. *State,* (1836) 4 Blackford, 150 ; *Carter* v. *State,* (May, 1851) 2 Indiana, 617 ; 1 Charters and Constitutions, 513, 526 ; *Lynch* v. *State,* (1857) 9 Indiana, 541 ; *McCarthy* v. *State,* (1877) 56 Indiana, 203 ; *Hudelson* v. *State,* (1883) 94 Indiana, 426 ; *Blake* v. *State,* (1891) 130 Indiana, 203.

In Illinois, the criminal code having declared that "juries in all cases shall be judges of the law and the fact," the jury at a trial for murder, after being out for some time, came into court, and through their foreman suggested that a juror maintained that he was competent to judge of the correctness of the instructions of the judge as the juror's opinion of the law might dictate. The judge instructed the jury that they must take the law as laid down to them by the court, and could not determine for themselves whether the law so given to them was or was not the law. Upon exception to the instructions, the Supreme Court of Illinois, speaking by Judge Breese, granted a new trial and said: "Being judges of the law and the fact, they are not bound by the law as given to them by the court, but can assume the responsibility of deciding, each juror for himself, what the law is. If they can say, upon their oaths, that they know the law better than the court, they have the power so to do. If they are prepared to say the law is different from what it is declared to be by the court, they have a perfect legal right to say so, and find the verdict according to their own notions of the law. It is a matter between their consciences and their God, with which no power can interfere." *Fisher* v. *People,* (1860) 23 Illinois, 283, 294. See

also *Mullinix* v. *People*, (1875) 76 Illinois, 211; *Spies* v. *Illinois*, (1887) 122 Illinois, 1, 252.

In the Declaration of Rights unanimously adopted October 14, 1774, by the Continental Congress, of which John Adams, Samuel Adams, Roger Sherman, John Jay, Samuel Chase, George Washington and Patrick Henry were members, it was resolved "that the respective Colonies are entitled to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law." 1 Journals of Congress, 28.

The Constitution of the United States, as framed in 1787 and adopted in 1788, ordained, in art. 3, sect. 3, that " the trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the State where the said crime shall have been committed;" and, in the Fifth, Sixth and Seventh Amendments adopted in 1791, "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb," "nor be deprived of life, liberty or property, without due process of law;" "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law;" and "in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of the United States, than according to the rules of the common law."

Within six years after the Constitution was established, the right of the jury, upon the general issue, to determine the law as well as the fact in controversy, was unhesitatingly and unqualifiedly affirmed by this court, in the first of the very few trials by jury ever had at its bar, under the original jurisdiction conferred upon it by the Constitution.

That trial took place at February term, 1794, in *Georgia* v. *Brailsford*, 3 Dall. 1, which was an action at law by the State of Georgia against Brailsford and others, British subjects. The pleadings, as appears by the files of this court, were as

follows: The declaration was in assumpsit for money had and received; the defendants pleaded *non assumpsit,* and "put themselves upon the country;" and the replication was, " And the said State of Georgia also putteth herself upon the country." The action, as the report shows, was brought to recover moneys received by the defendants upon a bond of a citizen of Georgia to them, to which the State of Georgia claimed title under an act of confiscation passed by that State in 1782, during the Revolutionary War, under circumstances which were agreed to be as stated in the suit in equity between the same parties, reported in 2 Dall. 402, 415. After the case had been argued for four days to the court and jury, Chief Justice Jay, on February 7, 1794, as the report states, "delivered the following charge:"

" This cause has been regarded as of great importance, and doubtless it is so. It has accordingly been treated by the counsel with great learning, diligence and ability; and on your part it has been heard with particular attention. It is, therefore, unnecessary for me to follow the investigation over the extensive field into which it has been carried; you are now, if ever you can be, completely possessed of the merits of the cause.

" The facts comprehended in the case are agreed; the only point that remains is to settle what is the law of the land arising from those facts; and on that point, it is proper that the opinion of the court should be given. It is fortunate on the present, as it must be on every occasion, to find the opinion of the court unanimous; we entertain no diversity of sentiment; and we have experienced no difficulty in uniting in the charge which it is my province to deliver."

The Chief Justice, after stating the opinion of the court in favor of the defendants upon the questions of law, proceeded as follows: " It may not be amiss, here, gentlemen, to remind you of the good old rule, that on questions of fact it is the province of the jury, on questions of law it is the province of the court to decide. But it must be observed that by the same law, which recognizes this reasonable distribution of jurisdiction, you have nevertheless a right to take upon your-

selves to judge of both, and to determine the law as well as
the fact in controversy.    On this, and on every other occasion,
however, we have no doubt you will pay that respect which is
due to the opinion of the court; for, as on the one hand, it is
presumed that juries are the best judges of facts; it is, on the
other hand, presumable that the court are the best judges of
law.    But still both objects are lawfully within your power
of decision."

Then, after telling the jury that they should not be influ-
enced by a consideration of the comparative situations and
means of the parties, he concluded the charge thus: "Go,
then, gentlemen, from the bar, without any impressions of
favor or prejudice for the one party or the other; weigh well
the merits of the case, and do on this, as you ought to do on
every occasion, equal and impartial justice."    The jury, after
coming into court, and requesting and receiving further ex-
planations of the questions of law, returned a verdict for the
defendants, without going again from the bar.    3 Dall. 3-5.

The report shows that, in a case in which there was no con-
troversy about the facts, the court, while stating to the jury
its unanimous opinion upon the law of the case, and reminding
them of " the good old rule, that on questions of fact it is the
province of the jury, on questions of law it is the province of
the court to decide," expressly informed them that "by the
same law, which recognizes this reasonable distribution of
jurisdiction," the jury " have nevertheless a right to take upon
themselves to judge of both, and to determine the law as well
as the fact in controversy."

The court at that time consisted of Chief Justice Jay, and
Justices Cushing, Wilson, Blair, Iredell and Paterson, all of
whom, (as appears by its records,) except Justice Iredell, were
present at the trial.

The doubts which have been sometimes expressed of the
accuracy of Mr. Dallas's report are unfounded, as is apparent
from several considerations.    He was of counsel for the plain-
tiff.    The court was then held at Philadelphia; and there is
no reason to doubt that the practice mentioned in the preface
to his first volume containing reports of cases in the courts of

Pennsylvania only, by which "each case, before it was sent to the press, underwent the examination of the presiding judge of the court in which it was determined," was continued in his succeeding volumes containing "reports of cases ruled and adjudged in the several courts of the United States, and of Pennsylvania, held at the seat of the Federal Government." The charge contains internal evidence of being reported verbatim, and has quotation marks at the end, although they are omitted at the beginning. And the charge, in the same words, with the prefix that it "was delivered by Jay, Chief Justice, on the 7th of February, in the following terms," is printed in Dunlop and Claypole's American Daily Advertiser of February 17, 1794.

That was not a criminal case, nor a suit to recover a penalty; had it been, it could hardly have been brought within the original jurisdiction of this court. *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265, 294, 295. But it was a suit by a State to assert a title acquired by an act of its legislature in the exercise of its sovereign powers in time of war against private individuals. As the charge of the court dealt only with the case before it, without any general discussion, it does not appear whether the opinion expressed as to the right of the jury to determine the law was based upon a supposed analogy between such a suit and a prosecution for crime, or upon the theory, countenanced by many American authorities of the period, that at the foundation of the Republic, as in early times in England, the right of the jury extended to all cases, civil or criminal, tried upon the general issue.

However that may have been, it cannot be doubted that this court, at that early date, was of opinion that the jury had the right to decide for themselves all matters of law involved in the general issue in criminal cases; and it is certain that in the century that has since elapsed there has been no judgment or opinion of the court, deciding or intimating, in any form, that the right does not appertain to the jury in such cases. And the opinions expressed by individual justices of the court upon the subject, near the time of the decision in *Georgia* v. *Brailsford*, or within forty years afterwards, of

which any reports are known to exist, tend, more or less directly, to affirm this right of the jury. That there is not a greater accumulation of evidence to this effect is easily accounted for when it is remembered that. comparatively few reports of trials were printed, and that the right of the jury was considered to be so well settled, that it was seldom controverted in practice, or specially noticed in reporting trials.

Upon the trial of Gideon Henfield in the Circuit Court of the United States for the District of Pennsylvania in 1793, before Justices Wilson and Iredell and Judge Peters, for illegal privateering, Mr. Justice Wilson told the jury that "the questions of law coming into joint consideration with the facts, it is the duty of the court to explain the law to the jury and give it to them in direction;" and, after expressing the unanimous opinion of the court upon the questions of law involved in the case, " concluded by remarking that the jury, in a general verdict, must decide both law and fact, but that this did not authorize them to decide it as they pleased; they were as much bound to decide by law as the judges: the responsibility was equal upon both." Wharton's State Trials, 49, 84, 87, 88.

This statement that the jury, in a general verdict, must decide both law and fact, and were as much bound to decide by law as the judges, and under an equal responsibility, is quite inconsistent with the idea that the jury were bound to accept the explanation and direction of the court in matter of law as controlling their judgment. That neither Mr. Justice Wilson nor Mr. Justice Iredell entertained any such idea is conclusively disproved by authentic and definite statements of their views upon the question.

Mr. Justice Iredell, speaking for himself only, in a civil case before this court at February term, 1795, said : " It will not be sufficient, that the court might charge the jury to find for the defendant; because, though the jury will generally respect the sentiments of the court on points of law, they are not bound to deliver a verdict conformably to them." *Bingham* v. *Cabot*, 3 Dall. 19, 33 [see Appendix].

Mr. Justice Wilson, in his lectures on law at the Philadel-

phia College in 1790 and 1791, discussing the maxim that the judges determine the law and the jury determine the fact, made the following observations:

" This well known division between their provinces has been long recognized and established. When the question of law and the question of fact can be decided separately, there is no doubt or difficulty in saying by whom the separate decision shall be made. If, between the parties litigant, there is no contention concerning the facts, but an issue is joined upon a question of law, as is the case in a demurrer, the determination of this question, and the trial of this issue, belongs exclusively to the judges. On the other hand, when there is no question concerning the law, and the controversy between the parties depends entirely upon a matter of fact, the determination of this matter, brought to an issue, belongs exclusively to the jury. But, in many cases, the question of law is intimately and inseparably blended with the question of fact; and when this is the case, the decision of one necessarily involves the decision of the other. When this is the case, it is incumbent on the judges to inform the jury concerning the law; and it is incumbent on the jury to pay much regard to the information, which they receive from the judges. But now the difficulty in this interesting subject begins to press upon us. Suppose that, after all the precautions taken to avoid it, a difference of sentiment takes place between the judges and the jury, with regard to a point of law; suppose the law and the fact to be so closely interwoven, that a determination of one must, at the same time, embrace the determination of the other; suppose a matter of this description to come in trial before a jury — what must the jury do? The jury must do their duty and their whole duty; they must decide the law as well as the fact. This doctrine is peculiarly applicable to criminal cases; and from them, indeed, derives its peculiar importance."

" Juries undoubtedly may make mistakes: they may commit errors: they may commit gross ones. But changed as they constantly are, their errors and mistakes can never grow into a dangerous system. The native uprightness of their sentiments will not be bent under the weight of precedent and

authority.   The *esprit de corps* will not be introduced among them ; nor will society experience from them those mischiefs of which the *esprit de corps*, unchecked, is sometimes productive.   Besides, their mistakes and their errors, except the venial ones on the side of mercy made by traverse juries, are not without redress.   The court, if dissatisfied with their verdict, have the power, and will exercise the power, of granting a new trial.   This power, while it prevents or corrects the effects of their errors, preserves the jurisdiction of juries unimpaired.   The cause is not evoked before a tribunal of another kind ; a jury of the country — an abstract, as it has been called, of the citizens at large — summoned, selected, impanelled, and sworn as the former, must still decide."

"One thing, however, must not escape our attention.   In the cases and on the principles which we have mentioned, jurors possess the power of determining legal questions.   But they must determine them according to law."  2 Wilson's Works, 371-374.

In closing his discussion of the subject, and reviewing the principles before stated, he said : "With regard to the law in criminal cases, every citizen, in a government such as ours, should endeavor to acquire a reasonable knowledge of its principles and rules, for the direction of his conduct, when he is called to obey, when he is called to answer, and when he is called to judge.   On questions of law, his deficiencies will be supplied by the professional directions of the judges, whose duty and whose business it is professionally to direct him. For, as we have seen, verdicts, in criminal cases, generally determine the question of law, as well as the question of fact. Questions of fact, it is his exclusive province to determine. With the consideration of evidence unconnected with the question which he is to try, his attention will not be distracted; for everything of that nature, we presume, will be excluded by the court.   The collected powers of his mind, therefore, will be fixed, steadily and without interruption upon the issue which he is sworn to try.   This issue is an issue of fact."   2 Wilson's Works, 386, 387.

These passages, taken together, clearly evince the view of

Mr. Justice Wilson to have been that, while an issue of law is to be tried and decided by the judge, an issue of fact, although it involve a question of law blended and interwoven with the fact, is to be tried and decided by the jury, after receiving the instructions of the court; and, if a difference of opinion arise between them and the judge upon the question of law, it is their right and their duty to decide the law as well as the fact; that a reasonable knowledge of the principles and rules of law is important to the citizen, not only " when he is called. to obey " as an individual, and " when he is called to answer" as a defendant, but also " when he is called to judge" as a juror; and that the general issue which the jury in a criminal case are sworn to try, and which it is their duty to decide, even if it involve questions of law, is " an issue of fact."

The provision of section 3 of the act of Congress of July 14, 1798, c. 74, for punishing seditious libels, that " the jury who shall try the cause shall have a right to determine the law and the fact, under the direction of the court, as in other cases," (1 Stat. 597,) is a clear and express recognition of the right of the jury in all criminal cases to determine the law and the fact. The words " direction of the court," as here used, like the words " opinion and directions " in the English libel act, do not oblige the jury to adopt the opinion of the court, but are merely equivalent to instruction, guide or aid, and not to order, command or control. The provision is in affirmance of the general rule, and not by way of creating an exception; and the reason for inserting it probably was that the right of the jury had been more often denied by the English courts in prosecutions for seditious libels than in any other class of cases.

Upon the trial of John Fries for treason, in 1800, before Mr. Justice Chase and Judge Peters, in the Circuit Court of the United States for the District of Pennsylvania, the district attorney having quoted from English law books definitions of actual and constructive treason, Mr. Justice Chase said: " They may, any of them, be read to the jury, and the decisions thereupon — not as authorities whereby we are bound, but as the opinions and decisions of men of great

legal learning and ability. But, even then, the court would attend carefully to the time of the decision, and in no case must it be binding upon our juries." Trials of Fries, 180. And he afterwards instructed the jury as follows: " It is the duty of the court in this case, and in all *criminal* cases, to state to the jury their opinion of the *law* arising on the facts; but the jury are to decide, on the present and in all *criminal* cases, *both the law and the facts*, on their consideration of the *whole* case." And he concluded his charge in these words: " If, upon consideration of the whole matter, (*law* as well as *fact*,) you are *not* fully satisfied, without any doubt, that the prisoner is guilty of the treason charged in the indictment, you will find him not guilty; but if upon the consideration of the whole matter, (*law* as well as *fact*,) you are convinced that the prisoner is guilty of the treason charged in the indictment, you will find him guilty." These instructions, with words italicized as above, are in the exhibits annexed by Mr. Justice Chase to his answer upon the impeachment in 1805. Chase's Trial, (Evans's ed.,) appx. 44, 45, 48. See also Trials of Fries, 196, 199 ; Wharton's State Trials, 634, 636.

In 1806, at the trial of William S. Smith in the Circuit Court of the United States for the District of New York, upon an indictment for setting out a military expedition against a foreign country at peace with the United States, Judge Talmadge said to the jury : " You have heard much said upon the right of a jury to judge of the law as well as the fact." " The law is now settled that this right appertains to a jury in all criminal cases. They unquestionably may determine upon all the circumstances, if they will take the responsibility and hazard of judging incorrectly upon questions of mere law. But the jury is not therefore above the law. In exercising this right, they attach to themselves the character of judges, and as such are as much bound by the rules of legal decision as those who preside upon the bench." Trials of Smith and Ogden, 236, 237.

In prosecutions in the District Court of the United States for the District of Massachusetts, under the act of Congress of January 8, 1808, c. 8, laying an embargo, (2 Stat. 453,)

Samuel Dexter argued the unconstitutionality of the act to the jury, and they acquitted the defendant, although the evidence of the violation of the act was clear, and the court held, and instructed the jury, that the act was constitutional. 3 Bradford's Hist. Mass. 108, note; 3 Webster's Works, 329, 330; *United States* v. *The William,* 2 Hall's Law Journal, 255; Sigma's Reminiscences of Dexter, 60, 61.

In 1812, at the trial of an action in the District Court of the United States for the District of New York, upon a bond given under the Embargo Act, Judge Van Ness instructed the jury that "this was in its nature and essence, though not in its form, a penal or criminal action; and they were, therefore, entitled to judge both of the law and the fact." *United States* v. *Poillon,* 1 Carolina Law Repository, 60, 66.

In 1815, at the trial of John Hodges in the Circuit Court of the United States for the District of Maryland for treason, William Pinkney, for the defendant, argued: "The best security for the rights of individuals is to be found in the trial by jury. But the excellence of this institution consists in its exclusive power. The jury are here judges of law and fact, and are responsible only to God, to the prisoner, and to their own consciences." And Mr. Justice Duvall of this court, after expressing his opinion upon the law of the case, said, with the concurrence of Judge Houston: "The jury are not bound to conform to this opinion, because they have a right, in all criminal cases, to decide on the law and the facts." Hall's Law Tracts, III, 19, 28; *S. C.,* 2 Wheeler Crim. Cas. 477, 478, 485.

In 1830, George Wilson and James Porter were jointly indicted in the Circuit Court of the United States for the District of Pennsylvania for robbing the mail, and were tried separately. In *Wilson's case,* Mr. Justice Baldwin, Judge Hopkinson concurring, after expressing to the jury an opinion upon the law, said to them: "We have thus stated to you the law of this case under the solemn duties and obligations imposed on us, under the clear conviction that in doing so we have presented to you the true test by which you will apply the evidence to the case; but you will distinctly understand

that you are the judges both of the law and fact in a criminal case, and are not bound by the opinion of the court; you may judge for yourselves, and if you should feel it your duty to differ from us, you must find your verdict accordingly. At the same time, it is our duty to say, that it is in perfect accordance with the spirit of our legal institutions that courts should decide questions of law, and the juries of facts; the nature of the tribunals naturally leads to this division of duties, and it is better, for the sake of public justice, that it should be so: when the law is settled by a court, there is more certainty than when done by a jury, it will be better known and more respected in public opinion. But if you are prepared to say that the law is different from what you have heard from us, you are in the exercise of a constitutional right to do so. We have only one other remark to make on this subject — by taking the law as given by the court, you incur no moral responsibility; in making a rule of your own, there may be some danger of a mistake." Baldwin, 78, 99, 100. And in *Porter's case*, the court, after repeating and explaining these instructions, said to the jury, "In a word, gentlemen, decide on the law and the facts as best comports with your sense of duty to the public and yourselves; act on the same rule under which you would be guided as a magistrate or judge on the oath and responsibility of office. Then you will not err." Baldwin, 108, 109.

Some justices of this court, indeed, who, as already shown, admitted the general right of juries in criminal cases to decide both law and fact, denied their right to pass upon the constitutionality of a statute, apparently upon the ground that the question of the existence or the validity of a statute was for the court alone. Paterson, J., in *Lyon's case*, (1798) Wharton's State Trials, 333, 336; Chase, J., in *Callender's case*, (1800) Wharton's State Trials, 688, 710–718; Baldwin, J., in *United States* v. *Shive*, (1832) Baldwin, 510. It may well be doubted whether such a distinction can be maintained. *Commonwealth* v. *Anthes*, 5 Gray, 185, 188–192, 262; Cooley Const. Lim. (6th ed.) 567. But the point does not arise in this case.

Upon the general question of the right of the jury in criminal cases to decide the law, Chief Justice Marshall's opinion is of so great weight, that the evidence of that opinion, although perhaps not so satisfactory as might be wished, should not be disregarded.

At the trial of Aaron Burr in the Circuit Court of the United States for the District of Virginia in 1808, for treason by levying war in Blennerhassett's Island, Chief Justice Marshall, in delivering an opinion upon the order of evidence, said: "Levying of war is a fact, which must be decided by the jury. The court may give general instructions on this, as on every other question brought before them, but the jury must decide upon it as compounded of fact and law." 1 Burr's Trial, 470.

In the charge, drawn up by the Chief Justice in writing, and read by him to the jury, speaking of the question of the defendant's constructive presence, he said: "Had he not arrived in the island, but had taken a position near enough to coöperate with those on the island, to assist them in any act of hostility, or to aid them if attacked, the question whether he was constructively present would be a question compounded of law and fact, which would be decided by the jury, with the aid of the court, so far as respected the law." 2 Burr's Trial, 429.

The Chief Justice took occasion to demonstrate that questions of the admissibility of evidence must be decided by the court only, saying: "No person will contend that, in a civil or criminal case, either party is at liberty to introduce what testimony he pleases, legal or illegal, and to consume the whole term in details of facts unconnected with the particular case. Some tribunal, then, must decide on the admissibility of testimony. The parties cannot constitute this tribunal; for they do not agree. The jury cannot constitute it; for the question is whether they shall hear the testimony or not. Who then but the court can constitute it? It is of necessity the peculiar province of the court to judge of the admissibility of testimony." p. 443.

Referring to his previous opinion on the order of testimony,

he remarked: "It was said that levying war is an act compounded of law and fact; of which the jury aided by the court must judge. To that declaration the court still adheres." p. 444. And he concluded his charge thus: "The jury have now heard the opinion of the court on the law of the case. They will apply that law to the facts, and will find a verdict of guilty or not guilty as their own consciences may direct." p. 445.

It thus appears that Chief Justice Marshall, while affirming that a question of the admissibility of evidence must be decided by the court, because that question was whether the jury should hear the evidence or not, yet told the jury, (in many forms, but of the same meaning,) that upon a question compounded of fact and law, involved in the issue submitted to the jury, the court might give general instructions, but the jury must decide it; that such a question, compounded of law and fact, would be decided by the jury, with the aid of the court so far as respects the law; that of such a question the jury, aided by the court, must judge; and that, having " heard the opinion of the court on the law of the case, they will apply," not " that opinion," but " that law," namely, the law as to which the court had expressed its opinion, " to the facts, and will find a verdict of guilty or not guilty as their own consciences may direct." The manifest intent and effect of all this was that the jury, after receiving the aid of the instructions of the court on matter of law, must judge of and determine, as their own consciences might direct, every question compounded of law and fact, involved in the general issue of guilty or not guilty.

The meaning of the charge in this respect, as carefully prepared by the Chief Justice, is too clear to be controlled by the words attributed to him by the reporter, on page 448, in the course of a desultory conversation with counsel in regard to other defendants, after the jury had found Burr not guilty.

In 1817, before Chief Justice Marshall, in the same court, there was tried an indictment for piracy, by robbing on the high seas, under the act of Congress of April 30, 1790, c. 9,

§ 8, (1 Stat. 113; Rev. Stat. § 5372,) enacting that any person committing upon the high seas " murder or robbery, or any other offence which, if committed within the body of a county, would by the laws of the United States be punishable with death," should be deemed a pirate.    Mr. Upshur, for the defendant, argued " that it was necessary that robbery should first be made punishable with death by the laws of the United States, when committed on land, before it could amount to piracy, when committed on the sea, which was not now the case; that Judge Johnson had so decided in South Carolina, although a contrary decision had been subsequently pronounced by Judge Washington; that the conflict between these two learned judges proved that the law was at least doubtful; that the jury in a capital case were judges, as well of the law as the fact, and were bound to acquit, where either was doubtful."    Chief Justice Marshall, (far from denying this right of the jury,) " being appealed to for the interpretation of the law, decided that it was not necessary that robbery should be punishable by death when committed on land, in order to amount to piracy if committed on the ocean; but as two judges (for both of whom the court entertained the highest respect) had pronounced opposite decisions upon it, the court could not undertake to say that it was not at least doubtful."    And the case being submitted to the jury, they returned a verdict of not guilty.    *United States* v. *Hutchings*, 2 Wheeler Crim. Cas. 543, 547, 548.[1]

It may be added that Mr. Conway Robinson, well known to many members of this court and this bar as a most careful and accurate, as well as learned lawyer, informed Mr. Justice Blatchford and myself that he well remembered hearing Chief Justice Marshall, presiding at the trial of a criminal case in the Circuit Court of the United States at Richmond, after expressing, at the request of the counsel on both sides, his own

---

[1] The decision of Mr. Justice Johnson, there referred to, does not appear to have been reported.    But the decision of Mr. Justice Washington is reported as *United States* v. *Jones*, (1813) 3 Wash. C. C. 209; and the point was decided the same way by this court, Mr. Justice Johnson dissenting, in *United States* v. *Palmer*, (1818) 3 Wheat. 610.

opinion upon the construction of the statute on which the indictment was founded, conclude his charge to the jury by telling them that, as it was a criminal case, they were not bound to accept his opinion, but had the right to decide both the law and the fact.

Until nearly forty years after the adoption of the Constitution of the United States, not a single decision of the highest court of any State, or of any judge of a court of the United States, has been found, denying the right of the jury upon the general issue in a criminal case to decide, according to their own judgment and consciences, the law involved in that issue — except the two or three cases, above mentioned, concerning the constitutionality of a statute. And it cannot have escaped attention that many of the utterances, above quoted, maintaining the right of the jury, were by some of the most eminent and steadfast supporters of the Constitution of the United States, and of the authority of the national judiciary.

It must frankly be admitted that in more recent times, beginning with the judgment of the Court of Appeals of Kentucky in 1830 in *Montee* v. *Commonwealth,* 3 J. J. Marsh. 132, and with Mr. Justice Story's charge to a jury in 1835 in *United States* v. *Battiste,* 2 Sumner, 240, the general tendency of decision in this country (as appears by the cases cited in the opinion of the majority of the court) has been against the right of the jury, as well in the courts of the several States, including many States where the right was once established, as in the Circuit Courts of the United States. The current has been so strong, that in Massachusetts, where counsel are admitted to have the right to argue the law to the jury, it has yet been held that the jury have no right to decide it, and it has also been held, by a majority of the court, that the legislature could not constitutionally confer upon the jury the right to determine, against the instructions of the court, questions of law involved in the general issue in criminal cases; and in Georgia and in Louisiana, a general provision in the constitution of the State, declaring that "in criminal cases the jury shall be judges of the law and fact," has been held not to authorize them to decide the law against the instruc-

tions of the court.  *Commonwealth* v. *Porter*, 10 Met. 263;
*Commonwealth* v. *Anthes*, 5 Gray, 185; *Ridenhour* v. *State*,
75 Georgia, 382; *State* v. *Tisdale*, 41 La. Ann. 338.

But, upon the question of the true meaning and effect of
the Constitution of the United States in this respect, opinions
expressed more than a generation after the adoption of the
Constitution have far less weight than the almost unanimous
voice of earlier and nearly contemporaneous judicial declara-
tions and practical usage.  *Stuart* v. *Laird*, 1 Cranch, 299.
And, upon this constitutional question, neither decisions of
state courts, nor rulings of lower courts of the United States,
can relieve this court from the duty of exercising its own
judgment.  *Liverpool Steam Co.* v. *Phenix Ins. Co.*, 129 U. S.
397, 443; *Andrews* v. *Hovey*, 124 U. S. 694, 717; *The J. E.
Rumbell*, 148 U. S. 1, 17.

The principal grounds which have been assigned for deny-
ing the right of a jury, upon the general issue in a criminal
case, to determine the law against the instructions of the
court, have been that the old maxim, *ad quæstionem juris
respondent judices, ad quæstionem facti respondent juratores*,
is of universal application ; that judges are more competent
than juries to determine questions of law ; and that decisions
upon such questions in one case become precedents to guide
the decision of subsequent cases.

But the question what are the rights, in this respect, of
persons accused of crime, and of juries summoned and em-
panelled to try them, under the Constitution of the United
States, is not a question to be decided according to what the
court may think would be the wisest and best system to be
established by the people or by the legislature; but what, in
the light of previous law, and of contemporaneous or early
construction of the Constitution, the people did affirm and
establish by that instrument.

This question, like all questions of constitutional construc-
tion, is largely a historical question; and it is for that reason,
that it has seemed necessary, at the risk of tediousness, to
review and to state at some length the principal authorities
upon the subject in England and America.   The reasons to be

derived from these authorities for maintaining the contested right of the jury in this regard may be summed up as follows:

By the Great Charter of England, and by the American constitutions, it is not by a decision of the ablest or most learned judges, that the citizen can be deprived of his life or liberty; but it is only by "the judgment of his peers," or, in the ancient phrase, "by his country," a jury taken from the body of the people.

The ancient forms, used before and since the adoption of the Constitution, and hardly altered at the present day, in which the general issue is pleaded by the accused, and submitted to the jury, are significant. When the defendant, being arraigned upon the indictment, pleads not guilty, he is asked by the clerk of the court, "How will you be tried?" and answers, "By God and my country." The oath administered to each juror as he is called and accepted is, "You shall well and truly try and true deliverance make between our sovereign lord the King" (or the State or People, or the United States, as the case may be,) "and the prisoner at the bar, whom you shall have in charge, according to your evidence. So help you God." And after the jury have been empanelled, the clerk reads the indictment to the jury, and then says to them: "To this indictment the prisoner at the bar has pleaded not guilty, and for trial has put himself upon the country, which country you are. You are now sworn to try the issue. If he is guilty, you will say so; if not guilty, you will say so; and no more."

In the maxim, *ad quæstionem juris respondent judices, ad quæstionem facti respondent juratores,* the word *quæstio* denotes an issue joined by the pleadings of the parties, or otherwise stated on the record, for decision by the appropriate tribunal. Issues of law, so joined or stated, are to be decided by the judge; issues of fact, by the jury. If the accused demurs to the indictment, an issue of law only is presented, which must be decided and judgment rendered thereon by the court, and by the court alone. But if the accused pleads generally not guilty, the only issue joined is an issue of fact, to be decided by the jury, and by the jury only — unless the jury

choose to return a special verdict, so that the record may present an issue of mere law, to be decided by the court. After a verdict of guilty, again, any defence in matter of law, apparent on the record, is to be considered and decided by the court on motion in arrest of judgment.

The maxim has no application to rulings, in the course of the trial, upon the admission of evidence. The object of rules as to the competency of evidence is to prevent trials from being unduly prolonged, and the consideration and decision of the merits of the real issue on trial obscured, embarrassed or prejudiced by the introduction of irrelevant matter. The question whether particular evidence shall be admitted or not is one to be decided before the evidence can be submitted to the jury at all, and must be, as it always is, decided by the court; and this is so, whether the admissibility of the evidence depends, as it usually does, upon a question of law only ; or depends largely or wholly upon a question of fact, as whether dying declarations were made under immediate apprehension of death, or whether a confession of the defendant was voluntary, or whether sufficient foundation has been laid for the introduction of secondary evidence, or for permitting a witness to testify as an expert. To infer, because the court must decide questions of law upon which the admissibility of evidence depends, that the jury have no right to determine the matter of law involved in the general issue, would be as unwarrantable as to infer, because the court must decide questions of fact upon which the admissibility of evidence depends, that the jury have no right to decide the matter of fact involved in that issue.

The jury to whom the case is submitted, upon the general issue of guilty or not guilty, are entrusted with the decision of both the law and the facts involved in that issue. To assist them in the decision of the facts, they hear the testimony of witnesses; but they are not bound to believe the testimony. To assist them in the decision of the law, they receive the instructions of the judge; but they are not obliged to follow his instructions.

Upon the facts, although the judge may state his view of

.them, the duty of decision remains with the jury, and cannot be thrown by them upon the judge. Upon the law involved in the issue of fact, the jury, if they are satisfied to do so, may let it be decided by the judge, either by returning a general verdict in accordance with his opinion as expressed to them, or by returning a special verdict reciting the facts as found by them, and, by thus separating the law from the facts, put the question of law in a shape to be decided by the court in a more formal manner. But the whole issue, complicated of law and fact, being submitted to their determination, the law does not require them to separate the law from the fact, but authorizes them to decide both at once by a general verdict.

The duty of the jury, indeed, like any other duty imposed upon any officer or private person by the law of his country, must be governed by the law, and not by wilfulness or caprice. The jury must ascertain the law as well as they can. Usually they will, and safely may, take it from the instructions of the court. But if they are satisfied on their consciences that the law is other than as laid down to them by the court, it is their right and their duty to decide by the law as they know or believe it to be.

In the forcible words of Chief Justice Vaughan, in *Bushell's case*, Vaughan, 135, 148, already quoted: "A man cannot see by another's eye, nor hear by another's ear; no more can a man conclude or infer the thing to be resolved by another's understanding or reasoning; and though the verdict be right the jury give, yet they, being not assured it is so from their own understanding, are forsworn, at least *in foro conscientiæ;*" or, as more briefly stated in another report of the same case, "The jury are perjured if the verdict be against their own judgment, although by directions of the court, for their oath binds them to their own judgment." T. Jones, 13, 17.

It is universally conceded that a verdict of acquittal, although rendered against the instructions of the judge, is final, and cannot be set aside; and consequently that the jury have the legal power to decide for themselves the law involved in the general issue of guilty or not guilty.

It has sometimes, however, been asserted that, although they have the power, they have no right to do this, and that it is their legal, or at least their moral duty, in every criminal case, to obey and follow the judge's instructions in matter of law.  The suggestion is not that the jury ought not to exercise the power wrongfully, but that they ought not to exercise it at all; that, whether the instructions of the court be right or wrong, just or arbitrary, according to the law as known of all men, or directly contrary to it, the jury must be controlled by and follow them.

But a legal duty which cannot in any way, directly or indirectly, be enforced, and a legal power, of which there can never, under any circumstances, be a rightful and lawful exercise, are anomalies — "the test of every legal power" (as said by Alexander Hamilton, and affirmed by Chancellor Kent, in *People* v. *Croswell*, 3 Johns. Cas. 362, 368, above cited) "being its capacity to produce a definite effect, liable neither to punishment nor control"—"to censure nor review."

It has been said that, if not their legal duty, it is their moral duty, to follow the instructions of the court in matter of law.  But moral duties, as distinguished from legal duties, are governed not by human, but by divine laws; and the oath which the jurors in a capital case severally take to the Almighty Judge is to well and truly try and true deliverance make between the government and the prisoner at the bar, according to their evidence — not according to the instructions of the court — and to decide whether, in their own judgment and conscience, the accused is guilty or not guilty.

The rules and principles of the criminal law are, for the most part, elementary and simple, and easily understood by jurors taken from the body of the people.  As every citizen or subject is conclusively presumed to know the law, and cannot set up his ignorance of it to excuse him from criminal responsibility for offending against it, a jury of his peers must be presumed to have equal knowledge, and, especially after being aided by the explanation and exposition of the law by counsel and court, to be capable of applying it to the facts as proved by the evidence before them.

On the other hand, it is a matter of common observation, that judges and lawyers, even the most upright, able and learned, are sometimes too much influenced by technical rules; and that those judges who are wholly or chiefly occupied in the administration of criminal justice are apt, not only to grow severe in their sentences, but to decide questions of law too unfavorably to the accused.

The jury having the undoubted and uncontrollable power to determine for themselves the law as well as the fact by a general verdict of acquittal, a denial by the court of their right to exercise this power will be apt to excite in them a spirit of jealousy and contradiction, and to prevent them from giving due consideration and weight to the instructions of the court in matter of law.

In civil cases, doubtless, since the power to grant new trials has become established, the court, being authorized to grant one to either party as often as the verdict appears to be contrary to the law, or to the evidence, may, in order to avoid unnecessary delay, whenever in its opinion the evidence will warrant a verdict for one party only, order a verdict accordingly. *Pleasants* v. *Fant*, 22 Wall. 116; *Hendrick* v. *Lindsay*, 93 U. S. 143; *Schofield* v. *Chicago &c. Railway*, 114 U. S. 615.

But a person accused of crime has a twofold protection, in the court and the jury, against being unlawfully convicted. If the evidence appears to the court to be insufficient in law to warrant a conviction, the court may direct an acquittal. *Smith* v. *United States*, 151 U. S. 50. But the court can never order the jury to convict; for no one can be found guilty, but by the judgment of his peers.

Decisions of courts, and especially of courts of last resort, upon issues of law, such as are presented by a demurrer or by a special verdict, become precedents to govern judicial decisions in like cases in the future. But the verdict of a jury, upon the general issue of guilty or not guilty, settles nothing but the guilt or innocence of the accused in the particular case; and the issue decided is so complicated of law and fact, blended together, that no distinct decision of any question of law is recorded or made. The purpose of establishing trial by jury was not to

obtain general rules of law for future use, but to secure impartial justice between the government and the accused in each case as it arose.

As said by Alexander Hamilton in *Croswell's case*, above cited, the power of deciding both law and fact upon the general issue in a criminal case is entrusted to the jury, "for reasons of a political and peculiar nature, for the security of life and liberty." 7 Hamilton's Works, 335; 3 Johns. Cas. 362. The people, by a jury drawn from among themselves, take part in every conviction of a person accused of crime by the government; and the general knowledge that no man can be otherwise convicted increases the public confidence in the justice of convictions, and is a strong bulwark of the administration of the criminal law.

By the law of England, as has been seen, a person accused of murder or other felony, and convicted before a single judge, could not move for a new trial, and had no means of reviewing his instructions to the jury upon any question of law, unless the judge himself saw fit to reserve the question for decision by higher judicial authority.

Although Mr. Justice Story, in *United States* v. *Gibert*, (1834) 2 Sumner, 19, thought that a new trial could not be granted to a man convicted of murder by a jury, because to do so would be to put him twice in jeopardy of his life, yet the Circuit Courts of the United States may doubtless grant new trials after conviction, though not after acquittal, in criminal cases tried before them. *United States* v. *Fries*, (1799) 3 Dall. 515; *United States* v. *Porter*, (1830) Baldwin, 78, 108; *United States* v. *Harding*, (1846) 1 Wall. Jr. 127; *United States* v. *Keen*, (1839) 1 McLean, 429; *United States* v. *Macomb*, (1851) 5 McLean, 286; *United States* v. *Smith*, (1855) 3 Blatchford, 255; *United States* v. *Williams*, (1858) 1 Clifford, 5. But the granting or refusal of a new trial rests wholly in the discretion of the court in which the trial was had, and cannot be reviewed on error. *Blitz* v. *United States*, 153 U. S. 308.

By the Constitution of the United States, this court has appellate jurisdiction in such cases, and under such regulations

only, as Congress may prescribe; and under the legislation of Congress before 1889, no rulings or instructions of a Circuit Court of the United States in a criminal case could be brought to this court, unless upon a certificate of division of opinion between two judges presiding at the trial. A person accused of murder or other crime might be tried, and, if convicted by the jury, sentenced before a single judge, perhaps only a district judge; and if so convicted and sentenced, there was no way in which the judge's rulings could be reviewed by this court. Act of April 29, 1802, c. 31, § 6, 2 Stat. 159; Rev. Stat. §§ 651, 697; *United States* v. *More*, 3 Cranch, 159, 172; *Ex parte Kearney*, 7 Wheaton, 38, 42; *Ex parte Gordon*, 1 Black, 503; *Ex parte Yarbrough*, 110 U. S. 651; *United States* v. *Perrin*, 131 U. S. 55.

By the acts of February 6, 1889, c. 113, § 6, and March 3, 1891, c. 517, indeed, a person convicted of murder or other infamous crime in a Circuit Court of the United States may bring the case to this court by writ of error, although the United States cannot do so. 25 Stat. 656; 26 Stat. 827; *United States* v. *Sanges*, 144 U. S. 310. But the right of review, so given to this court, cannot supersede or impair the rightful power of the jury under the Constitution, in deciding the issue submitted to them at the trial.

There may be less danger of prejudice or oppression from judges appointed by the President elected by the people, than from judges appointed by a hereditary monarch. But, as the experience of history shows, it cannot be assumed that judges will always be just and impartial, and free from the inclination, to which even the most upright and learned magistrates have been known to yield — from the most patriotic motives, and with the most honest intent to promote symmetry and accuracy in the law — of amplifying their own jurisdiction and powers at the expense of those entrusted by the Constitution to other bodies. And there is surely no reason why the chief security of the liberty of the citizen, the judgment of his peers, should be held less sacred in a republic than in a monarchy.

Upon these considerations, we are of opinion that the learned judge erred in instructing the jury that they were

bound to accept the law as stated in his instructions, and that this error requires the verdict to be set aside as to both defendants.

But we are also of opinion that the judge committed an equally grave error in declining to submit to the jury matter of fact involved in the issue on trial.

It clearly appears, that the jury were not only instructed that, while they had the physical power to return a verdict of manslaughter, yet they must take the law from the court; but that they were also instructed that, if they found these defendants guilty of any crime, it could not properly be manslaughter. There can be no doubt upon the record before us, and it is admitted in the opinion of the majority of the court, that the judge denied the right of the jury to find as a fact that the defendants had been guilty of manslaughter only. Nor can there be any doubt that the jury were thereby led to agree upon a verdict of guilty of murder, to the great prejudice of the defendants.

In a case in which the jury, as appeared by their inquiries of the court, were in doubt whether the homicide committed by the defendants was murder or manslaughter, to instruct them that they could not acquit the defendants of murder and convict them of manslaughter only, but must find them guilty of murder or of no crime at all, does not appear to us to differ, in principle, from instructing them, in a case in which there was no question of manslaughter, that there was no evidence upon which they could acquit the defendant, or do anything but convict him of murder.

This is not a case in which the judge simply declined to give any instructions upon a question of law which he thought did not arise upon the evidence. But, after giving sufficient definitions, both of murder and of manslaughter, he peremptorily told them that they could not convict the defendants of manslaughter only, and thereby denied the right of the jury to pass upon a matter of fact necessarily included in the issue presented by the general plea of not guilty.

This appears to us to be inconsistent with settled principles of law, and with well considered authorities.

As said by this court, speaking by Mr. Justice Clifford, "In criminal cases, the true rule is that the burden of proof never shifts; that in all cases, before a conviction can be had, the jury must be satisfied from the evidence, beyond a reasonable doubt, of the affirmative of the issue presented in the accusation that the defendant is guilty in the manner and form as charged in the indictment." *Lilienthal's tobacco* v. *United States*, 97 U. S. 237, 266. See also *Potter* v. *United States*, 155 U. S. 438; *Commonwealth* v. *McKie*, 1 Gray, 61; *People* v. *Downs*, 123 N. Y. 558.

Upon the trial of an indictment under a statute of the Territory of Utah, establishing two degrees of murder, with different punishments, the jury were instructed, "that an atrocious and dastardly murder has been committed by some person is apparent, but in your deliberations you should be careful not to be influenced by any feeling;" and the defendant was found guilty of murder in the first degree, and sentenced to death. This court, upon writ of error to the Supreme Court of the Territory, reversed the judgment, because that instruction must have been regarded by the jury as "an instruction that the offence, by whomsoever committed, was murder in the first degree; whereas it was for the jury, having been informed as to what was murder, by the laws of Utah, to say whether the facts made a case of murder in the first degree or murder in the second degree;" and "the prisoner had the right to the judgment of the jury upon the facts, uninfluenced by any direction from the court as to the weight of the evidence." *Hopt* v. *Utah*, 110 U. S. 574, 582, 583.

As stated by the Chief Justice, speaking for this court, in a case of murder, decided at the last term, "It is true that in the Federal courts the rule that obtains is similar to that in the English courts, and the presiding judge may, if in his discretion he think proper, sum up the facts to the jury; and if no rule of law is incorrectly stated, and the matters of fact are ultimately submitted to the determination of the jury, it has been held that an expression of opinion upon the facts is not reviewable on error. *Rucker* v. *Wheeler*, 127 U. S. 85,

93; *Lovejoy* v. *United States*, 128 U. S. 171, 173. But he should take care to separate the law from the facts, and to leave the latter in unequivocal terms to the judgment of the jury as their true and peculiar province. *M'Lanahan* v. *Universal Ins. Co.*, 1 Pet. 170, 182. As the jurors are the triers of facts, expressions of opinion by the court should be so guarded as to leave the jury free in the exercise of their own judgments." *Starr* v. *United States*, 153 U. S. 614, 624, 625.

The Supreme Court of Michigan, speaking by Chief Justice Cooley, in setting aside a verdict of murder, in a case in which the homicide was admitted, and the only question was whether it was murder or manslaughter, said: "The trial of criminal cases is by a jury of the country, and not by the court. The jurors, and they alone, are to judge of the facts, and weigh the evidence. The law has established this tribunal, because it is believed that, from its numbers, the mode of their selection, and the fact that the jurors come from all classes of society, they are better calculated to judge of motives, weigh probabilities, and take what may be called a common sense view of a set of circumstances, involving both act and intent, than any single man, however pure, wise and eminent he may be. This is the theory of the law, and, as applied to criminal accusations, it is eminently wise, and favorable alike to liberty and to justice. But to give it full effect, the jury must be left to weigh the evidence, and to examine the alleged motives by their own tests. They cannot properly be furnished for this purpose with balances which leave them no discretion, but which, under certain circumstances, will compel them to find a malicious intent when they cannot conscientiously say they believe such an intent to exist." *People* v. *Garbutt*, 17 Michigan, 9, 27.

In *The King* v. *Burdett*, cited in the earlier part of this opinion, Mr. Justice Best said: "If there was any evidence, it was my duty to leave it to the jury, who alone could judge of its weight. The rule that governs a judge as to evidence applies equally to the case offered on the part of the defendant, and that in support of the prosecution. It will hardly be contended, that if there was evidence offered on the part of

the defendant, a judge would have a right to take on himself to decide on the effect of the evidence, and to withdraw it from the jury. Were a judge so to act, he might, with great justice, be charged with usurping the privileges of the jury, and making a criminal trial, not what it is by our law, a trial by jury, but a trial by the judge." And Lord Tenterden, in words peculiarly applicable to the present case, said: "In cases of murder, it rarely happens that the eye of any witness sees the fatal blow struck, or the poisonous ingredients poured into the cup. In drawing an inference or conclusion from facts proved, regard must always be had to the nature of the particular case, and the facility that appears to be afforded, either of explanation or contradiction." "The premises may lead more or less strongly to the conclusion, and care must be taken not to draw the conclusion hastily; but in matters that regard the conduct of men, the certainty of mathematical demonstration cannot be required or expected; and it is one of the peculiar advantages of our jurisprudence, that the conclusion is to be drawn by the unanimous judgment and conscience of twelve men, conversant with the affairs and business of life, and who know, that where reasonable doubt is entertained, it is their duty to acquit; and not of one or more lawyers, whose habits might be suspected of leading them to the indulgence of too much subtilty and refinement." 4 B. & Ald. 95, 121, 161, 162.

The care with which courts of the highest authority have guarded the exclusive right of the jury to decide the facts in a criminal case is exemplified in a very recent case before the Judicial Committee of the Privy Council, in which, under section 423 of the Criminal Law Amendment Act, 1883, (46 Vict. c. 17,) authorizing the judge presiding at a criminal trial to reserve questions of law for review, with a proviso that no judgment should be reversed "unless for some substantial wrong or other miscarriage of justice," the questions reserved were whether certain evidence had been improperly admitted, and whether, if the court came to the conclusion that it was not legally admissible, the court could nevertheless affirm the judgment if it was of opinion that, independently of that evi-

dence, there was sufficient evidence to support the conviction, and that the accused was guilty of the offence with which he was charged. It was argued that if, without the inadmissible evidence, there was evidence sufficient to sustain the verdict and to show that the accused was guilty, there had been no substantial wrong or miscarriage of justice in affirming a judgment upon the conviction by the jury. But Lord Chancellor Herschell, speaking for six other law lords as well as for himself, held otherwise, and said : " It is obvious that the construction contended for transfers from the jury to the court the determination of the question whether the evidence — that is to say, what the law regards as evidence — establishes the guilt of the accused. The result is that in a case where the accused has the right to have his guilt or innocence tried by a jury, the judgment passed upon him is made to depend not on the finding of the jury, but on the decision of the court. The judges are in truth substituted for the jury, the verdict becomes theirs and theirs alone, and is arrived at upon a perusal of the evidence without any opportunity of seeing the demeanour of the witnesses and weighing the evidence with the assistance which this affords. It is impossible to deny that such a change of the law would be a very serious one, and that the construction which their lordships are invited to put upon the enactment would gravely affect the much cherished right of trial by jury in criminal cases." *Makin* v. *Attorney General*, (1894) App. Cas. 57, 69, 70.

By section 1035 of the Revised Statutes, "in all criminal causes, the defendant may be found guilty of any offence the commission of which is necessarily included in that with which he is charged in the indictment, or may be found guilty of an attempt to commit the offence so charged : Provided, that such attempt shall be itself a separate offence." The defendants, therefore, under this indictment, might have been convicted of murder, or of manslaughter, or of an assault only. Having pleaded not guilty, they could only be convicted by the verdict of a jury. If a homicide was committed with malice, it was murder ; if committed without malice, but without any lawful excuse, it was manslaughter only. The

burden of proof at every step was upon the government. In order to obtain a conviction of murder, it must prove beyond a reasonable doubt that the homicide was committed with malice. The question whether, taking into consideration all the circumstances in evidence, as well as the credibility of the several witnesses, there was a criminal homicide, and, if so, whether it was murder or only manslaughter, could be finally decided against the defendants by the jury alone. According to the settled practice of the courts of the United States, indeed, the court, even in a criminal case, may express its opinion to the jury upon any question of fact, provided that it submits that question to the jury for decision. But the court in this case went beyond this, and distinctly told the jury that, if they found that a felonious homicide had been committed by the defendants, they could not properly convict them of manslaughter, which was equivalent to saying that, if any crime was proved, it was murder. This instruction had the direct tendency, and the actual effect, of inducing the jury to return a verdict of guilty of the higher crime. The jury may have been satisfied that the defendants killed the mate without lawful excuse, and may yet have had doubts whether, upon so much of the testimony as they believed to be true, the killing was malicious and therefore murder. That doubts had occurred to the jurors upon this point is shown by the questions addressed by one of them to the presiding judge. The judge dispelled those doubts, not by further defining the distinction as matter of law between murder and manslaughter, but by telling the jury that as matter of fact they could not convict the defendants of manslaughter only. He thus substituted his own decision upon this question of fact for the decision of the jury, to which the defendants were entitled under the Constitution and laws of the United States. If all the justices of this court should concur in the opinion of the judge below upon this question of fact, still the defendants have not had the question decided by the only tribunal competent to do so under the Constitution and laws.

For the twofold reason that the defendants, by the instructions given by the court to the jury, have been deprived, both

of their right to have the jury decide the law involved in the general issue, and also of their right to have the jury decide every matter of fact involved in that issue, we are of opinion that the judgment should be reversed, and the case remanded with directions to order a new trial as to both defendants.